IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No. 15-cv-01857-KLM

MICHAEL ELLIS, ALLEN J. WIESENFELD, and PETER TUCKER, Individually and on
Behalf of All Others Similarly Situated,

      Plaintiff,

v.

THE SPECTRANETICS CORPORATION, SCOTT DRAKE, and GUY A. CHILDS,

      Defendants.

_____

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

_____

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ...................................................................... 6

III.    PARTIES ......................................................................................................... 6

IV.     CONFIDENTIAL WITNESS FOUNDATION ALLEGATIONS ..................... 8

        A.     Confidential Witness Number One (CW1) ........................................... 8

        B.     Confidential Witness Number Two (CW2) ......................................... 11

        C.     Confidential Witness Number Three (CW3) ...................................... 12

        D.     Confidential Witness Number Four (CW4) ........................................ 12

        E.     Confidential Witness Number Five (CW5) ......................................... 13

        F.     Confidential Witness Number Six (CW6) ........................................... 13

        G.     Confidential Witness Number Seven (CW7) ...................................... 14

V.      SUPPORTING BACKGROUND ALLEGATIONS ....................................... 15

        A.     Spectranetics' Business and Background ............................................ 15

        B.     Seeking Further VI Growth, Spectranetics Acquires AngioScore, Inc. ............... 16

        C.     Spectranetics Announces Approval of "New" ISR Indication ........................... 17

        D.     Spectranetics' VI Products Faced Stiff Competition Prior to and During the Class
               Period, Which Was Only Heightened by the Introduction of DCBs .................... 18

        E.     Spectranetics' Supposed Banner Sales and Growth During the Class Period ...... 20

VI.     AS CONFIRMED BY MULTIPLE FORMER EMPLOYEES, DEFENDANTS RELIED
        UPON AN ILLICIT CHANNEL STUFFING SCHEME TO SHOW GROWTH AND
        MEET MARKET EXPECTATIONS ............................................................. 21

A.    Former Employees Confirm Rampant Channel Stuffing Since Before the Start of the Class Period ................................................................................................. 22

B.    Defendants' Channel Stuffing Scheme Starts to Unravel as Defendants Are Forced to Admit Q4 2014 Channel Stuffing, Which Defendants Falsely Portray as an Unusual One-Time Event ................................................................................ 35

C.    Defendants' Channel Stuffing Continues to Impact the Company's Financial Results In Q2 2015 and Beyond ........................................................................... 39

VII.   SPECTRANETICS' FINANCIAL RESULTS WERE MATERIALLY MISLEADING AND VIOLATED APPLICABLE GAAP, SEC RULES, AND ITS OWN STATED POLICIES ................................................................................................................. 43

A.    Obligations Imposed by the Securities Laws and U.S. GAAP ........................... 43

B.    The Company Systematically Violated Its Stated Revenue Recognition Policy as well as GAAP Revenue Recognition Principles ................................................... 44

C.    The Company's Violation of Disclosure Obligations Imposed by GAAP and SEC Regulations ........................................................................................................ 50

D.    Spectranetics' Disclosures in its SEC Filings About Increasing Days Sales Outstanding Were Materially Misleading ........................................................... 55

VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ........................................................................................ 60

A.    Materially False and Misleading Statements and Omissions Concerning Q4 2013 and FY 2013 Results ............................................................................................ 60

    1.    Q4 2013 Press Release and Form 8-K ...................................................... 60

    2.    Q4 2013 Form 10-K ................................................................................. 61

    3.    Q4 2013 Conference Call ......................................................................... 62

    4.    Q4 2013 Analyst Reaction ........................................................................ 63

B.    Materially False and Misleading Statements and Omissions Concerning Q1 2014 Results .............................................................................................................. 64

    1.    Q1 2014 Press Release and Form 8-K ...................................................... 64

    2.    Q1 2014 Form 10-Q ................................................................................. 65

3.      Q1 2014 Conference Call........................................................................ 66

4.      Q1 2014 Analyst Reaction ..................................................................... 67

C.      Materially False and Misleading Statements and Omissions Concerning Q2 2014 Results.................................................................................................................... 67

1.      Q2 2014 Press Release and Form 8-K ................................................... 67

2.      Q2 2014 Form 10-Q............................................................................... 68

3.      Q2 2014 Conference Call........................................................................ 69

4.      Q2 2014 Analyst Reaction ..................................................................... 72

D.      Materially False and Misleading Statements and Omissions Concerning Q3 2014 Results.................................................................................................................... 72

1.      Q3 2014 Press Release and Form 8-K ................................................... 72

2.      Q3 2014 Form 10-Q............................................................................... 73

3.      Q3 2014 Conference Call........................................................................ 74

4.      Q3 2014 Analyst Reaction ..................................................................... 77

E.      Defendants Provide Materially False and Misleading 2015 Guidance in the December 4, 2014 Press Release and the Company's First-Ever "Analyst and Investor Day".......................................................................................................... 78

F.      Materially False and Misleading Statements and Omissions Concerning Q4 2014 Results and Defendants' Reiteration of Overall 2015 Guidance ......................... 80

1.      Q4 2014 Press Release and Form 8-K ................................................... 80

2.      Q4 2014 Conference Call........................................................................ 83

3.      Q4 2014 Analyst Reaction ..................................................................... 85

G.      Materially False and Misleading Statements and Omissions in the 2014 Form 10-K ...................................................................................................................... 87

H.      Defendants Announce Disappointing, Yet Materially False and Misleading Q1 2015 Results & Revised 2015 Guidance ............................................................. 88

1.      Q1 2015 Press Release and Form 8-K ................................................... 88

2. Q1 2015 Conference Call.................................................................. 90

3. Q1 2015 Analyst Reaction ........................................................ 96

4. Q1 2015 Form 10-Q.................................................................. 97

I. May 2015 Bank of America Merrill Lynch Health Care Conference .................. 99

IX. END-OF-CLASS PERIOD DISCLOSURES – THE RISK MATERIALIZES............. 100

X. MATERIALLY FALSE AND MISLEADING SOX CERTIFICATIONS ................... 100

XI. ADDITIONAL SCIENTER AND CONTROL PERSON ALLEGATIONS................. 104

A. Defendants Had To Present the Façade of a Financially Sound and Growing Company to Support its May 2014 Note Offering............................................... 108

B. The Timing and Amount of Defendant's Class Period Stock Sales ................... 109

C. Bonuses and Other Incentive-Based Compensation Further Add to the Inference of Scienter ...................................................................................... 109

1. Performance Bonus Plan (Short-Term Cash Compensation) ................. 110

2. Long-Term Equity-Based Incentive Compensation (RSUs and PSUs).. 110

3. Special Bonus Award.............................................................. 112

XII. CLASS ACTION ALLEGATIONS .................................................... 112

XIII. LOSS CAUSATION.................................................................... 114

XIV. PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)......... 116

XV. NO SAFE HARBOR ................................................................... 118

XVI. LEGAL CLAIMS ASSERTED ....................................................... 123

XVII. PRAYER FOR RELIEF ............................................................... 123

XVIII. JURY TRIAL DEMANDED .......................................................... 123

Lead Plaintiff Allen J. Wiesenfeld ("Lead Plaintiff" or "Wiesenfeld") and Plaintiffs Michael Ellis ("Ellis") and Peter Tucker ("Tucker") (together with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys.

The investigation included, *inter alia*, a review of Securities and Exchange Commission ("SEC") filings made by Defendant The Spectranetics Corporation ("Spectranetics" or the "Company"), securities analysts' reports and advisories about the Company, press releases, conference calls, and other public statements issued by the Company and/or individual defendants, media reports about the Company, interviews of individuals with knowledge of the events described herein, and other publicly available information concerning the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of Spectranetics securities between February 27, 2014 and July 23, 2015, inclusive (the "Class Period"), against Spectranetics and certain of its officers and/or directors, for violations of the Securities Exchange Act of 1934 (the "Securities Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Spectranetics develops, manufactures, markets, and distributes medical devices used in minimally invasive procedures within the cardiovascular system. The Company's products are used to cross (or enter), prepare, and treat arterial blockages in the legs and heart (the Company's "Vascular Intervention" or "VI" business), as well as to remove pacemaker and

defibrillator cardiac leads (the Company's "Lead Management" or "LM" business). This litigation primarily concerns the Company's Vascular Intervention business, which consists of two major sub-segments: Peripheral and Coronary.

3.      During the Class Period, Defendants were keenly focused on promoting growth in the Company's Vascular Intervention business. To that end, Defendants went on a promotional blitzkrieg during the fall of 2014 and into early 2015, attending numerous analyst, investor, and healthcare conferences to boast supposed record growth in the Company's VI segment, and falsely projecting substantially increasing growth into 2015. During these conferences, and all throughout the Class Period, Defendants misled the market as to the level of VI product sales and growth, both overstating the Company's sales and revenue figures for each quarter from the fourth quarter of 2013 through the first quarter of 2015, and materially overstating the Company's sales, revenue, and earnings guidance for 2015. Defendants' efforts were successful and pushed the Company's stock price to levels never before reached since the Company went public in 1992.

4.      To create the façade of a strongly growing business, Defendants routinely and systematically engaged in extremely aggressive quarter-end bulk selling of certain VI products at deep volume discounts in order to create the (false) appearance that the Company had met growing sales targets. In so doing, as detailed herein, Defendants recognized sales and revenue in violation of Generally Accepted Accounting Principles ("GAAP") and the Company's own stated policies. Furthermore, because Spectranetics' sales forecasts were materially misleading and unreliable due to this illicit and undisclosed channel stuffing scheme,  Defendants issued false and materially misleading sales, revenue, and earnings guidance for 2015.

5.      Unbeknownst to investors, Defendants' aggressive quarter-end selling was

widespread and systemic, and most often appeared as massive quarter-end "bulk sales" offered on heavy price discounts – often 50% or more – in order to move product. Defendants pushed excess supply onto the Company's customers in order to create a misleading impression as to Spectranetics' financial health and growth in the face of stiff competition, including new competition posed by the introduction of drug coated balloon ("DCB") technology that hit the market in the fall of 2014.

6.      As detailed herein, Defendants themselves engaged directly in high-pressure sales tactics to force quarter-end bulk sales, and demanded that sales representatives complete large amounts of quarter-end bulk sales in order to move product and meet sales targets. In so doing, the Company entered each quarter "in the hole" and would need to engage in still more quarter-end bulk sales to continue to meet targets – thus creating a fragile cycle chronically dependent upon deep quarter-end volume discounts, and all undisclosed to investors. Defendants also failed to disclose that such sales were often offered on extended payment terms, that the practice often resulted in product expiring on customer shelves, and that Spectranetics allowed returns of product – including returns of expired product and other returns in violation of the Company's own stated policies. Moreover, Defendants ignored employee concerns regarding these practices and the financial and accounting ramifications thereof.

7.      In engaging in such sales practices, Defendants knew or recklessly disregarded: (i) that the Company's sales and revenue figures reported for Q4 2013, Q1-Q4 2014, and Q1 2015 were false and materially misleading, (ii) that these practices caused the Company to issue false and materially misleading sales figures in violation of GAAP, and (iii) material risks that Defendants' sales practices created an inherent "air pocket" in sales, leaving the Company extremely vulnerable to missing sales and revenue targets in the face of any change in economic

or competitive pressure.

8.     Indeed, Defendants knew or recklessly disregarded that their quarter-end bulk sales on heavy discount were ultimately unsustainable, and that, as a result of these risky sales practices, they had created a veritable "house of cards" that was susceptible to collapse when faced with any intervening competitive sales pressure. Relatedly, Defendants knew of yet ignored material risks to the Company's VI sales posed by the introduction of DCBs to the market in late 2014 and early 2015. In addition to their illicit channel stuffing, Defendants' knowing disregard of the risks posed by this technology further rendered Spectranetics' 2015 sales, revenue and earnings targets false and materially misleading.

9.     The extent to which Spectranetics relied on heavily discounted, end-of-quarter bulk sales to meet its sales and earnings guidance was concealed from investors prior to and during the Class Period, as were the risks to its business arising from those sales. In particular, increased competition posed by new DCB technology, coupled with the fact that numerous customers had bloated inventories of Spectranetics products at the end of 2014 due to previously completed bulk sales, made Spectranetics particularly vulnerable to missing its aggressive earnings and growth forecasts in 2015. Despite this, Defendants *raised* Spectranetics' guidance and told investors that the Company was "rock solid" and poised for growth.

10.     Thus, throughout the Class Period, Defendants violated the federal securities laws by disseminating materially false and misleading statements to the investing public regarding the Company's sales, revenue, and earnings. As a result of Defendants' misstatements and omissions as alleged herein, Spectranetics stock traded at artificially inflated prices during the Class Period, reaching an all-time record high of $37.04 per share in intraday trading on March 18, 2015. During the Class Period, Defendants reaped millions of dollars from selling shares of the

Company's artificially inflated stock and from incentive-based compensation tied to the Company's financial performance, particularly to the Company's total revenues.

11.    However, the risks created by Defendants' illicit sales practices eventually materialized, catching up with the Company and causing it to miss forecasts in 2015, shortly after DCBs hit the market. These risks created by Defendants' actions first partially materialized on April 23, 2015, when Defendants announced disappointing Q1 2015 results, citing "weakness" in the Vascular Intervention business segment, and revised the Company's 2015 revenue guidance to the lower end of the previously-provided range. On this disclosure and partial materialization of risk, shares of Spectranetics stock dropped $8.18 per share (over 23%), from a closing price of $34.70 per share on April 23, 2015, to close at $26.52 per share on April 24, 2015. Still, the price drop likely would have been even more severe had the news of April 23 not been tempered by Defendants' simultaneous announcement of false positive news relating to the Company's VI business, including their assurances that key VI revenue would be on-target for the remainder of 2015.

12.    Yet another blow, and further materialization of Defendants' concealed risks, appeared upon the Company's disclosure of further disappointing Q2 2015 results on July 23, 2015, revealing that the Company's VI business – its most important business segment – did not meet targets, as Defendants had assured investors on April 23. As a result, Defendants further revised the Company's 2015 guidance downward. As the revelations set forth herein were absorbed by the market, the Company's stock was hammered by massive sales, sending the stock price plummeting to close at $16.30 per share on July 24, 2015, marking an ultimate decline of over 55% of shareholder value from the Class Period high.

## II.      JURISDICTION AND VENUE

13.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C.§§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15.      Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Spectranetics' principal executive offices are located within this Judicial District.

16.      In connection with the conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.      PARTIES

17.      Plaintiff Wiesenfeld purchased Spectranetics securities during the Class Period as set forth in the certification previously filed with this Court, and incorporated by reference herein, and was damaged thereby as the result of Defendants' wrongdoing as alleged in this complaint.

18.      Plaintiff Ellis purchased Spectranetics securities during the Class Period as set forth in the certification previously filed with this Court, and incorporated by reference herein, and was damaged thereby as the result of Defendants' wrongdoing as alleged in this complaint.

19.     Plaintiff Tucker purchased Spectranetics securities during the Class Period as set forth in the certification concurrently filed herewith, and incorporated by reference herein, and was damaged thereby as the result of Defendants' wrongdoing as alleged in this complaint.

20.     Defendant Spectranetics is a Delaware corporation with its principal executive offices located at 9965 Federal Drive, Colorado Springs, Colorado 80921.

21.     Defendant Scott Drake ("Drake) was, since 2011 and at all relevant times herein, Chief Executive Officer ("CEO") and a director of Spectranetics. According to the Company, under Drake's leadership, revenue grew from $117.9 million in 2010 to a reported $204.9 million in 2014.

22.     Defendant Guy A. Childs ("Childs") was, at all relevant times Chief Financial Officer ("CFO"), of Spectranetics from January 2003 until approximately September 2015, having previously announced his plan to step down in March 2015.

23.     Defendants Drake and Childs are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants

are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     CONFIDENTIAL WITNESS FOUNDATION ALLEGATIONS

24.     Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, including information in part obtained from former employees of Spectranetics. Information provided by the former employees is reliable and credible because: (a) each of the witnesses worked at Spectranetics during the Class Period; (b) each witness stated that she/he had personal knowledge of the information provided; (c) the witnesses' job titles and responsibilities show that they had personal knowledge of the information provided; (d) the witness accounts corroborate one another; and (e) the witness accounts are corroborated by other information alleged herein.

### A.     Confidential Witness Number One ("CW1")

25.     CW1 was a Sales Analyst who worked at the Company's Colorado headquarters from fall of 2012 until November 2014. CW1 initially reported to Director of Sales Operations Steve Malsom ("Malsom") until October or November 2013. CW1 and the other sales analysts were then reorganized under the budget/financial division and CW1 reported to Manager of Financial Planning & Analysis Donna Holley ("Holley"). CW1 served as the interim Manager in March 2014 or April 2014 until June 2014 to temporarily replace Holley. Around June 2014, Atul Suri ("Suri") became the new Director of Sales Operations and CW1 reported to Suri. Suri reported to Kimberly McIntosh Bridges ("Bridges"), Spectranetics' Senior Vice President ("SVP") of Sales and Marketing for the Vascular Intervention business segment, who reported directly to the CEO, Defendant Drake.

26.     CW1 worked with three other analysts to prepare sales forecasts for the

Company's Vascular Intervention products, while one other analyst worked with LM products. In June 2014, one of the VI analysts transferred to a position in the finance division. CW1's group supported most departments at the Company, but the group primarily worked with sales operations and finance.

27.     As a Sales Analyst, CW1's responsibilities included working with Regional Managers on quarterly sales forecasts, supporting the finance division by handling commissions and compensation plans, and compiling a budget for the VI sales division's costs. Specifically, CW1 created and distributed a variety of reports in Excel and Access, including daily, weekly, monthly, and quarterly sales reports for actual sales from the mainframe database and assisted with the quarterly forecasting process for the VI division. On a daily basis, also CW1 converted actual sales from the previous day into individual reports for each Territory Manager showing volume, revenue, the average selling price of products, and how close the sales representative was to his or her quarterly target. As the quarter progressed, these daily sales reports became more detailed. In the last month of the quarter, CW1 included more information in each sales representative's report such as customers that had previously purchased from the representative in that territory so the sales representative could "fish for more sales" with those customers. According to CW1, the information in these reports was intended to help the sales representative achieve his or her quarterly sales targets.

28.     For the quarterly forecasting process for the VI division, CW1 explained that CW1 began the process with a forecast report for each region, incorporating information about potential quantities of products to be sold and potential customers for the products. CW1 sent these reports to each of the Territory Managers, as well as to the Regional Managers and above. According to CW1, each Territory Manager would then fill in their respective information and

prospects for the quarter, and the Regional Manager would provide CW1 with the feedback from the Territory Managers for each region. Typically, CW1 would communicate back and forth with the Regional Manager about the forecasts. Bridges and/or VP of Sales Brett Martin ("Martin") (until Martin began overseeing the LM sales division in approximately Q2 2014) were also involved in these forecast communications.

29.     According to CW1, Bridges held conference calls with the Regional Managers to discuss their quarterly forecast submissions. CW1 participated in these calls throughout CW1's tenure at the Company and stated that Bridges had a certain growth rate that needed to be reflected in the forecasts. Therefore, the purpose of these calls was to work out these figures with the Regional Manager and make sure the forecasts reflected the figure Bridges was looking to achieve. CW1 was informed and believed that these forecasts were ultimately provided to Defendants Drake and Childs and formed the basis of the Company's public sales and revenue forecasts.

30.     According to CW1, Bridges also held frequent conference calls at the end of each quarter with Regional Managers to discuss actual sales compared to the forecasts. While these calls were not regularly scheduled, they occurred more frequently, often every other day, in the last days of the quarter. Throughout CW1's tenure at the Company, CW1 participated in these calls in order to respond to any of the Regional Managers' questions.

31.     Additionally, CW1 attended various regional sales meetings. Director Malsom included the sales analysts in these regional sales meetings because the analysts worked closely with the numbers and could answer questions and CW1 had an even greater role in these meetings when CW1 served as interim Manager of Financial Planning & Analysis. However, when Suri became director in approximately June 2014, CW1 still sent the above-described

reports for quarterly sales results to Suri, but Suri did not include the sales analysts in these regional sales meetings.

## B.   Confidential Witness Number Two ("CW2")

32.     CW2 was a Clinical Sales Specialist at Spectranetics in South Florida from February 2014 through July 31, 2015. CW2 reported to Regional Manager Chris DeCarolis ("DeCarolis") in the VI division.[1]

33.     As a Clinical Sales Specialist, CW2 supported three Territory Managers (sales representatives) in the South Florida region, including Garrin Rose ("Rose"), who covered Miami and Broward County. These Territory Managers, including Rose, reported to DeCarolis. CW2 believed that approximately nine or ten sales representatives reported to DeCarolis and that DeCarolis oversaw sales in most of Florida except for the panhandle regions such as Pensacola and Tallahassee. At the beginning of CW2's employment, CW2 worked mostly with Rose.

34.     According to CW2, CW2 wrote a letter to the VP of Human Resources in April 2015, detailing a number of ethical concerns CW2 witnessed while working for the Company, primarily related to Territory Manager Rose. CW2's letter included, among other things, a report of Rose's offer to bribe a physician with $5,000 (as discussed in more detail below) and that Rose was not complying with United States Food and Drug Administration (the "FDA") requirements to report adverse events that occur during surgeries. Weeks later, CW2 was contacted by the Company's Compliance Officer who, after it was established that CW2 did not have documented proof of the $5,000 bribery offer, said the Compliance Officer would "chalk it [Rose's bribery offer] up to a bad joke." According to CW2, the Compliance Officer did not

---

[1] While not every region necessarily had both, according to CW5, after the AngioScore acquisition, reorganization occurred and Regional Sales Directors oversaw Regional Managers. Plaintiffs are informed and believed that around this time, during the summer of 2014, DeCarolis was promoted to Regional Sales Director.

seem to take CW2 seriously and did not appear interested in investigating CW2's ethical concerns any further.

### C.     Confidential Witness Number Three ("CW3")

35.     CW3 was a Spectranetics Territory Manager for VI sales in the Southwest Florida region from January 2014 until June 2015. CW3 reported to Regional Manager DeCarolis, who reported to Bucky.[2] Bucky reported to SVP Bridges who reported directly to Drake.

36.     CW3 was responsible for sales and growth of VI products in CW3's territory and for overseeing the Clinical Specialists. CW3 explained that when Spectranetics medical devices were used by surgeons, a company representative had to be present to open the product and ensure that the equipment was being used properly. The Clinical Specialists were often present for the surgeries, and CW3 sometimes attended the surgeries as well.

### D.     Confidential Witness Number Four ("CW4")

37.     CW4 was a Spectranetics Territory Manager in the VI division from May 2014 to February 2015 in the Ohio region. CW4 reported to Regional Sales Director Mike Lascu ("Lascu"). Lascu reported to Area VP Joe Ingoglia ("Ingoglia") who reported to SVP Bridges. Bridges reported directly to Defendant Drake.

38.     CW4 joined Spectranetics right before the Company acquired AngioScore Inc. ("AngioScore"), the then-U.S. market leader in specialty scoring balloon catheters. As a result of the AngioScore acquisition, CW4's territory within Ohio changed shortly after CW4 started working at Spectranetics. CW4 stated that the long drive to the new territory was the main reason CW4 resigned.

---

[2] Plaintiffs are informed and believe that "Bucky" is James Polk, who was an Area Director (a position later referred to as Area Vice President ("VP") after the AngioScore acquisition) at the time.

39.     CW4 was responsible for selling all VI products, including, but not limited to, disposable laser catheters and AngioSculpt. AngioScore's line of scoring balloon catheters had previously received approvals from the FDA for both coronary and peripheral indications.

**E.     Confidential Witness Number Five ("CW5")**

40.     CW5 was a Spectranetics Territory Manager in the VI division from approximately March 2014 until September 2015. CW5's territory generally included the state of South Carolina and part of Georgia, but the territory changed about five times due to the AngioScore acquisition and the influx of additional sales representatives.  CW5 believed there were approximately eight to ten sales representatives in CW5's region, which included North Carolina, Tennessee, Georgia, South Carolina, and Alabama.

41.     CW5 reported to several different people during CW5's employment. Prior to the AngioScore acquisition, CW5 reported to Regional Manager Dave Goldin, and at some point during the summer of 2014, CW5 reported to Regional Manager Bill Mason (previously with AngioScore) until November 2014. From this time until April 2015, there was no Regional Manager for that area, so CW5 reported to a Regional Director. From April 2015 until CW5 left the Company, CW5 reported to Regional Manager Joanne.[3] While not every region necessarily had both, according to CW5, shortly after the AngioScore acquisition, Regional Directors oversaw Regional Managers. CW5's Regional Director reported to SVP Bridges, who reported to Defendant Drake.

**F.     Confidential Witness Number Six ("CW6")**

42.     CW6 was originally employed as an AngioScore sales representative in the Tampa, Florida region prior to the Spectranetics acquisition. CW6 worked as Territory Manager

---

[3] CW5 could not recall the last name of CW5's Regional Manager during this period. Plaintiffs are informed and believe CW5's last direct superior was Joanne DeAngelo.

(sales representative) for Spectranetics from July 2014 until the summer of 2015. Because territories were being reorganized at Spectranetics, CW6 agreed to relocate to Orlando, Florida shortly after starting with the Company. CW6 reported to Regional Manager DeCarolis who reported to SVP Kim Bridges. Bridges reported to Defendant Drake. As a Territory Manager, CW6 was responsible for selling VI products. Since CW6 had to relocate, CW6 had to establish entirely new accounts in Orlando.

### G.    Confidential Witness Number Seven ("CW7")

43.    CW7 was originally employed at Spectranetics from 2009 to 2010. CW7 began working for AngioScore in or around March 2012 as a Territory Sales Manager for western Missouri and the state of Kansas. CW7 re-joined Spectranetics as a result of the AngioScore acquisition in or around July 2014. CW7 served as a VI Territory Manager (sales representative) for Spectranetics in Kansas from July 2014 until March 2015. CW7 reported to Regional Manager Mike Majick who reported to the VI division's Director of Sales.

44.    After returning to Spectranetics in 2014, CW7 had essentially two "buckets" in CW7's sales quota: AngioSculpt and all other Spectranetics VI products.  CW7 recalled that CW7's monthly quota for legacy Spectranetics products was approximately $17,000, and for AngioSculpt it was approximately $40,000 to $50,000. CW7 noted that the new territory did not have existing laser accounts, and opening a new laser account was challenging because CW7's territory was mainly small hospitals that did not perform as many procedures.

45.    CW7 recalled seeing daily sales reports that were forwarded to all sales representatives on a daily, weekly, and monthly basis showing the percentage of sales achieved compared to forecasts (annual sales quota), the percentage compared to the quarterly sales quota, and the percentage compared to the monthly sales quota. CW7 said that Spectranetics maintained

an internal system that its sales representatives could use to independently check their own sales information at any time. Based on these reports, CW7 recalled seeing during Q4 2014 that approximately half of the sales force at Spectranetics was having difficulty meeting sales quotas.

## V.   SUPPORTING BACKGROUND ALLEGATIONS

### A.   Spectranetics' Business and Background

46.   For the year ended December 31, 2014, the sale of disposable products generated 90% of Spectranetics' consolidated revenue, of which Vascular Intervention products accounted for 64%, and Lead Management products accounted for 36%. The remaining 10% of the Company's revenue derived from sales and rental of its proprietary laser system (the CVX-300 Excimer Laser System) and related services.

47.   According to Spectranetics, its Vascular Intervention products are primarily used to "cross", "prep", and "treat" blood vessels that have been compromised by: (i) coronary artery disease ("CAD"), which occurs when the arteries that supply blood to the heart muscle become hardened and narrowed due to the buildup plaque on artery walls; (ii) peripheral artery disease ("PAD"), a disease marked by plaque build-up in the arteries that carry blood to the head, organs, and limbs, whereby arteries in the lower extremities are clogged or obstructed; and (iii) in-stent restinosis ("ISR"), which occurs when a blockage re-forms or an artery narrows again following an angioplasty or placement of a stent.

48.   Spectranetics sells its Vascular Intervention products to primarily two types of customers: (i) private office-based-labs ("OBLs") run by physicians or physician groups, and (ii) hospitals.

49.   Prior to and during the Class Period, the largest component of the Company's Vascular Intervention business consisted of devices to perform atherectomy procedures.

Atherectomy is a procedure that utilizes a catheter with a sharp blade on the end to remove plaque from a blood vessel. Spectranetics' atherectomy devices included a variety of disposable laser catheters and vessel "crossing" devices. The "Turbo Tandem" laser and the "Turbo Elite" laser were Spectranetics' top-selling disposable laser catheters sold during the Class Period, and the "Quick Cross" was the most popular disposable crossing device sold during the Class Period.

**B.      Seeking Further VI Growth, Spectranetics Acquires AngioScore, Inc.**

50.      Purportedly seeking to expand its VI product line and sales, on June 30, 2014, Spectranetics acquired AngioScore, the then-U.S. market leader in specialty scoring balloon catheters, and its AngioSculpt device platform, a line of scoring balloon catheters, which had previously received FDA approvals for both coronary and peripheral indications prior to Spectranetics' acquisition.

51.      With the AngioScore acquisition, Spectranetics' sales force grew to 120 representatives, from approximately 50 the prior year. According to Defendants, AngioScore's business, which fell under Spectranetics' Vascular Intervention umbrella, was split evenly between peripheral and coronary, which made the acquisition an especially attractive one. Defendants represented that AngioSculpt products could and would be marketed and sold for treatment of CAD, PAD, and ISR indications, thus, according to Defendants, presenting a large benefit to the Company.

52.      According to former Spectranetics sales representatives, however, as alleged herein, AngioSculpt actually often worked in competition against the Company's laser catheters, as doctors could and did use scoring balloons and laser catheters for the same procedure(s) and purpose(s). Furthermore, from a sales perspective, AngioSculpt products were more difficult to sell because they were much more expensive than other angioplasty balloons and because the

Medicare reimbursement code covered only a fraction of the AngioSculpt cost. Given doctors had different product and procedure options to choose from,  AngioSculpt was generally anunattractive product for OBLs, which tended to be more keenly aware of costs than hospitals.

### C.    Spectranetics Announces Approval of "New" ISR Indication

53.    In July 2014, Spectranetics claimed another purported boon to its Vascular Intervention business when the FDA approved the Company's proposed combination use of certain of its peripheral atherectomy devices (specifically, disposable laser catheters known as the Turbo-Tandem and Turbo-Elite Lasers), followed by a balloon angioplasty, to treat ISR. The fourth quarter of 2014 was the first full quarter the Company could market its disposable laser catheters (the Company's best-selling peripheral atherectomy devices) for this newly-approved ISR indication. Analysts repeated Defendants' proclamations that new system placements and increased purchasing by existing customers as a result of the new ISR indication would drive VI revenue. As Defendant Drake, the Company's CEO, stated during the Class Period, the Company's "performance in ISR is critically important." Spectranetics reported a market potential of $350 million domestically and up to $750 million worldwide for this new ISR indication.

54.    Before FDA approval of the new ISR label indication in July 2014, Spectranetics' Turbo-Elite and Turbo-Tandem laser catheters (the Company's main atherectomy devices) were approved by the FDA for treatment of peripheral stenosis (narrowing of vessel) and occlusions (blockage of vessel). Even during this time, doctors could – and did – use these laser catheters in combination for the "new" ISR indication described above.

55.    Indeed, according to former Spectranetics employees, including Spectranetics' front-line sales representatives (as alleged herein), doctors in both OBLs and hospital settings

already were aware of this use, even without FDA-approved marketing, and often did use Spectranetics' laser catheters for this purpose. Accordingly, such sales representatives did not expect to see a substantial increase in atherectomy device sales as a result of this "new" ISR indication.

> **D.     Spectranetics' VI Products Faced Stiff Competition Prior to and During the Class Period, Which Was Only Heightened by the Introduction of DCBs**

56.     Spectranetics' largest business and source of revenue during the Class Period centered on its Vascular Intervention business segment. While the VI segment included products to treat both peripheral and coronary indications, the Company's atherectomy devices used to treat PAD and ISR constituted the highest-selling products. Together, the AngioSculpt scoring balloons and the approval of the new ISR indication for Spectranetics' disposable laser catheters were widely trumpeted by Defendants during the Class Period as the Company's growth drivers heading into 2015.

57.     PAD is a disease in which plaque builds up in the arteries that carry blood to the head, organs, and limbs, and is characterized by clogged or obstructed arteries in the lower extremities. Treatment of PAD may be impacted depending on where the condition presents itself: above-the-knee ("ATK") or below the knee ("BTK").

58.     Just prior to and during the beginning quarters of the Class Period herein, PAD was typically treated: (i) by balloon angioplasty (either a scoring balloon or plain old balloon angioplasy ("POBA")), (ii) by placing a stent (either drug-coated, bare metal or covered), or (iii) by laser atherectomy – or by any combination thereof.

59.     Stenting, in particular is subject to a painful and dangerous complication called in-stent restenosis ("ISR"), which occurs when a blockage returns the artery and settles on the stent. ISR can occur in a coronary or a peripheral indication. POBA, meanwhile, is subject to

other complications, including injury to the artery wall, an increased risk of restinosis, and the need for reintervention as lesions become longer or more heavily calcified.

60.     Thus, during the Class Period, developing technologies – including drug coated balloons – emerged for the treatment of PAD, demonstrating high efficacy and fewer complications than traditional treatments.

61.     Even prior to the introduction of DCBs, however, Spectranetics faced an extreme amount of sales competition in its VI business, with one former employee describing the amount of competition akin to "a knife fight in a phone booth." According to the Company's 2014 10-K, Spectranetics' primary competitors in peripheral atherectomy included ev3 Inc. (a division of Covidien, recently acquired by Medtronic, Inc.); Cardiovascular Systems, Inc.; and Pathway Medical Technologies, Inc. (recently acquired by Boston Scientific Corporation). Two startup companies with planned entry into peripheral atherectomy in the near future were AtheroMed, Inc. (acquired by Volcano Corporation, recently acquired by Philips) and Avinger. Manufacturers of specialty balloons in the peripheral and coronary markets included Boston Scientific, C.R. Bard, Inc., and TriReme Medical LLC. Finally, the primary competitors of drug-coated balloons included C.R. Bard and Medtronic in the U.S., and Medtronic, Biotronik, B. Braun, C.R. Bard, and Cook Medical in Europe.

62.     On October 10, 2014, the FDA announced that it had approved the first drug-coated balloon technology to treat PAD.[4] Thus, major pharmaceutical companies Medtronic and C.R. Bard released the first DCBs to treat PAD in the U.S. market in late 2014, with Medtronic offering the Admiral DCB and C.R. Bard offering the Lutonix DCB

63.     Throughout 2014 and into 2015, DCBs, also called drug-eluting balloons

---

[4] http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm418455.htm

("DEBs"), were increasingly being used instead of stents and POBA to treat PAD. According to the American Heart Association, DCBs presented a preferable alternative because:

> [A]ny stentless technology for the improvement of long-term patency is preferable to overcome the drawbacks of stenting. DEBs have a number of advantages over standard angioplasty and stent technologies: homogeneous drug delivery to the vessel wall; drug release without the need to use a polymer, which may induce chronic inflammation; application in locations where stent implantation is not desirable like motion segments in the common femoral or popliteal arteries; and the potential to reduce antiplatelet therapy.

*Available at* http://circ.ahajournals.org/content/126/20/2433.full

64.     On October 10, 2014, C.R. Bard announced that the FDA had granted approval of C.R. Bard's DCB – the Lutonix DCB – as the first and only DCB approved in the U.S. for treatment of PAD in the femoropopliteal arteries (*i.e.*, above-the-knee).

65.     On January 5, 2015, Medtronic, Inc. announced that the FDA had granted approval of Medtronic's DCB – the "IN.PACT Admiral DCB" – for treatment of ATK PAD.

66.     Following the FDA's October 2014 approval of DCBs for the treatment of PAD, analysts opined as to potential impact on Spectranetics' Vascular Intervention business. However, while some analysts opined that the FDA approval of DCBs to treat PAD would negatively impact Spectranetics' Vascular Intervention business – specifically, sales of the Company's peripheral atherectomy devices – Defendants remained bullish about the VI business segment and its supposed growth during the Class Period.

**E.      Spectranetics' Supposed Banner Sales and Growth During the Class Period**

67.     During the Class Period, the Company's Vascular Intervention business segment constituted the single largest component of the Company's revenue, and within VI, peripheral atherectomy was widely considered and trumpeted by both Defendants and analysts as the Company's leading growth segment. As indicated in the Company's SEC filings, both before and during the Class Period, Defendants were highly focused on further growing this segment of

the Company's business, and as alleged herein, Defendants made material misstatements and omissions in furtherance of that end.

68.     Thus, for Q4 2013, Defendants reported total sales of $41.9 million ($1.0 million above Street consensus), and VI sales of $20.6 million ($1.6 million above Street consensus), marking 23% growth year-over-year ("YoY") for the segment.

69.     For Q1 2014, Defendants reported total sales of $39.6 million ($1.8 million below Street consensus), and VI sales of $20.0 million ($0.3 million above Street consensus). Analysts noted that this was "highly uncharacteristic for Spectrantics[.]" The Lead Management segment was cited for having driven the miss, but was partially offset by what analysts described as "impressive performance" from the Vascular Intervention business.

70.     Thus, for Q2 2014, Defendants reported total sales of $43.6 million ($1.6 million above Street consensus), and VI sales of $22.5 million ($1.1 million above Street consensus), marking 19% growth YoY for the segment.

71.     For Q3 2014, Defendants boasted total sales of $58.8 million ($1.5 million above Street consensus), and VI sales of $36.6 million ($1.4 million above Street consensus), marking *93% growth* YoY for the VI segment. Following Q3 2014, analysts noted this was the sixth quarter in which Defendants reported near 20% growth for U.S. peripheral atherectomy segment.

72.     In Q4 2014, Defendants reported total sales of $63.0 million ($1.3 million above Street consensus), and VI sales of $39.1 million ($200,000 above Street consensus), which represented a remarkable *90% growth* for the segment YoY.

## VI.     AS CONFIRMED BY MULTIPLE FORMER EMPLOYEES, DEFENDANTS RELIED UPON AN ILLICIT CHANNEL STUFFING SCHEME TO SHOW GROWTH AND MEET MARKET EXPECTATIONS

73.     From at least Q4 2013 through at least Q1 2015, Defendants engaged in a fraudulent scheme to deceive the investing public about the true performance, profitability, and

growth trends of the Company and its VI business. Defendants made false and misleading representations about the financial performance of Spectranetics and reported inflated financial results. During the Class Period Spectranetics inflated its results by: (1) flooding OBL customers with large quantities of heavily-discounted disposable-products (including, among others, laser catheters and cross products) ahead of demand (*i.e.*, excess inventory) near the end of each quarter to meet the market's expectations, as well as the sales and earnings projections provided to the public by the Individual Defendants (collectively, channel stuffing or bulk sales); and (2) improperly accounting for these bulk sales, which were accompanied by extended payment terms and the right to return the products or exchange expired products.  Defendants omitted material information about these practices that rendered other statements about the performance of its VI business misleading.

74.     Defendants not only failed to disclose to investors that Spectranetics was engaged in quarter-end bulk sales and channel stuffing, but Defendants also concealed and omitted the extent to which Spectranetics was dependent on these illicit practices to meet its sales and earnings estimates, as well as the risks to the Company's future sales arising from these sales practices. In particular, already facing intense competition and the prospect of even greater competition from the introduction of DCBs, the Company was at even greater risk of missing earnings forecasts because the Company was cannibalizing its future sales and its OBL customers were already bloated with inventory from these bulk sales.

A.     **Former Employees Confirm Rampant Channel Stuffing Since Before the Start of the Class Period**

75.     According to CW1, a former Sales Analyst at the Company's corporate headquarters, Spectranetics' managers and corporate executives were well aware of these practices and in fact *incentivized* sales representatives to offer quarter-end volume discounts.

76.     These sales practices were rampant by late 2013 and occurred throughout 2014. CW1 indicated that during CW1's tenure with the Company (from the fall of 2012 to November 2014), CW1 saw bulk sales practices grow significantly, especially during 2014 and into year-end 2014. CW1 explained that in 2012, CW1 noticed there were some bulk sales or volume discounts offered to select customers near quarter-end, but the amounts were not alarming and seemed targeted as a reward for repeat customers. However, the practice grew from quarter to quarter such that, by 2014, CW1 observed that *most* of the sales for a given quarter were made in the last week of the quarter. Customers knew that if they waited until the end of the quarter, they could receive discounts *as much as half the regular price*.

77.     In late 2013 and during 2014, management had been repeatedly warned about the excessive use of bulk sales and the buildup of excess inventory at OBL customers caused by the channel stuffing. CW1 was concerned about the long-term effect of relying on bulk sale discounts, and had been warning management since late 2013 about the practice, but this practice only increased during CW1's tenure at the Company.

78.     CW1 recalled various times when CW1 discussed concerns with management about the impact the quarter-end volume discounts had on the Company. CW recalled discussing those concerns directly with Controller Chris Bednar ("Bednar") and SVP Bridges. CW1 ran reports quarterly that quantified the practice and indicated what would happen if the practice continued, cautioning Bednar and Bridges that sales would eventually come "tumbling down" if the practice continued at the current rate. According to CW1, no reason was provided for CW1's termination, but CW1 thought that part of the reason could have been because CW1 frequently warned management about the harmful long-term impact of the bulk sales discounting practice.

79.     The risks from the practice of heavy bulk-discounting was readily apparent and

known *prior* to the Class Period. For example, in December 2013, CW1 and two other analysts presented a series of reports to Holley illustrating the increased volume of bulk orders each quarter, the increased discounts and the decreasing average price of the product due to these practices.

80.     CW1 also presented similar information to all VI Regional Managers, Areas VPs, and others, including SVP Bridges at a sales meeting in Chicago in April 2014 focused on Q1 2014 sales results. CW1 presented information about the steady increase of volume discounts for the last six quarters (from Q4 2012 through Q1 2014). CW1 indicated that these figures illustrated the Company's increased reliance on volume discounts because each quarter, the amount of product offered at volume discounts *increased* due to the lower price in tandem with the Company's increasing revenue growth projections. CW1 explained that *in order to meet increasing revenue growth projections, the Company had to continuously increase the amount of product offered at volume discounts*. This cycle caused the average product price to decrease as well. According to CW1, Bridges, and the Regional Managers were not surprised to hear about the bulk orders. From the meeting discussion, CW1 believed that approximately half of the sales representatives present at the meeting wanted to stop the practice but the other half did not because the Company's incentive compensation structure *rewarded* them with large bonuses for meeting certain pre-established sales goals, aided by this practice.

81.     Spectranetics' bulk sales (channel stuffing) in 2013 and 2014 resulted in the build-up of excess inventory at many OBL accounts. By Q3 2014, CW1's calculations indicated that it would take certain customers approximately *six to nine months to work through the inventory already on hand* due to bulk orders. CW1 had calculated these figures by looking at the historical amount of product typically used by customers in a quarter and the amount of

product already sold to the customer to determine the amount of inventory the customers had sitting on the shelves. Although CW1 left the Company in November 2014, CW1 could tell from the calculations into November 2014 that the build-up of inventory for customers towards the end of 2014 would significantly reduce sales for the beginning of 2015.

82.     The pressure to meet quarterly targets came from the top of the Company. CW1 was informed and believed that Defendant Drake was well aware of the bulk sales and volume discounts offered at the end of each quarter because CW1 spoke with *different* sales representatives who told CW1 that Drake stressed to sales representatives that they had to meet quarterly sales targets any way possible. CW1 stated that Regional Managers could authorize a bulk sale discount, but if the Regional Manager was not available CW1 believed that Area VPs could sign off instead.

83.     According to CW1, the most common product offered in volume discounts was the Turbo Elite disposable laser catheter. CW1 described the Turbo Elite as the "cash cow" representing about 70% of VI sales.

84.     These bulk sales were akin to "robbing Peter to pay Paul."  Effectively, for *each* disposable product Spectranetics was bulk selling in the waning moments of a quarter (to meet market expectations for that quarter), the Company was cannibalizing approximately *twice* as many disposable product sales from future quarters. By way of example of the type of volume discounts provided to customers, which were often very substantial, CW1 reported one Miami customer received a *55% discount* for a 120-unit purchase.

85.     These heavily-discounted bulk-sales were accompanied by an understood right of return. CW1 indicated that Spectranetics allowed for the *return of all products at any time*. As an example, CW1 cited another customer in Florida that took advantage of this return policy by

purchasing 120 units at the end of Q1 2014 so that the doctor could get American Express rewards. The next quarter (Q2 2014), the doctor returned over half of the units (60 to 80 units). The doctor was fully reimbursed for the return. CW1 also indicated that the sales representative was allowed to keep the commission.

86.     CW1 spoke to Bednar about instances of product returns as they occurred, and the problem with practice of large bulk sale discounts generally, on multiple occasions. From CW1's discussions with Bednar, CW1 was informed and believed that Bednar had discussed this directly with Defendants Drake and Childs. However, in the commission example above and other instances, CW1 was instructed by Controller Bednar through Suri to "let it go," allowing the sales representative to keep the full commission on the 120 units, despite the return of over half of the product.

87.     CW2, a Clinical Sales Specialist in South Florida from February 2014 through July 31, 2015, also described intense pressure to meet quarterly sales targets through bulk sales and heavy volume discounts. As soon as CW2 joined Spectranetics, it was evident to CW2 that the Company was reliant upon bulk sales to meet targets, and that Defendants Drake and Childs were not only aware of these practices, *but at times, directed sales representatives to engage in them*. According to CW2, Territory Manager Rose (with Regional Manager DeCarolis) was especially instrumental in making bulk sales at the end of quarters in order to help the Company meet its sales projections.

88.     According to CW2, Rose typically engaged in bulk sales with OBLs rather than hospitals because the physicians themselves could authorize the purchase without requiring a purchasing department, such as in a hospital. According to CW2, Rose would occasionally convey the details of bulk-sale transactions to CW2.

89.     Specifically, CW2 recalled one instance where Rose told CW2 that *Rose received a call from Drake, Childs, and SVP Bridges on the last day of the second quarter, June 30, 2014, saying the Company was not going to make its quarterly targets unless Rose leveraged his customer relationships and found a customer willing to accept a bulk shipment*. According to CW2, Rose called Dr. Pablo Guala ("Guala") who owned an OBL in Miami, and Guala verbally agreed to purchase product in bulk at a reduced price. According to CW2, the total purchase amount of this bulk sale of laser catheters was in the range of $200,000 to $250,000. According to CW2, the full price of a laser catheter was approximately $2400 each, but the discounted price offered was approximately $1200 each. CW2 stated that Dr. Guala purchased so many units that he had to store the excess product in his home. CW2 explained that Dr. Guala requested that his American Express card be charged a specified monthly amount until the total was paid.

90.     According to CW2, Rose confided in CW2 that Rose felt enormous pressure receiving the call from Drake, Childs, and Bridges with only hours before the quarter would end. In fact, Rose told CW2 that Dr. Guala was initially not available because he was in the middle of a procedure. Thus, Rose had numerous frantic phone calls and text messages back and forth between himself, Drake, Childs, and Bridges during the final hours of the quarter as Rose attempted to reach and negotiate the bulk sale with Dr. Guala. After Rose finally managed to reach Dr. Guala, Rose called Defendants Drake and Childs, as well as SVP Bridges to let them know he received a verbal agreement.

91.     According to CW2, prior to the end of Q2 2014, Rose asked if one of CW2's physician friends would be offended if Rose offered the physician $5,000 to enter into a bulk deal. CW2 was shocked and simply responded that Rose could ask the physician if he wanted. CW2 later asked this physician if Rose offered the physician $5,000 for a bulk deal in Q2 2014

and the physician responded with confirmation that Rose had offered the $5,000 bribe. The physician told CW2 that the physician would not accept a bribe, but would have accepted a volume discount if the product were needed. However, the hospital had no need for the product, so there was no sale.

92.     Although Rose's customers were still working their way through inventory in Q3 2014 and even into Q4 2014 due to previous bulk sales, CW2 said Rose proceeded to engage in bulk sales deals with at least three of his large customers at the end of Q4 2014. According to CW2, three OBLs, Dr. Guala, Dr. Manny Gonzalez ("Gonzalez"), and Palms Access all entered into bulk deals with Rose at the end of Q4 2014. According to CW2, these three OBLs were considered to be Spectranetics VIP customers due to their volume purchases. CW2 believed that Drake, Childs, and Bridges met with each of these customers in-person, as was customary with VIP customers.

93.     According to CW2, Rose met his annual quota for 2014 by the end of Q2 2014 and that once a sales representative meets his or her annual quota, the commission increases even more for sales made after that point. Rose frequently informed CW2 that he intended to maximize commissions for 2014 by selling as much as possible in order to receive a promotion and get out of sales by the end of Q4 2014 so that Rose's successor would have to deal with the fallout in 2015. Rose told CW2 that he was frequently discussing the possibility of a promotion with DeCarolis and senior management towards the end of 2014.

94.     According to CW2, Rose informed CW2 at the January 2015 National Sales Meeting in Las Vegas that his commission check for Q2 2014 alone was $200,000. Based upon Rose's offer to pay $5,000 to CW2's physician friend, CW2 believed that Rose offered a cut of his commission to other physicians who agreed to the bulk orders. CW2 said that Rose was

promoted to a national position created for him called Strategic Account Manager beginning in January 2015, to help sales representatives close deals.

95.     According to CW2, the new Territory Manager who took over Rose's territory in January 2015 had difficulty making sales because even at the end of Q2 2015, many customers were still working through Rose's bulk-sale inventory and were not ready to purchase additional product.

96.     The products CW2 observed sold in bulk were the laser catheters and QuickCross products. According to CW2, DeCarolis was aware of Rose's bulk arrangements because DeCarolis typically needed to sign off on the discounts. According to CW2, the discounted price offered on bulk deals was typically around $1100 to $1200 each for the laser catheters (from $2400) but CW2 heard of discounted prices offered as low as $900 or $1000 each.

97.     Due to the Company's poor sales performance in Q1 2015, CW2 said Bridges was riding around with DeCarolis at the end of Q1 2015 looking for sales opportunities so that the company could make its numbers.

98.     CW3 stated that because customers knew about the volume discounts offered at the end of the quarter, they would wait until the end of the quarter to get the discount and avoid paying full price. CW3 said a disposable laser catheter cost approximately $2400, but the typical discounted price was $1200 to $1500 if the customer purchased 50 units. CW3 did not like to offer bulk sales, but according to CW3, DeCarolis went around CW3 and offered volume discounts to CW3's customers regardless.

99.     CW3 could not recall the first time DeCarolis went around CW3 to offer discounts to CW3's customers, but it was prior to Q4 2014. CW3 considered the volume discounts DeCarolis extended to CW3's customers in Q4 2014 to be "insane" and "ridiculous."

According to CW3, depending upon the volume purchased, customers were offered as much as 50% discounts on the disposable laser catheters and 50-75% on the Quick-Cross product. Since DeCarolis negotiated these deals for CW3's territory, CW3 was not certain of all of the specifics, such as the volume required to receive these discounts. In part due to CW3's reluctance to offer these discounts, CW3 did not meet the Q4 2014 sales quota.

100.    CW3 said that sales representatives were incentivized to make bulk deals with customers through various "contests" in Q4 2014 and other quarters. CW3 did not like the practice and chose not to participate, but noted that the sales people who engaged in these practices often received promotions. CW3 specifically noted that DeCarolis and Rose negotiated many bulk sales and were promoted. According to CW3, Rose was promoted from Territory Manager to a national position.

101.    CW3 said that increased sales were incorporated into the forecasts due to the new ISR indication. CW3 explained that an ISR sale consisted of a bundled sale, but this significantly increased the cost of a procedure and did not interest most customers. CW3 explained that for ISR, most surgeons either use a laser catheter or a scoring balloon but not both together. With respect to ISR sales in Q4 2014, CW1 indicated that the Company's forecast was for $2 million, however, at the time CW1 left the Company in mid-November, the sales so far that quarter that could be attributed to ISR were only a couple hundred thousand dollars.

102.    CW3 further explained that, with OBLs, the surgeons were more concerned about costs because they were privately-owned and the procedures typically received a pre-determined reimbursement. Thus, if the surgeon paid less for the equipment the surgeon made more money from the procedure. Accordingly, volume discounts were also of more interest and more popular for physicians at the OBLs than the hospitals.

103.    CW3 confirmed that returns and exchanges were allowed on all Spectranetics products at any time. Thus, even if a product expired, Spectranetics replaced the product at no cost to the customer. From speaking to a Clinical Specialist in the Miami area, CW3 was aware of a high amount of returns in that area.

104.    CW4 confirmed that volume discounts were offered at the end of every quarter, particularly at the end of Q4 2014 because of year end goals. According to CW4, the sales representatives received hourly updates on sales in the final weeks of Q4 2014 via email. According to CW4, to obtain approval for a bulk sale, CW4 would inform Lascu, who then obtained approval from Ingoglia. The bulk sales CW4 offered were either a certain percentage discount based on the volume purchased or if the customer purchased a certain volume, some units were offered for free. CW4 heard others discuss, but did not personally offer, extended payment terms as well.

105.    According to CW5, engaging in bulk sales at the end of quarters was "almost mandated" at the company, but it did not make sense to CW5. CW5 stated that CW5 had engaged in the practice at other companies, but said it was only done in certain circumstances for certain customers. CW5 said that engaging in these practices regularly was considered to be bad business because customers would rely on heavy discounts and refuse to make purchases at the non-discounted price.

106.    According to CW5, the Company internally referred to the prevalence of bulk sales as being "on the juice" and it was acknowledged that the Company needed to get "off the juice." According to CW5, the reasoning given by management at Spectranetics for negotiating bulk sales was that if the product was on the shelf, it would be used by the customer, if not the customer would use something else. However, CW5 said that such deep discounts were offered

causing the average sales price to decline, and eventually this practice would catch up with the Company. According to CW5, the bulk discounts inflated the prospects for a given territory, and made sales forecasts inaccurate if they were based on bulk sales rather than sales of product actually used.

107.    CW5 also recalled that sales representatives were incentivized to engage in bulk sales every quarter, including Q4 2014. According to CW5, the products typically sold in bulk at Spectranetics were the laser catheters and QuickCross.

108.    CW5 recalled that customers were offered *extended payment terms* of 90 days with bulk deals and that volume discounts offered were often as much as 50 percent and required a manager's signature.

109.    According to CW5, Drake addressed the sales representatives at sales meetings and encouraged bulk sales. CW5 recalled that it was acknowledged during a meeting that management knew they had to "get off the juice" or stop offering bulk discounts, but were not told to stop the practice. CW5 believed that by 2015, the bulk sale practice had caught up with the Company.

110.    CW6 also confirmed that there was pressure at Spectranetics to engage in bulk sales. DeCarolis pressured CW6 to make bulk sales, saying that this was Bridges' instructions. CW6 had also heard from several other employees that bulk sales in Miami helped the Company achieve its quarterly numbers.

111.    CW6 mostly sold AngioSculpt and did not have accounts with much usage for laser catheters, so CW6 could only recall engaging in a bulk sale on one occasion, for approximately ten laser catheters. CW6 noted that AngioSculpt sales were challenging due to the higher cost and low reimbursement value, making them particularly unattractive to OBLs which

cared more about costs. Thus CW6 primarily sold AngioSculpt to hospital accounts.

112.    According to CW6, whenever CW6 obtained a new laser account for Spectranetics, DeCarolis would always reassign the account to the other Orlando Territory Manager, Mike Fishman ("Fishman"). As a result, CW6 did not maintain many laser accounts. According to CW6, the price for laser catheters in CW6's region was approximately $2100 each and the lowest price DeCarolis authorized CW6 to offer CW6's customers for laser catheters was $1800. However, Fishman sold laser catheters at least as low as $1500. According to CW6, DeCarolis indicated that this was because Fishman had customers that purchased more volume than CW6's customers. According to CW6, DeCarolis said CW6 could offer extended payment terms for bulk sales, but CW6 was not interested in offering extended payment terms to customers.

113.    CW6 was aware that the discounts DeCarolis permitted CW6 to offer to CW6's customers was not as high as other sales representatives, not limited to Fishman, offered in CW6's region. According to CW6, every Territory Manager received daily sales reports for their respective regions via email. CW6 said that the emails listed all the sales made by Territory Managers in their respective region the previous day. Specifically, the email listed the Territory Manager, the name of the account, the product group, the volume and the dollar amount of the total sale. By looking at the volume and the dollar amount in these daily sales reports, CW6 could see that other sales representatives were selling products at much lower prices than DeCarolis ever permitted CW6 to offer. CW6 said sales representatives also received monthly sales reports which were broken down by region showing the sales total for each region and then further broken down by sales representatives with the region and sales from each product group.

114.    In addition, CW6 stated that Rose accompanied CW6 on sales calls, offering

discounts much steeper than DeCarolis ever permitted CW6 to offer.

115.    CW7, a VI Territory Manager in Kansas from July 2014 to March 2015, confirmed that throughout this time period, Spectranetics engaged in quarter-end volume discounts on bulk laser catheter sales. CW7 knew one sales representative in Iowa who inherited a territory from a legacy Spectranetics sales representative in which the Spectranetics sales representative had loaded laser catheter customers with approximately $100,000 in inventory. As a result of the bulk sale, the new representative struggled to make any laser catheter sales for an entire year.

116.    CW7 said it was possible, but not common, to offer AngioSculpt in bulk.  CW7 explained that that the price range of AngioSculpt was quite high, at $750 to $1100, and that Medicare reimbursement did not cover the full cost of AngioSculpt. CW7 believed that some hospitals requested reimbursement for an angioplasty balloon, which is typically around $300. CW7 explained that doctors at OBLs tended to "cheap out" and did not typically use AngioSculpt because of the reimbursement concern.

117.    CW7 was informed and believed that one reason sales representatives engaged in larger amounts of bulk sales at the end-of-quarter Q4 2014 was due to the higher sales quotas attributed to the new ISR indication. CW7 explained that while the ISR indication was newly-approved by the FDA for marketing purposes, doctors already used the product off-label for ISR. CW7 explained that, based on the product combination purchased by a customer, CW7 knew that Spectranetics sales representatives were already selling product that was used for the ISR indication when CW7 returned to work for the Company in July 2014, and the only difference with the "new" ISR indication was that sales representatives could now promote the lasers for that purpose. Thus, CW7 was informed and believed that many of the doctors who wanted to use

laser catheters for ISR, likely were already using it for that purpose. Moreover, if doctors did not already use laser catheters for the ISR indication, it was often difficult to convince a doctor to change his/her practices. CW7 could see that the additional ISR sales were not materializing and sales representatives were struggling to meet quotas.

>    **B.**     **Defendants' Channel Stuffing Scheme Starts to Unravel as Defendants Are Forced to Admit Q4 2014 Channel Stuffing, Which Defendants Falsely Portray as an Unusual One-Time Event**

118.    By aggressively over-selling the Company's disposable VI products to OBLs via quarter-end bulk sales, the Company inflated sales, revenues, and growth rates for its VI business, and its reported results for FY 2013, Q1 2014, Q2 2014, Q3 2014, Q4 2014, and Q1 2015, were materially misleading. The practice also created a resulting "air pocket" or vacuum in demand, creating a material concealed risk that the Company's 2015 sales would not meet forecasted levels, and thus rendering 2015 projections unreliable and materially misleading. Indeed, given the widespread and extensive nature of the aggressive quarter-end bulk selling and volume discounts of the Company's disposable VI products, Defendants knew that their 2015 sales and revenue projections were unreliable, over-stated, and materially misleading. Defendants further ignored the material concealed risk that any competitive pressure on the Company's VI sales could cause their carefully maintained artifice to crumble.

119.    The Company's undisclosed reliance on heavily discounted bulk-sales of disposable products to meet expectations (especially in Q4 2014) eventually caught up with the Company in 2015. For example, on April 23, 2015, the Company reported Q1 2015 financial results that missed market expectations due to weakness in its VI business. During a conference call with investors, Defendant Childs expressly admitted that the slowdown in growth during Q1 2015 was "primarily due to ordering patterns in the office-based setting."  Defendant Childs further noted that the Company "had a strong quarter in Q4 [2014], and Q1 [2015] was soft" but

"[w]e're confident, the OBL business will drive growth going forward." According to Defendant Drake, "The softness if you will is more in the OBL side of our business, which was stronger in Q4 [2014], softer in Q1 [2015]. And we've scrubbed at the account level, what's going on and I think [Defendant Childs] referred to really nothing there other than ordering patterns from an OBL standpoint."

120.    As a result of the foregoing admissions and partial materialization of the risk, Spectranetics' stock price dropped $8.18 per share (over 23%), from a closing price of $34.70 per share on April 23, 2015, to close at $26.52 per share on April 24, 2015, on unusually heavy volume.

121.    Although Defendants were forced to admit that the bulk sales to OBL customers had inflated Q4 2014 results at the expense of Q1 2015 results, Defendants went out of their way to try and portray this as a one-time event in Q4 2014 that had gone undetected (when in reality, it was a wide-scale practice that the Defendants actively encouraged). For example, an April 24, 2015, a J.P. Morgan report stated:

> **However, based on our conversations with management, we believe that Spectranetics' own salesforce likely contributed to this issue.** The company confirmed that many of these customers entered 2015 with excess inventory due to aggressive selling on the part of some reps into yearend. This boosted 4Q sales, which saw US Peripheral Atherectomy grow an impressive 30%, but ultimately created an air pocket in 1Q order activity. The good news is that this should be a temporary phenomenon and, encouragingly, some of these accounts have already placed orders in April. Meanwhile, management has implemented changes to its commission structure to try to discourage this kind of activity in the future. However, it is clearly a frustrating development at a time when this business should have the wind at its back given the scale of the ISR opportunity.

(Emphasis in original).[5]

122.    After the stock tumbled, Defendants participated in meetings to further convince analysts that this had been a limited issue. After management meetings, J.P. Morgan issued a

---

[5] Unless otherwise noted, all emphasis is added.

follow up report on April 30, 2015, that further stated:

> **Most of the concerns we've heard from investors since last Thursday's call revolve around the atherectomy business**, which accounted for about two thirds of the overall miss. Management attributed this shortfall to weak order activity at office-based labs. As we noted at the time, this reduced order flow was largely a self-inflicted wound. Many of these customers entered 2015 with excess inventory due to aggressive selling on the part of some reps into year-end. This boosted 4Q sales by roughly $2.0M and ultimately created an air pocket in 1Q order activity. While a bolus of orders like this late in the quarter would normally have raised some red flags, management was slow to recognize the issue. This was in part due to the fact that they were in the early stages of the ISR rollout and thus seeing good underlying demand across their customer base.

(Emphasis in original).

123.    The April 30, 2015 J.P. Morgan report further described how management had "made changes to its rep compensation plan" to "prevent a problem like this from occurring again":

> **To prevent a problem like this from occurring again, Spectranetics has made changes to its rep compensation plan.** These include restrictions on end of quarter activity and required sign-offs from sales management for office-based orders. The company is also evaluating its contracting practices with accounts to try to smooth out quarter-to-quarter volatility. We also expect Spectranetics to pursue more of a specialized sales model going forward, with vascular reps gravitating toward either the coronary or peripheral space. While this will be a gradual process, we view it as prudent given how much the company's portfolio has expanded over the past 12 months.

(Emphasis in original).

124.    The Defendants' admissions also corroborate the accounts of CW1, CW2, CW3, and CW6 about the heavy concentration of discounted bulk-sales in Florida. However, CW1, CW4, CW5, and CW7 confirm that the bulk discounting practice occurred throughout the country. In these meetings, Defendants admitted that a significant amount of the bulk sales in Q4 2014 had occurred in two (2) regions. For example, in an analyst report issued by Canaccord Genuity on May 4, 2015, the analyst had "participated in meetings with senior management last week and came away feeling more confident about the business both near and long term:"

Q1 miss – **Management attributed 100% of the Q1 miss to the pull forward of VI revenue into Q4 (out of Q1:15) from 2 regions** (note: SPNC has 12 total regions in the US). Each region contains 8-10 direct reps reporting to them so it was a chunk of the business. **According to management, all of the pull forward into Q4 occurred in these 2 regions and was focused in OBLs where buying patterns typically skew toward the end of the quarter, when the customer seeks price discounts.** Notably, management said this phenomenon does not usually occur in hospital accounts, which comprises about 70% of the total VI business.

125.    During an analyst conference on May 14, 2015, Defendant Drake admitted that the growth rate the Company had reported in Q4 2014 had been inflated. Specifically, when asked about the "unique" issue disclosed in Q1 2015, Defendant Drake stated:

**You were kind to say unique, I'll call the issues embarrassing. We had a couple of regions racing for the finish line at the end of Q4 and, frankly, I think they pulled some volume in, that should have resided in Q1.**

So if you take that 30% growth in Q4, I would bring that down a little bit, you take that mid-teens growth in Q1, I'd bring that up a little bit. And I think 20%-plus growth in the atherectomy market, that's growing about 8%, is pretty good and I think it's sustainable and I think our position in it is outstanding, frankly. So those are the issues, embarrassing, happened. We've put some controls in place that we didn't have before. But the underlying strength and health of that business is absolutely rock solid.

126.    Contrary to the Defendants' portrayal, the improper bulk sales practices to OBL customers were not limited to Q4 2014. As confirmed by the CW accounts, alleged above in ¶¶75-117, the quarter-end bulk sales of disposable products to OBL customers was a common, routine, and encouraged practice at the Company at least as far back as December 2013 and throughout 2014.

127.    Further, despite Defendants' claims otherwise, throughout the Class Period, the Defendants were aware of the improper quarter-end bulk sales to OBL customers and the financial incentives offered to Spectranetics' sales representative to engage in the improper bulk sales practices. As detailed by the CW accounts, alleged above in ¶¶75-117, the Individual Defendants actively encouraged the bulk sales practices at quarter-end and were aware that the

Company's compensation practices facilitated bulk sales practices.

128.    Contrary to Defendants' attempt to portray the issue as limited to Q4 2014 and indications that controls had been put in place to prevent these practices, Defendants failed to disclose that Spectranetics was still engaging in these bulk sales to OBL customers in Q1 2015 and that the Company's Q1 2015 VI results (and growth rates) would have been even worse had the Company not engaged in even further bulk sales to inflate Q1 2015 results (at the expense of sales in Q2 2015 and beyond). For example, as alleged above, due to the Company's poor sales performance in Q1 2015, CW2 said SVP Bridges was riding around with DeCarolis at the end of Q1 2015 looking for sales opportunities so that the company could make its numbers.

### C.    Defendants' Channel Stuffing Continues to Impact the Company's Financial Results In Q2 2015 and Beyond

129.    The extensive use of bulk sales to OBL customers throughout 2014 and Q1 2015 continued to negatively impact the Company's VI sales in Q2 2015, as certain OBL customers in Florida still possessed excessive inventory. As noted above, according to CW2, the new Territory Manager who took over from Rose in January 2015 had difficulty making sales because even at the end of Q2 2015, certain customers were still working through the inventory from Rose's bulk sales in 2014 and those customers were not ready to purchase additional product. By Q3 2014, CW1's calculations indicated that it would take approximately *six to nine months to work through the inventory already on hand* for certain customers due to bulk orders.

130.    Unbeknownst to investors, the true impact of increasingly fierce competitive pressures in the VI segment had been masked by Defendants' heavy reliance on bulk sales to OBL customers during 2014, which consistently inflated VI revenues and allowed Defendants to meet market expectations. In Q2 2015, due to the Company's limited ability to engage in the heavily discounted bulk sales to OBL customers as the Company had in 2014 and Q1 2015, the

financial performance of Spectranetics' VI segment was even more vulnerable to the even greater competition posed by DCBs.

131.     Then, on July 23, 2015, after the market closed, the Company announced further disappointing Q2 2015 results and lowered its revenue guidance for the remainder of 2015, from $258 million, which already was the low end of the guidance range Defendants provided on April 23, to a range of $240-250 million. According to Defendants, competitive pressure, rapid adoption of DCBs, and ongoing sales force optimization efforts were causing its AngioSculpt franchise to perform below expectations. In the Company's July 23, 2015 press release, Defendants explained: "The revised Vascular Intervention guidance reflects the impact of competitive drug-coated balloon launches on AngioSculpt revenue and ongoing sales team optimization." Defendant Drake was quoted as saying:

> We are adjusting our 2015 outlook based on first-half results that fell short of plan and tempered expectations for the second half. Performance of our AngioSculpt franchise was below expectations due to relatively rapid adoption of competitive drug-coated balloons and our ongoing sales force optimization efforts.

132.     Defendants also lowered total Vascular Intervention revenue from previously-provided guidance of $166.6 million to a lower range of $158 to $165 million, while AngioSculpt revenue was further revised from the previous outlook of $59 million (which was already lowered guidance provided on April 23, 2015, down from the $62-$66 million guidance previously given) down to an even lower range of $55-$58 million.

133.     While the Company reported peripheral atherectomy growth of 21%, again (according to Defendants) primarily driven by ISR, up from the disappointing 16% growth experienced by the segment in Q1 2015 (versus Q1 2014), it was still down drastically from the 30% growth for the segment reported in Q4 2014 (versus Q4 2013).

134.     In the earnings call held the same day, which concluded after the close of trading,

Defendant Drake admitted that "On the Vascular Intervention side of our business, we underestimated the impact of drug-coated balloons, and overestimated our ability to compete in this changing clinical paradigm." He further commented that "[t]he weaker U.S. performance is largely a function of competitive drug-coated balloons and our need to improve commercial execution." Drake elaborated: "the attractiveness of the PAD market has yielded consolidation and heightened competition. Concurrently, drug-coated balloons are being adopted more rapidly than previously anticipated. These market dynamics have put pressure, primarily on our U.S. scoring balloon franchise."

135.    Contrary to Defendants' earlier Class Period claims that the AngioScore sales force integration was complete and successful, Defendants also attributed part of the reduced 2015 guidance to further sales force optimization needs. Thus, Defendant Drake explained the sales force optimization work that still needed to be done:

> We referenced last quarter that we're optimizing our U.S. VI sales force. While the heavy lift of integration is largely behind us, work remains. Our analysis yielded a decision to redeploy several million dollars to our U.S. VI team with the following goals; further dedicating sales reps to the peripheral and coronary markets, adding to our clinical team to improve case coverage, and our new sales and clinical teammates allow for more offensive selling capacity. This work is ongoing and will take time to have the desired effect.

136.    Defendants also revealed that their previous statements about increased reimbursements were false, as Drake commented: "Also in Q2, the reimbursement landscape temporarily contained a device offset that represented a headwind to our business. The June reimbursement revision seems to support important vessel prep in the form of atherectomy and the use of drug-coated balloons."

137.    Finally, Drake admitted that their predictions of complementary use of DCBs with atherectomy devices was wrong: "On the atherectomy front, we have not seen notable pressure from DCBs nor have we seen complementary adoption."

138.    Defendant Childs reported ISR revenue of approximately $4 million for Q2 2015, and total ISR revenue of $7 million for the first half of the year. But he also advised that this would mark the end of the Company's providing guidance on ISR sales, even while confirming that peripheral atherectomy revenue (primarily driven, according to Defendants, by ISR revenue) was the Company's "most relevant metric":

> Going forward, we expect this to be increasingly difficult to tease out as physicians are using the full range of catheter sizes to treat ISR versus the specific above-the-knee products we include in our estimates. Our plan is to continue to estimate ISR revenue and provide the number through the end of this year, but we will not be guiding to a specific number. As we previously said, overall growth in U.S. peripheral atherectomy is the most relevant metric and we will continue to report this going forward.

139.    Thus, for the first time since the ISR launch in October 2014, Defendants did not provide specifics on ISR-related revenue projections for the rest of 2015.

140.    Surprised by the magnitude of the reduction in revenue guidance, analysts expressed confusion caused by the fact that Defendants had reduced VI guidance even without factoring in AngioSculpt, yet continued to insist that DCBs were not negatively impacting atherectomy. When pressed on why VI revenue forecasts would be reduced given the supposedly stable (at least from the analysts' perspective) peripheral atherectomy performance, Drake admitted:

> We under-appreciated the impact of drug-coated balloons and over-appreciated our ability to grow in that clinical environment.
>
> Since that time, we have taken a very deep look both externally and internally. We combined that with a lot of time spent in the field with our team and customers and we've applied our best judgment here. I think our guidance broadly takes into account the risks and opportunities in front of us and that's what we've attempted to do at this point.

141.    Ultimately, after some pressing by the same analyst, Defendant Drake did admit to some impact of DCBs on atherectomy revenue, the existence of which he had emphatically

denied earlier in the Class Period:

> [analyst]: "…has the competitive landscape gotten tougher at all as you now have some competitors that are offering both the DCB and an atherectomy product?"

> [Drake]: "…there is a new dynamic going on certainly clinically with the adoption of drug-coated balloons. And I think the clinical algorithm is still settling out and I think that's going to be the case here for some time going forward. But, clearly, companies with drug-coated balloons and atherectomy are making for a heightened competitive environment and we've tried to factor that in here.

142.    Upon still more analyst pressure to understand exactly what had changed and why the Company was revising its Vascular Intervention revenue projections downward, even excluding AngioSculpt, Defendant Drake again admitted "our understanding I think is clearer on the impact of drug-coated balloons and our respect for what's happening externally on that front."

143.    On this news, shares of Spectranetics declined $8.53 per share, over 34%, to close at $16.30 per share on July 24, 2015, trading on unusually heavy volume.

## VII.   SPECTRANETICS' FINANCIAL RESULTS WERE MATERIALLY MISLEADING AND VIOLATED APPLICABLE GAAP, SEC RULES, AND ITS OWN STATED POLICIES

144.    As alleged herein, Spectranetics' financial statements filed with the SEC, including the Company's Annual Reports on Form 10-K for FY 2013 and FY 2014, as well the Company's Quarterly Reports on Form 10-Q for Q1 2014, Q2 2014, Q3 2014, Q1 2015, were materially false and/or misleading when made because these financial statements violated GAAP, applicable SEC rules, and the Company's stated accounting policies.

### A.   Obligations Imposed by the Securities Laws and U.S. GAAP

145.    The Financial Accounting Standards Board (FASB) is the designated   private sector organization for establishing standards of financial accounting that govern the preparation of financial statements. GAAP are those principles recognized by the accounting profession as

the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Rules and interpretive releases of the SEC are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. ASC 105-10-05-1.

146.     As set forth in FASB Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

147.     Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are *presumed* to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

### B.     The Company Systematically Violated Its Stated Revenue Recognition Policy as well as GAAP Revenue Recognition Principles

148.     Throughout the Class Period, Spectranetics' stated revenue recognition policy remained substantially consistent. That policy was stated in Company's 2013 Form 10-K (and

similarly repeated in the Company's 2014 Form 10-K), as follows:

> *Revenue Recognition.* We recognize revenue when all of the following criteria are met: persuasive evidence of an arrangement exists; delivery has occurred; the sales price is fixed or determinable; and collectibility is reasonably assured. Revenue from the sale of our disposable products is recognized when products are shipped to the customer and title transfers. **In general, customers do not have a right of return for credit or refund. However, we allow returns under certain circumstances** and record an allowance for sales returns based on an analysis of revenue transactions and historical experience of sales returns and price adjustments. The allowance for sales returns is recorded as a reduction of revenue based on our estimates. Actual sales returns may vary depending on customer inventory levels, new product introductions and other factors. Revenue from the sale of laser systems is recognized after completion of contractual obligations, which generally include delivery and installation of the systems. Our field service engineers are responsible for installation of each laser. We generally provide a one-year warranty on laser sales, which includes parts, labor and replacement gas. Upon expiration of the warranty period, we offer similar service to our customers under annual service contracts or on a fee-for-service basis. We recognize revenue from fee-for-service arrangements upon completion of the related service.

149.    In these filings, Spectranetics conveyed that it recognized revenue in accordance with Staff Accounting Bulletin No. 101 ("SAB 101"), as amended by Staff Accounting Bulletin No. 104 ("SAB 104"). SAB 104, Topic 13, *Revenue Recognition*, as amended, and SAB 101, *Revenue Recognition in Financial Statements*, clearly state that revenue is realized or realizable and earned only if and when all of the following criteria are met:

(a)     "Persuasive evidence of an arrangement exists," with the term "arrangement" meaning the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction;

(b)     "Delivery has occurred or services have been rendered;"

(c)     "The seller's price to the buyer is fixed or determinable;" and

(d)     "Collectibility is reasonably assured."

SAB 101(A)(1).

150.    Additionally, FASB Statement of Concepts[6] ("CON") No. 5, Recognition and

---

[6] FASB Statements of Financial Accounting Concepts broadly cover financial reporting concepts. FASB publishes these documents to provide a general overview of accounting concepts, definitions, and ideas guiding recognition and measurement for financial reporting purposes.

Measurement in Financial Statements of Business Enterprises, articulates that revenues and gains should not be recognized in financial statements until they are both earned and realizable:

(a)     "Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash [FASB Statement of Concepts No. 5, 83a]."

(b)     "Revenues are not recognized until earned. An entity's revenue- activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues [FASB Statement of Concepts No.5, 83b]."

(c)     "The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers [FASB Statement of Concepts No. 5, 84a]."

151.    Contrary to the statement in Spectranetics' 2013 Form 10-K (and substantially repeated in the Company's 2014 Form 10-K) that, "[i]n general, customers do not have a right of return for credit or refund," Spectranetics routinely permitted OBL customers during the Class Period to return products for credit or refund. As alleged above and confirmed by CW1 and CW3, this statement (as well as the similar statement in the Company's 2014 Form 10-K) was materially false and/or misleading because Spectranetics did, in fact, provide its customers the right to return products for credit or refund.

152.    By generally providing such a right of return for credit or refund (or to exchange expired products) to OBL customers that engaged in quarter-end discounted bulk sales, Defendants' recognition of revenue for these bulk sales was improper and Defendants failed to make required disclosures of those transactions in its SEC filings. Defendants knowingly recognized revenues improperly for transactions involving side agreements with customers, whereby Spectranetics agreed to take return of the product, even if it was expired.

153.    Spectranetics violated GAAP, SEC guidance, and its own stated policy by recognizing revenue on bulk sale arrangements because the customer had the right to return the products, and Spectranetics did not satisfy specific GAAP and SEC criteria required to appropriately recognize revenues made subject to those conditions. FAS 48, *Revenue Recognition When Right of Return Exists,* establishes accounting and reporting standards for revenue recognition on sales of a product when the buyer has the right to return the product. FAS 48, ¶6 provides that in such circumstances, revenue from the sales transaction should be recognized at the time of sale only if all of the following conditions are met:

(a) ***The seller's price to the buyer is substantially fixed or determinable at the date of sale***.

(b) The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

(c) The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

(d) The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

(e) The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

(f) ***The amount of future returns can be reasonably estimated***.

(Emphasis added).

154.    Spectranetics' bulk sales practices failed to satisfy the requirements emphasized in bold. As demonstrated by the CW allegations, future returns were not capable of reasonable estimation because of the large volume of bulk sales resulted in systemic over-supply at customers and potentially leading to expiration of the product on the shelf (which customers were allowed to return).

155.    FAS 48, ¶¶8a and 8b provide further guidance that confirms that Spectranetics could not reasonably estimate the returns:

8. The ability to make a reasonable estimate of the amount of future returns depends on many factors and circumstances that will vary from one case to the next. However, the following factors may impair the ability to make a reasonable estimate:

> a. The susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand; and

> b. Relatively long periods in which a particular product may be returned.

156.   Given the rapidly changing technological field, the products were particularly susceptible to technological obsolescence or changes in demand. Moreover, the time period in which the products could remain on the shelves of the hospitals or OBLs could be "[r]elatively long," but Spectranetics still would accept returns, which impaired its ability to make a reasonable estimate of the amount of future returns.

157.   SEC Staff Accounting Bulletin ("SAB") 104 provides additional guidance that states that if a sales transaction fails to meet all of the conditions of FAS 48, as outlined above, "*no revenue may be recognized until those conditions are subsequently met or the return privilege has substantially expired.*" SAB 104 also provides other factors in addition to those listed in FAS 48, ¶8 that may preclude a registrant from making a reasonable and reliable estimate of product returns. The criteria in SAB 104 below, presented in bold print, precluded Spectranetics from being able to make a reasonable and reliable estimate of product returns:

> The staff believes that the following additional factors, among others, may affect or preclude the ability to make reasonable and reliable estimates of product returns: (1) *significant increases in or excess levels of inventory in a distribution channel (sometimes referred to as "channel stuffing")*, (2) lack of "visibility" into or the inability to determine or observe the levels of inventory in a distribution channel and the current level of sales to end users, (3) expected introductions of new products that may result in the technological obsolescence of and larger than expected returns of current products, (4) the significance of a particular distributor to the registrant's (or a reporting segment's) business, sales and marketing, (5) the newness of a product, (6) *the introduction of competitors' products with superior technology or greater expected market acceptance*, and (7) other factors that affect market demand and changing trends in that demand for the registrant's products.

SAB 104 at 66-67 (emphasis added).

158.    Spectranetics' quarter-end bulk sale transactions, which resulted in OBL customers possessing excessive levels of inventory, comport closely with the condition of "significant increases in or excess levels of inventory in a distribution channel (sometimes referred to as 'channel stuffing')." Many of the transactions would also comport with the condition of "the introduction of competitors' products with superior technology or greater expected market acceptance," in that Defendants knew that the market was rapidly adopting DCBs and other technological advances were being made rapidly. Thus, Defendants knew or recklessly disregarded that the amount of product that ultimately may need to be returned was unknown and could be larger than expected.

159.    For example, for the foregoing reasons, the Company improperly recognized revenue in Q1 2014 on the bulk sale transaction cited by CW1. As alleged above, CW1 indicated that Spectranetics allowed for the *return of all products at any time* and that in Q1 2014, a Florida customer took advantage of this return policy by purchasing 120 units at the end of the quarter so that the doctor could get American Express rewards and then the doctor returned over half of the units (60 to 80 units) the next quarter (Q2 2014). The doctor was fully reimbursed for the return. CW1 also indicated that the sales representative was allowed to keep the full commission.

160.    Similarly, in Q2 2014, CW2 stated that Dr. Guala purchased so many units from Rose that doctor had to store the excess product in his home. CW2 explained that Dr. Guala requested that his American Express card be charged a specified monthly amount until the total was paid.

C.      **The Company's Violation of Disclosure Obligations Imposed by GAAP and SEC Regulations**

161.    Spectranetics' quarter-end bulk sales practices to OBL customers can be described as a form of improper "channel stuffing." Channel stuffing has been defined by the American Institute of Certified Public Accountants ("AICPA") as:

> [A] marketing practice that suppliers sometimes use to boost sales by inducing distributors to buy substantially more inventory than they can promptly resell. Inducements to overbuy may range from deep discounts on the inventory to threats of losing the distributorship if the inventory is not purchased.[7]

162.    The SEC describes channel stuffing as:

> [T]he pulling forward of revenue from future fiscal periods by inducing customers – through price discounts, extended payment terms or other concessions – to submit purchase orders in advance of when they would otherwise do so.[8]

163.    Spectranetics' bulk sales to OBL customers during the Class Period squarely fall within the SEC's definition of channel stuffing. As alleged in the CW accounts set forth above, Spectranetics induced OBL customers (via discounts, extended payment terms, and/or other concessions) to purchase disposable products well in advance (and in excess) of OBLs' needs. For example, as alleged above, CW1's calculations indicated that by Q3 2014 it would take certain customers approximately *six to nine months to work through the inventory already on hand* for certain customers due to bulk orders. Similarly, as noted by the example provided by CW2, at the end of Q2 2014, one Florida based customer agreed to purchase such a large quantity on the last day of the quarter that the Doctor had to store the excess product in his home.

164.    As alleged above, the Company admitted that in Q4 2014, substantial bulk orders occurred in at least two regions that pulled-in sales/revenues from Q1 2015 and that certain OBL

---

[7] 1999 AICPA Indicators of Improper Revenue Recognition, at 4.

[8] *In the Matter of Sunbeam Corp.*, Securities Act Release No. 7976, Exchange Act Release No. 44305, Accounting and Auditing Enforcement Act Release No. 1393, File No. 3-10481, 2001 SEC LEXIS 931, at *4 n.4 (May 15, 2001).

customers entered 2015 with excessive inventory. For example, as noted by CW2 above, although Rose's customers were still working their way through inventory in Q3 2014 and even Q4 2014 due to previous bulk sales, CW2 said Rose proceeded to engage in bulk sales deals with at least three of his large customers at the end of Q4 2014. According to CW2, the new Territory Manager who took over from Rose in January 2015 had difficulty making sales because even at the end of Q2 2015, certain customers were still working through the inventory from Rose's bulk sales in 2014 and those customers were not ready to purchase additional product.

165.    Material undisclosed channel stuffing of products at the end of a quarter distorts a company's results of operations, and when undisclosed, causes a company's financial reporting to be misleading. Defendants failed to disclose Spectranetics' channel stuffing as required to prevent investors from being misled. In addition, Spectranetics' accounting treatment for its sale transactions was improper, as described above.

166.    Thus, in SAB 104, the SEC referred to the requirements under Financial Reporting Release ("FRR") No. 36, which noted that the following practice – which is analogous to channel stuffing as applied by Spectranetics – *must* be disclosed in the Management Discussion and Analysis ("MD&A") section in Forms 10-K and 10-Q:

> Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.

SAB 104 at 77.[9]

167.    Defendants also were required, but failed, to prepare Spectranetics' financial statements in accordance with the following fundamental accounting principles under GAAP:

> (a) The principle that "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users [of the

___

[9] SAB 104, referring to FRR No. 36 (§501), *Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures.*

financial reports] in making rational investment, credit, and similar decisions." FASB Statement of Concepts No. 1;

(b) The principle that "[f]inancial reporting should provide information [about the economic resources of] an enterprise, the claims to those resources . . . and the effects of transactions, events, and circumstances that change resources and claims to those resources." *Id.*;

(c) The principle that "[f]inancial reporting should provide information about an enterprise's financial performance during a period [because] [i]nvestors and creditors often use information about the past to help in assessing the prospects of an enterprise." *Id.*;

(d) The principle that "[f]inancial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it." *Id.*;

(e) The principle that financial reporting should be reliable in that it represents what it purports to represent. "That information should be reliable as well as relevant is a notion that is central to accounting." FASB Statement of Concepts No. 2;

(f) The principle of completeness, which means that nothing is "left out of the information that may be necessary to insure that it validly represents underlying events and conditions." *Id.*; and

(g) The principle that "[c]onservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered."

*Id.*

168. Defendants' misstatements of sales, revenues, net income and stockholders' equity caused by Spectranetics' improper sales practices and unreliable accounting in the Company's Annual Reports on Form 10-K for FY 2013 and FY 2014, as well as the Quarterly Reports on Form 10-Q for Q1 2014, Q2 2014, Q3 2014, and Q1 2015, were material. The SEC clarified the principles of materiality in SAB 99, reaffirming long-accepted concepts expressed in auditing and accounting literature. It also provides interpretive guidance to ensure those concepts are properly applied.

169. Among the most important of SAB 99's principles are that:

(a) Registrants and auditors may not rely solely on quantitative criteria to evaluate an item's materiality;

(b) The materiality of items can be determined reliably only if they are evaluated both individually and collectively; and

(c) An intentional misstatement may be illegal even if the item it concerns is immaterial.

170.    According to SAB 99, "quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is 'material' if there is substantial likelihood that a reasonable person would consider it important."

171.    In addition, SAB 99 states that there are several ways in which a "quantitatively small" misstatement may be material. For example, the misstatement may conceal a failure to meet analysts' expectations or it may convert a loss into a profit. In fact, one of the more widespread abuses that SAB 99 addresses is the intentional recording of immaterial errors in a registrant's financial statements in order to smooth earnings artificially and give a false impression of their stability. To the extent that registrants intentionally misstate immaterial items, they potentially violate provisions of the Exchange Act, which mandates the use of accurate and reasonably detailed records as the basis for financial statements. The bulk sales were material because Spectranetics and the Individual Defendants knew they were improper, the magnitude of those transactions was critical to Spectranetics' ability to meet its own guidance, and "there is substantial likelihood that a reasonable person would consider [the improper transactions to be] important."

172.    Moreover, by failing to disclose the improper quarter-end bulk sales transactions and the impact it would have on the Company's future sales and growth, the registration statement and prospectus for the Note Offering (defined herein below), as well as each of the Company's Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, filed with the

SEC during the Class Period, failed to comply with the disclosure obligations imposed on Defendants under Item 303 of Regulation S-K. Item 303 requires the disclosure of known trends that will affect future revenue, specifically: "known trends…that have had or that the registrant reasonably expects will have a material…unfavorable impact on…revenues." 17 CFR § 229.303(a)(3)(ii).

173.    GAAP regulation ASC 275-1 similarly requires that a company disclose risks and uncertainties that could significantly affect the amounts reported in financial statements in the near term and particularly calls for disclosure if the volumes of business transacted with particular customers could be severely impacted in the near term.

174.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information." *See Management's Discussion and Analysis of Fin. Condition and Results of Operation*, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Indeed, the SEC has stated that disclosure requirements under Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition…with particular emphasis on the registrant's prospects for the future." *Id.* at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of  the required discussion of those matters and the analysis of their effects." *See Commission Guidance Regarding Management's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

175.    Disclosure of known trends and forward-looking information concerning the

registrant's revenue are required by Item 303 "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations." *See Management's Discussion*, S.E.C. Release No. 6835, 1989 WL 1092885, at *4.

> **D.**     **Spectranetics' Disclosures in its SEC Filings About Increasing Days Sales Outstanding Were Materially Misleading**

176.    During the Class Period, Spectranetics' filings with the SEC were materially false and/or misleading because those filings knowingly and/or recklessly did not disclose the true cause for a rise in the Company's days sales outstanding ("DSO"). Unbeknownst to investors, by the start of the Class Period, the true cause behind the rise in the Company's DSOs was Spectranetics' substantial and increasing reliance on quarter-end bulk sales to certain OBL customers to meet market expectations for its VI sales and growth.

177.    DSO is a common financial metric that represents the average number of days it takes a company to collect its receivables. It is a measure of collectibility and serves as a useful measure of cash flow efficiency and revenue quality. A DSO of 40, for example, means that it takes a company 40 days on average to convert a credit sale (i.e., an account receivable) into cash. An abnormally high DSO, in comparison to a relevant benchmark, is a sign that receivables are at risk of collection and may indicate problems with the Company's collection process.[10]   As such, DSO is a widely used metric associated with measuring the quality of a company's accounts receivables. The significance of this metric has been noted by the SEC: "A growing

---

[10]  *See* David C. Hammer, *Performance is reality, how is your revenue cycle holding up?*, Healthcare Financial Management Association (July 1, 2005); *see also* Michael D. Carpenter and Jack E. Miller, *A Reliable Framework for Monitoring Accounts Receivable, Financial Management*, Vol. 8, No. 4 at 37-40 (Winter 1979); Scott Blakeley, Esq., *The Credit Professional's Duty and Protection with Disclosing Corporate Fraud at the Public Company*, The Credit Research Foundation at 2 (November 2002) ("A company's DSO is, at least on Wall Street, an important indicator of the condition of its accounts receivable, and therefore a gauge of asset quality.").

DSO figure is often a telltale sign that a company's receivables are impaired."[11]   The older a

receivable gets, the less likely it is to be collected.

178.   DSO is a significant metric with respect to revenue quality.   Although a rise or

change in a Company's reported DSO is a normal and often benign event that can result for a

variety reasons, "[a] higher DSO could indicate aggressive Revenue Recognition . . . ."   *See*

*Howard M. Schilit and Jeremy Perler, Financial Shenanigans: How to Detect Accounting*

*Gimmicks & Fraud in Financial Reports* (Third Edition) at 51.   For example, "[a]n increase in

DSO can often be an indicator that a product was shipped late in a quarter."   *Id.* at 66.   Similarly,

a substantial increase in DSO in combination with extended payment terms, can be a red flag:

"Investors should be particularly concerned about accelerated (or even improper) revenue

recognition when a company begins extending very generous payment terms and DSO spikes."

*Id.* at 70.   Importantly, substantial changes in DSO can result from undisclosed accounting

manipulations:

> Analysts use a days' sales outstanding (DSO) metric to catch signs of
> collection problems. Higher DSO (as discussed earlier) typically suggests
> that customers have been paying more slowly. Or worse, perhaps
> management has used Earnings Manipulation Shenanigans to inflate
> revenue and profits.

*Id.* at 258.

179.   In 2013, the Company's Quarterly Reports on Form 10-Q for the first three

quarters of 2013 had simply reported the Company's DSO figures without any additional

commentary. However, the Company's Annual Report on Form 10-K for the 2013 fiscal year

noted an increase in the Company's DSOs in Q4 2013. Specifically, the Company's Annual

Report on Form 10-K, additionally disclosed, "The increase in days sales outstanding was

---

[11] *See S.E.C. v. Korkuc*, No. 03-cv-3017, Complaint, ¶28 (E.D.N.Y., June 19, 2003); *see also*
SEC AAER No. 1673A (Nov. 25, 2002), *available* at
http://www.sec.gov/litigation/litreleases/lr17859a.htm.

primarily due to a higher proportion of revenue recorded *in the latter half of the fourth quarter of 2013* compared with the prior year."

180.    The above statement from the Company's 2013 Form 10-K was materially false and/or misleading because it failed to disclose: (1) that the reason for the higher proportion of revenue recorded in the "latter half of the quarter" was because of an increasingly disproportionate amount of revenue being recorded in the *last week of the quarter* and even the *last day* of the quarter (for example, as alleged above, CW1 noted that due to bulk sales, *most* of the sales for a given quarter were made in the last week of the quarter); (2) that the Company was engaging in quarter-end bulk sales to OBL customers to meet quarterly expectations; (3) that extended payment terms were provided as part of enticing OBLs to engage in bulk-sales at quarter-end and that such bulk-sales were done at substantial/deep discounts of approximately 50% that effectively decreased future sales by twice as much; (4) that Spectranetics was providing OBL customers that engaged in these quarter-end bulk sales a right of return or refund (or to exchange expired products); (5) that, as a result of the foregoing, the Company's OBL customers that were participating in bulk sales were becoming increasingly bloated with excess inventory that would decrease future demand; and (6) that the Company was becoming increasingly exposed to extended payment terms to OBL customers, which carried a substantially higher risk of loss (when combined with allowing those customers rights of return).

181.    Thereafter, in 2014, Spectranetics slightly modified its disclosure about the increase in the Company's DSOs.  The Company's Quarterly Report on Form 10-Q for Q1 2014 (and similarly for Q2 2014), in relevant part, stated:

> … Days sales outstanding are calculated by dividing the ending accounts receivable balance, net of reserves for sales returns and doubtful accounts, by the average daily sales for the quarter. Inventory turns are calculated by dividing annualized cost of sales for the quarter by ending inventory. The increase in days

sales outstanding was primarily due to an increase in the percentage of revenue recorded **in the latter half of the quarter and the increase in sales to our office-based physician clinics, the fastest growing segment of the VI business. In some cases we have granted extended terms, generally no more than 90 days, to these physician-owned facilities, which are greater than our typical 30 day terms.** Additionally, we have increased sales to our distributor in Japan, which under our contract is granted 75 day terms.

182.     The above statement from the Company's 10-Qs for Q1 2014 and Q2 2014, were materially false and/or misleading for the same reasons alleged above in ¶180. Additionally, the statement "[i]n some cases we have granted extended payment terms," was also materially false and misleading because it did not disclose that this was a routine practice in connection with the Company's practice of quarter-end bulk sales and because it did not disclose that extended payment terms were generally associated with deeply discounted sales that effectively constituted channel stuffing at twice the normal rate of sales and as a result were accompanied by twice the risk of a negative future impact.

183.     The Company's Quarterly Report on Form 10-Q for Q3 2014, however, actually reported a decrease in DSOs, which "was primarily due to the integration of AngioScore. With a higher level of consignment sales, which tend to get processed and paid more promptly, AngioScore's days sales outstanding historically have been lower than those of Spectranetics."

184.     The above statement from the Quarterly Report on Form 10-Q for Q3 2014 was materially false and/or misleading for the same reasons alleged above in ¶¶180-82. Additionally, Defendants failed to disclose that the addition of AngioScore and its lower DSOs was masking the extent of Defendants' quarter-end bulk sales practices.

185.     Thereafter, the Company's Annual Report on Form 10-K, in relevant part, provided the following with respect to DSOs:

. . . Days sales outstanding are calculated by dividing the ending accounts receivable balance, net of allowances for sales returns and doubtful accounts, by the average daily sales for the quarter. The increase in days sales outstanding was

primarily due to an increase in the percentage of revenue recorded *in the latter half of the quarter* and the increase in sales to our office-based physician clinics, which is the fastest growing segment of the VI business. *In some cases, we have granted extended terms,* generally no more than 90 days, to these physician-owned facilities, which are longer than our typical 30 day terms. Additionally, we have increased sales to our distributor in Japan, which under our contract is granted 75 day terms. Inventory turns are calculated by dividing annualized cost of sales for the quarter by ending inventory. The decrease in inventory turns was primarily due to the inclusion of AngioScore's inventory, which historically has turned more slowly than that of Spectranetics, primarily as a result of their extensive use of consignment inventory held at customer locations.

186.   The above statement from the Annual Report on Form 10-K for FY 2014 was materially false and/or misleading for the same reasons alleged above in ¶¶180, 182, 184.

187.   The Company's Form 10-Q for Q1 2015, in relevant part, stated:

. . . Days sales outstanding are calculated by dividing the ending accounts receivable balance, net of reserves for sales returns and doubtful accounts, by the average daily sales for the quarter. The increase in days sales outstanding for the three months ended March 31, 2015 was primarily due to an increase in the impact of granting extended terms, generally no more than 90 days, to certain office-based physician clinics, which are longer than our typical 30 day terms. Inventory turns are calculated by dividing annualized cost of sales for the quarter by ending inventory. The decrease in inventory turns for the three months ended March 31, 2015 was primarily due to an increase in finished goods based on anticipated higher revenue in the first quarter of 2015 and the acquired Stellarex inventory.

188.   The above statement from the Quarterly Report on Form 10-Q for Q1 2015 was materially false and/or misleading for the same reasons alleged above in ¶¶180, 182, 184, 186.

189.   Moreover, the Company's Form 10-Q for Q1 2015 contained a subtle admission/concession about the Company's increasing reliance on offering extended payment terms to induce OBL customers to engage in bulk sales in late 2014 and Q1 2015. Specifically, the Company's Q1 2015 stated, "The increase in days sales outstanding for the three months ended March 31, 2015 was primarily due to *an increase in the impact* of granting extended terms, generally no more than 90 days, to *certain* office-based physician clinics, …." The specific addition of "increase in the impact of granting extended terms" and clarification that this

practice related to "certain" OBLs (as opposed to generally all of the Company's OBL customers) was a subtle concession by Defendants that Spectranetics had become increasingly reliant on offering extended payment terms to certain OBL customers (*e.g.*, customers in Florida) to engage in quarter-end bulk sales.

190.    After the Class Period, Spectranetics' Form 10-Q for Q2 2015, noted a slight decrease in DSO in the first six months of 2015, which it disclosed was "primarily due to increased collections from slower-paying customers." This disclosure reflected a subtle admission that in Q2 2015 the Company experienced increased collections from OBL customers with extended payment terms (*i.e.*, "slower-paying customers") that was the corresponding effect of an increasing concentration of bulk sales to these OBLs in prior quarters.

191.    As a result of the foregoing, as well as coupled with the Company's violations of GAAP and failure to disclose its reliance on improper channel stuffing, the Company's disclosures about its rising DSOs during the Class Period were materially false and misleading and did not accurately portray the true financial performance or condition of the Company.

## VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

### A.    Materially False and Misleading Statements and Omissions Concerning Q4 2013 and FY 2013 Results

#### 1.    Q4 2013 Press Release and Form 8-K

192.    On February 27, 2014, Defendants filed a Current Report on Form 8-K with the SEC attaching a press release of the same date (the "February 27, 2014 press release"), which reported Q4 2013 total revenues up 14% YoY to $41.9 million ($1.0 million above Street consensus), and VI revenues of $20.6 million ($1.6 million above Street consensus). Defendants noted that VI revenue growth was up 23%, led by U.S. peripheral atherectomy revenue growth of 35%. Additionally, Defendants reported that net income for Q4 2013 was $883,000, or $0.02 per

diluted share, and adjusted EBITDA was $4.6 million for the quarter.

193.    On February 27, 2014, Defendants also reported FY 2013 results. FY 2013 total revenues were up 13% to $158.8 million, and VI revenue growth was up 12%, with revenues of $75.6 million. Defendants reported that net loss for FY 2013 was $370,000, or a loss of $0.01 per diluted share, and adjusted EBITDA was $13.3 million for the year.

194.    The above-cited financial results reported in the February 27, 2014 press release, including total revenue and growth, VI revenue and growth, atherectomy revenue growth, and adjusted EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

### 2.    2013 Form 10-K

195.    On February 28, 2014, the Company filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year (the "2013 10-K"). The 2013 10-K was signed by Drake and Childs, and reiterated the Company's earnings results previously reported on February 27, 2014.

196.    The financial results repeated in the 2013 10-K, including total revenue and growth, VI revenue and growth, atherectomy revenue growth, and adjusted EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit

channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

197.    The 2013 10-K was further materially false and misleading because it failed to disclose information on known trends, as required by Item 303 of Regulation S-K (17 CFR § 229.303), and it failed to disclose risks and uncertainties that could significantly affect financial amounts reported, as required by GAAP regulation ASC 275-1. Specifically, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends within the Company, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand); and (ii) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would, or was reasonably expected to, have a "material…unfavorable impact on…revenues."

### 3.    Q4 2013 Conference Call

198.    On February 27, 2014, Defendants hosted a conference call with analysts and investors to discuss Q4 2013 and FY 2013 earnings results. During the call, Defendant Drake noted the Company's growth drivers and discussed the 40% U.S. sales force expansion to drive 2014 sales:

> **Our Vascular Intervention business delivered revenue of $20.6 million, an increase of 23%. And US peripheral atherectomy was up 35% over prior year**. This growth was balanced across hospital and office space labs and these results reflect increased traction on the sales execution side, and the great

opportunity we have in front of us.

<center>***</center>

Now let's turn to our growth drivers. **As we stated, growth in our Vascular business is predicated upon three things: atherectomy penetration and share gains, capitalizing on the ISR opportunity and expanding our product portfolio. As we've done consistently, we grew our US atherectomy business faster than the market. Q4 growth was 35%,** driven by sales execution, new product growth and new account starts. Our sales force expansion adds fuel to this fire.

199.    The above-cited financial results reported during the February 27, 2014, conference call, including VI revenue and growth, and peripheral atherectomy revenue and growth, were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business. The statements that "growth in our Vascular business is predicated upon three things" and "we grew our US atherectomy business faster than the market" are materially false and misleading because Defendants failed to disclose that the "growth" was artificially fueled by the illicit sales practices alleged herein.

### 4.    Q4 2013 Analyst Reaction

200.    Analysts were pleased with the "strong" Q4 2013 results. On February 28, 2014, J.P. Morgan noted that Q4 2013 total revenues were $1.0 million above Street consensus and were VI revenues were $1.6 million above Street consensus. Moreover, J.P. Morgan stated that disposable sales increased 15% to $36.8 million, which was $1.1 million above Street consensus.

J.P. Morgan also noted that with the Company's recent sales force expansion, the growth benefits should become more apparent over the next few quarters

**B.      Materially False and Misleading Statements and Omissions Concerning Q1 2014 Results**

**1.      Q1 2014 Press Release and Form 8-K**

201.    On April 7, 2014, Defendants filed a Current Report on Form 8-K with the SEC attaching a press release of the same date (the "April 7, 2014 press release"), reporting preliminary Q1 2014 earnings results, with total revenues up 5% YoY at $39.6 million, and VI revenues up 16% YoY. Additionally, Defendants estimated that net loss for the quarter would be $5.7 to $6.1 million, or $0.14 to $0.15 per share.

202.    On April 23, 2014, Defendants filed a Form 8-K with the SEC attaching a press release of the same date (the "April 23, 2014 press release"), reporting Q1 2014 earnings results, with total revenues up 5% YoY at $39.6 million, and VI revenue growth up 16% YoY to $20.0 million, led by U.S. peripheral atherectomy revenue growth of 29%. Additionally, Defendants reported that net loss for the quarter was $5.7 million, or $0.14 per share, and adjusted EBITDA was negative $2.9 million

203.    The above-cited financial results reported in the April 7 and April 23, 2014 press releases, including total revenue and growth, VI revenue and growth, peripheral atherectomy revenue growth, and EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing,

the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

204.    In both April press releases, Defendants acknowledged a slight miss on total revenue versus expectations, but attributed the miss primarily to the Lead Management segment, and insisted that the miss was offset by "strong performance" and "steadfast" traction in the VI segment.

205.    Defendants' statements of "strong performance" and "steadfast" traction in the VI segment were materially false and misleading because they failed to disclose that the VI segment's "growth" was artificially fueled by the illicit sales practices alleged herein.

### 2.    Q1 2014 Form 10-Q

206.    On April 30, 2014, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal year first quarter (the "Q1 2014 10-Q"). The Form 10-Q was signed by Defendants Drake and Childs, and reiterated the Company's financial results previously stated on April 23, 2014.

207.    The financial results repeated in the Q1 2014 10-Q, including total revenue and growth, VI revenue and growth, peripheral atherectomy revenue growth, and EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying

demand and growth of the Company's VI business.

208.    The Q1 2014 10-Q was further materially false and misleading because it failed to disclose information on known trends, as required by Item 303 of Regulation S-K (17 CFR § 229.303), and it failed to disclose risks and uncertainties that could significantly affect financial amounts reported, as required by GAAP regulation ASC 275-1. Specifically, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends within the Company, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand); and (ii) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would, or was reasonably expected to, have a "material…unfavorable impact on…revenues."

### 3.    Q1 2014 Conference Call

209.    On April 23, 2014, Defendants hosted a conference call with analysts and investors to discuss Q1 2014 earnings results. During the call, Defendant Drake stated:

> **Our Vascular Intervention business delivered revenue of $20 million, an increase of 16%, and US peripheral atherectomy was up 29% over prior year**. This performance was balanced across hospital and office-based labs and **our growth rate was three times to four times that of the overall market**. These results reflect increased traction on sales execution, case penetration, and the great opportunity in front of us.

210.    The financial results reported by Defendant Drake during the conference call, including VI revenue and growth, and peripheral atherectomy revenue growth were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices

resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

### 4.  Q1 2014 Analyst Reaction

211.  Analysts were surprised with Company's Q1 2014 results. On April 23, 2014, J.P. Morgan noted that Q1 2014 total revenues were 1.8 million below Street consensus, finding Q1 2014 "highly uncharacteristic for Spectrantics." However, J.P. Morgan found comfort in Defendants' representations that the miss was due to disappointing Lead Management performance, which "was partially offset by another impressive performance from the Vascular Intervention business" noting that VI revenues came in above Street consensus. J.P. Morgan further stated that the VI segment's outperformance, was "even more impressive considering the fact that the company saw little, if any, benefit from its recent salesforce expansion, not to mention its pending application for an ISR indication would become more apparent over the next few quarters." The J.P. Morgan report remained confident that there was "nothing in this quarter's performance to change our positive long-term view on the company's growth prospects."

### C.  Materially False and Misleading Statements and Omissions Concerning Q2 2014 Results

### 1.  Q2 2014 Press Release and Form 8-K

212.  On July 24, 2014, Defendants filed a Current Report on Form 8-K with the SEC attaching a press release of the same date (the "July 24, 2014 press release"), reporting Q2 2014 earnings results, with total revenues up 10% YoY at $43.6 million, and VI revenue growth was up 19% YoY to $22.5 million, led by U.S. peripheral atherectomy revenue growth of 22%.

Additionally, Defendants reported that net loss for the quarter was $6.6 million, or $0.16 per share, and adjusted EBITDA was $780,000.

213.    The financial results reported in the July 24, 2014 press release, including total revenue and growth, VI revenue and growth, U.S. peripheral atherectomy revenue growth, and EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

214.    In the July 24, 2014 press release, Drake praised the strong Q2 2014 results, noting that Defendants "had a strong second quarter with continued momentum in our vascular and international businesses.…"

215.    Drake's statement attributing the "strong second quarter" to "continued momentum" in the Company's VI business segment was materially false and misleading because he failed to disclose that the segment's "growth" was artificially fueled by the illicit sales practices alleged herein.

### 2.    Q2 2014 Form 10-Q

216.    On August 11, 2014, the Company filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal second quarter (the "Q2 2014 10-Q"). The Form 10-Q was signed by Defendants Drake and Childs, and reiterated the Company's earnings results previously stated

on July 24, 2014.

217.     The financial results repeated in the Q2 2014 10-Q, including total revenue and growth, VI revenue and growth, peripheral atherectomy revenue growth, and EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

218.     The Q2 2014 10-Q was further materially false and misleading because it failed to disclose information on known trends, as required by Item 303 of Regulation S-K (17 CFR § 229.303), and it failed to disclose risks and uncertainties that could significantly affect financial amounts reported, as required by GAAP regulation ASC 275-1. Specifically, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends within the Company, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand); and (ii) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would or was reasonably expected to have a "material…unfavorable impact on…revenues."

### 3.     Q2 2014 Conference Call

219.     On July 24, 2014, Defendants hosted a conference call with analysts and investors

to discuss Q2 2014 earnings results. During the call, Defendant Drake lauded the Company's VI growth and sales execution:

> **Our Vascular Intervention business delivered revenue of $22.5 million, a constant currency increase of 18% and US peripheral atherectomy was up 22% over prior year**. This performance was balanced across hospital and office-based labs and **our growth rate remained significantly faster than the market. These results are driven by solid traction in the field** and our expanded team is settling in.
>
> <div align="center">***</div>
>
> Now on to our growth drivers. **Growth acceleration in our vascular business is predicated upon capitalizing on ISR, successful integration of AngioScore and leveraging our expanded commercial footprint. Our US atherectomy growth in the second quarter was 22%, driven by sales execution, case penetration and new accounts.** Our larger sales team is increasing its productivity and performing as projected. This expanded coverage was well timed with the ISR label and the incremental scale of the AngioScore team adds substantial firepower.

220.   The above-cited financial results, including VI revenue and growth, and U.S. peripheral atherectomy growth, were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business. Moreover, the statements regarding the VI segment's "growth acceleration" and "growth drivers" were materially false and misleading because Defendants failed to disclose that the "growth" was artificially fueled by the illicit sales practices alleged herein.

221.   Defendant Childs reiterated the earnings results reported in the July 24, 2014

press release and Q2 2014 10-Q, stating that:

> Second quarter revenue of $43.6 million was an increase of 10%. Vascular Intervention revenue of $22.5 million, increased 19% or 18% in constant currency, led by US peripheral atherectomy growth of 22%.

222.   The above-cited financial results, including total revenue and growth, VI revenue and growth, and U.S. peripheral atherectomy growth, were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

223.   Moreover, in response to the disappointing total revenue results previously reported in Q1 2014, Defendants assuaged the market's fears by highlighting VI revenue growth and atherectomy revenue growth, with Defendant Drake boasting that "our growth rate was three times to four times that of the overall market." Thus, having successfully deflected the market's fears by highlighting VI strength and growth, and having placed the blame for the missed Q1 2014 results on weakness in the Lead Management segment, Defendants had to report strong Q2 2014 VI results. Rather than true strong sales and growth, however, as recounted by CW2 herein above, Defendants were desperate on the last day of Q2 2014, warning CW2's Territory Manager, Rose, that the Company was not going to make its quarterly target unless Rose could secure a last minute bulk order of at least $200,000 to $250,000. Moreover, according to CW2,

such a bulk sale was entered into on extended payment terms. Thus, Defendants' statements regarding Q2 2014 VI revenue growth were materially false and misleading because Defendants failed to disclose that the "growth" was artificially fueled by the illicit sales practices alleged herein.

### 4. Q2 2014 Analyst Reaction

224. Analysts were pleased with the seemingly "strong" Q2 2014 results. On July 25, 2014, J.P. Morgan noted that Q2 2014 total revenues were $1.6 million above Street consensus and VI revenues were $1.1 million above Street consensus.

225. J.P. Morgan praised the VI segment growth, stating that "[t]his marks the fourth consecutive quarter of >20% growth for this [VI] segment, a performance that is even more impressive considering the fact that the company has yet to see the full benefit from its recent salesforce expansion, let alone the ISR indication approval." Pleased with the successful quarter as reported by Defendants, J.P. Morgan reiterated their Overweight rating and noted that the stage was "set for growth acceleration."

### D. Materially False and Misleading Statements and Omissions Concerning Q3 2014 Results

### 1. Q3 2014 Press Release and Form 8-K

226. On October 23, 2014, Defendants filed a Current Report on Form 8-K with the SEC attaching a press release of the same date (the "October 23, 2014 press release"), reporting third quarter 2014 earnings results, with total revenues up 48% YoY at $58.8 million, and VI revenue growth up 93% YoY to $36.6 million. U.S. peripheral atherectomy revenue grew 19% and for its first quarter following the AngioScore acquisition, AngioSculpt revenues were $14.9 million.  Defendants also reported net loss for the quarter of $13.9 million, or $0.33 per share, and adjusted EBITDA of $2.7 million.

227.    The financial results reported in the October 23, 2014 press release, including

total revenue and growth, VI revenue and growth, peripheral atherectomy revenue growth,

AngioSculpt sales, and EBITDA were materially false and misleading because, as alleged in

§§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i)

Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the

Company's sales figures, to meet its revenue and growth targets, as well as market expectations;

and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in

violation of both GAAP and its own stated policies and procedures. As a result of the foregoing,

the Company's reported financial results created a materially false and misleading impression as

to the underlying demand and growth of the Company's VI business.

228.    In the October 23, 2014 press release, Drake praised the VI segment's growth,

noting that it was "growing faster than the market across key vascular segments…."

229.    Drake's statement that Spectranetics' VI segment was "growing faster" than the

market was materially false and misleading because Drake failed to disclose that the segment's

"growth" was artificially fueled by the illicit sales practices alleged herein.

## 2.    Q3 2014 Form 10-Q

230.    On November 6, 2014, the Company filed its Quarterly Report with the SEC on

Form 10-Q for the 2014 fiscal third quarter (the "Q3 2014 10-Q"). The Form 10-Q was signed by

Defendants Drake and Childs, and re-reported the Company's third quarter 2014 earnings results

previously stated on October 23, 2014.

231.    The financial results repeated in the Q3 2014 10-Q, including total revenue and

growth, VI revenue and growth, peripheral atherectomy revenue growth, AngioSculpt sales, and

EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*,

Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

232.    The Q3 2014 10-Q was further materially false and misleading because it failed to disclose information on known trends, as required by Item 303 of Regulation S-K (17 CFR § 229.303), and it failed to disclose risks and uncertainties that could significantly affect financial amounts reported, as required by GAAP regulation ASC 275-1. Specifically, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends within the Company, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand); and (ii) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would, or was reasonably expected to, have a "material…unfavorable impact on…revenues."

### 3.    Q3 2014 Conference Call

233.    On October 23, 2014, Defendants hosted a conference call with analysts and investors to discuss Q3 2014 earnings results. During the call, Defendant Drake lauded the Company's VI "strong growth" and "crisp execution", noting the VI segment was on "rock solid ground," stating in part:

**Our Vascular business delivered revenue of $36.6 million which represents growth of 93%, including $14.9 million of AngioSculpt sales**. The strength of

this performance stands out as it was achieved in the midst of a major integration. The Lead Management business delivered revenue of $17.6 million, 9% growth. **As you can see, growth is accelerating from the first half levels and we're well on our way to delivering on our Q1 call projections.**

\*\*\*

To be a bit more granular on results, overall, **VI delivered strong growth at 93%; U.S. peripheral atherectomy was up 19% on strong laser catheter sales driven by crisp execution and early ISR traction. AngioScore was ahead of projections at $14.9 million,** supported by our leadership position in plaque modification and success with the 200 millimeter launch. Sales of this product are significantly greater than expected and it's one of the most successful product launches in the company's history.

\*\*\*

In summary, **the Vascular business is on rock solid ground**. Significant growth catalysts point to good things ahead, notably the ISR indication, new product introductions, and a fully trained, scaled and integrated commercial team….

234.    The financial results reported by Drake, including VI revenue and growth, peripheral atherectomy revenue growth, and AngioSculpt revenue were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business. Moreover, Drake's statements that the VI "growth" was due to "strong laser catheter sales driven by crisp execution and early ISR traction" was materially false and misleading because Drake failed to disclose that the segment's "growth" was in fact artificially fueled by the illicit sales practices alleged herein. Finally, Drake's statements that "growth is accelerating from the first half levels and we're well on our way to delivering on our Q1 call

projections" and that "the Vascular business is on rock solid ground" are materially false and misleading as Drake failed to disclose material risks, including: (i) the existence of trends within the Company, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand); and (ii) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would or was reasonably expected to have a "material…unfavorable impact on…revenues."

235.    Defendant Childs confirmed the earnings results reported in the press release, stating that:

> Third quarter revenue of $58.8 million was an increase of 48%. Vascular Intervention revenue of $36.6 million increased 93% led by U.S. peripheral atherectomy growth of 19% and AngioSculpt revenue of $14.9 million. Additionally, coronary atherectomy revenue increased at an impressive rate of 43% with strong contributions from Japan supported by double-digit growth in the United States.

236.    The financial results repeated by Childs, including total revenue and growth, VI revenue and growth, peripheral and coronary atherectomy revenue growth, and AngioSculpt revenue were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

237.    During the October 23, 2014 conference call, Defendant Drake also downplayed

and materially misrepresented the risk of potential negative effects posed by the introduction of competitive DCBs to the already competitive marketplace. During the call, in response to a question from Jason R. Mills from Canaccord Genuity about the potential negative impact of DCBs on laser atherectomy, specifically ISR sales, Drake assured the public of the supposedly "complementary" nature of DCB's with Spectranetics' portfolio:

> Yeah, Jason, **the short answer is no, it does not discourage us at all. In fact, we believe very, very strongly that there is a complementary nature between atherectomy and drug-coated technology generally,** and we think there is a bias to our atherectomy given the ISR application.

238.    Defendant Drake's statements disclaiming any potential negative effect of DCBs and instead lauding the supposedly positive "complementary" nature of DCBs, suggesting a boon to Spectranetics' VI products as a result of the introduction of DCBs, were materially false and misleading in light of the facts that: (i) Defendants failed to disclose a material risk (and known trend) inherent in the Company's sales practices, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive pressure; and (ii) that Defendants' ability to compete was dependent upon the unsustainable practice of pushing bulk sales at quarter-end to meet revenue guidance and was out of line with actual demand, and would, or was reasonably expected to, have a material unfavorable impact on revenues.

### 4.      Q3 2014 Analyst Reaction

239.    Analysts were pleased with the "strong" Q3 2014 results. On October 24, 2014, J.P. Morgan noted that Q3 2014 total revenues were $1.5 million above Street consensus and VI revenues were $1.4 million above Street consensus. J.P. Morgan praised the VI segment growth, stating that "[t]his marks the sixth consecutive quarter of ~20% growth for this segment, a

performance that is even more impressive considering the fact that the company has yet to see much benefit from the recent ISR indication approval." In sum, J.P. Morgan was confident in the Defendants' statements, and concluded that they "increase[d] our conviction that the pieces are in place for a meaningful growth acceleration at the company over the next few quarters."

   E.   **Defendants Provide Materially False and Misleading 2015 Guidance in the December 4, 2014 Press Release and at the Company's First-Ever "Analyst and Investor Day"**

   240.   On December 4, 2014, Defendants hosted the Company's first ever "Analyst and Investor Day" during which they provided the Company's much-anticipated 2015 financial guidance. Defendant Childs stated:

   Now to the specifics of our 2015 outlook. Total revenue is projected to be in the range $258 million to $265 million, that is growth of 28% to 30% versus our 2014 outlook. This revenue guidance reflects the unfavorable impact of a declining euro to dollar exchange rate estimated in the range of $1.5 million to $2 million.

   Vascular Intervention revenue growth is projected to grow 41% to 46% and this includes approximately $15 million to $20 million of ISR related revenue, as well as AngioSculpt revenue projected in the range of $62 million to $66 million.

   241.   On the same day, Defendants filed a Current Report on Form 8-K with the SEC, attaching a press release of the same date (the "December 4, 2014 press release"). The December 4, 2014 press release similarly reported, in pertinent part:

   Revenue is projected to be in the range of $258 million to $265 million, an increase of 28% to 30% over the company's 2014 outlook of $202.0 million to $203.5 million….

   • Vascular Intervention revenue growth is anticipated to be in the range of 41% to 46%. This includes AngioSculpt revenue of $62 million to $66 million and ISR revenue of approximately $15 million to $20 million.

                                                * * *

   Net loss, Non-GAAP Net loss and Adjusted EBITDA outlook all reflect improving trends compared with previously provided 2014 outlook. Net loss is projected to be in the range of $28.0 million to $32.0 million, or $0.66 to $0.75 per share. Non-GAAP net loss is projected to be in the range of $4.3 million to $8.3 million, or $0.10 to $0.20 per share. Adjusted EBITDA is anticipated to be in

the range of $12.3 million to $16.3 million.

242.    On this news, Spectranetics' share price rose $2.41 per share to close at $33.49 on December 4, 2014, and as the market continued to respond to the news, the Company's share price rose an additional $1.31 per share to close at $34.82 on December 5, 2014, with the stock trading on both days on very heavy volume.

243.    The 2015 guidance provided by Defendants in the December 4, 2014 press release and by Defendant Childs during the Analyst and Investor Meeting of the same date was materially false and misleading and lacked a reasonable basis because Defendants knowingly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures; (iii) the Company's illicit sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive or economic pressure; and (iv) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would or was reasonably expected to have a material unfavorable impact on revenues.

244.    When asked during the December 4, 2014, analyst and investor meeting about the potential impact of DCBs on sales of the Company's peripheral atherectomy devices, and specifically whether the advent of DCBs would "replace some of those other [atherectomy] devices," Defendant Drake denied any such possibility, instead proclaiming that DCBs "will help the atherectomy market in general."

245.     Defendant Drake's statements disclaiming any potential negative effect of DCBs and instead lauding the supposedly helpful impact of DCBs, suggesting a boon to Spectranetics' VI products as a result of the introduction of DCBs, were materially false and misleading in light of the facts that: (i) Defendants failed to disclose a material risk (and known trend) inherent in the Company's sales practices, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive pressure; and (ii) that Defendants' ability to compete was dependent upon the unsustainable practice of pushing bulk sales at quarter-end to meet revenue guidance and was out of line with actual demand, and would, or was reasonably expected to, have a material unfavorable impact on revenues.

**F.      Materially False and Misleading Statements and Omissions Concerning Q4 2014 Results and Defendants' Reiteration of Overall 2015 Guidance**

**1.      Q4 2014 Press Release and Form 8-K**

246.     On February 19, 2015, Defendants filed a Current Report on Form 8-K with the SEC, attaching a press release of the same date (the "February 19, 2015 press release"), reporting Q4 2014 earnings results, with total revenues up 50% YoY at $63 million, and VI revenue growth up 90% YoY to $39.1 million. U.S. peripheral atherectomy revenue grew 30% and AngioSculpt revenues were $14.7 million. Additionally, Defendants reported that net loss for the quarter was $14.7 million, or $0.35 per share, and adjusted EBITDA was $3.2 million.

247.     In the February 19, 2015 press release, Defendants also reported FY 2014 earnings results, with total revenues up 29% from FY 2013 at $204.9 million, and VI revenue growth up 56% FY 2013 to $118.1 million. Additionally, Defendants reported that net loss for the year was $40.9 million, or $0.98 per share, and adjusted EBITDA was $11.2 million.

248.    The financial results reported in the February 19, 2015 press release, including the fourth quarter figures on total revenue and growth, VI revenue and growth, U.S. peripheral atherectomy revenue growth, AngioScupt revenue, and quarterly EBITDA, as well as the FY 2014 total revenue and growth, VI revenue and growth, and EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

249.    In the press release, Drake praised the Company's execution and performance, stating:

> our tactical execution and performance combined with strategic progress set us up well for future growth and operating leverage. Notably, we have early traction with ISR, our mechanical tools launch is ahead of schedule, the AngioScore integration is on track and, following our acquisition of the Stellarex platform in January, commercialization in Europe is underway. Our competitive position is stronger than ever and we believe it will continue to improve over time.

250.    Defendant Drake's statement that the Company's "competitive position is stronger than ever" was materially false and misleading because he failed to disclose that the Company's "growth" was artificially fueled by the illicit sales practices alleged herein.

251.    In the February 19, 2015 press release, the Company announced an update to 2015 guidance to account for Stellarex acquisition-related items, but reiterated the overall 2015 guidance:

AMENDED CLASS ACTION COMPLAINT

Spectranetics is updating its 2015 financial outlook to reflect the projected impact of Stellarex and adjustments for the weakening euro since the financial outlook provided in December 2014.

\*\*\*

**Spectranetics management continues to project revenue in the range of $258 million to $265 million, an increase of 26% to 29% over 2014**. Management estimates the negative impact of a weakening euro at approximately $3 million. Projected sales from the Stellarex DCB products are anticipated to largely offset the foreign currency impact in 2015.

\*\*\*

**Vascular Intervention revenue growth is anticipated to be in the range of 41% to 46%. This includes projected AngioSculpt revenue of $62 million to $66 million and projected ISR revenue of approximately $15 million to $20 million**.

\*\*\*

Net loss for 2015 is projected to be in the range of $58.0 million to $62.0 million, or $1.36 to $1.46 per share. The net loss, excluding Stellarex, is projected to be $28.0 million to $32.0 million, or $0.66 to $0.75 per share. The net loss budgeted for Stellarex is approximately $30.0 million, or $0.71 per share. The Stellarex acquisition closed on January 27, 2015 and Spectranetics is in the early stages of integration. As integration proceeds, the budget will likely change. Also, the company has identified potential further applications of the technology that may enhance revenue and return metrics and entail additional investments.

Non-GAAP net loss for 2015 is projected to be in the range of $31.9 million to $35.9 million, or $0.75 to $0.84 per share.

252.    Defendants' repeated 2015 projections were materially false and misleading and lacked a reasonable basis because Defendants knowingly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures; (iii) the Company's illicit sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive or economic pressure; and (iv) that Defendants' practice of pushing bulk sales at

quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would or was reasonably expected to have a material unfavorable impact on revenues.

### 2.    Q4 2014 Conference Call

253.    On February 19, 2015, Defendants hosted a conference call with analysts and investors to discuss Q4 2014 and FY 2014 earnings results. During the call, Defendant Drake touted the Company's Q4  2014 growth:

> On the top-line this quarter, **we posted 51% overall growth**, 16% organic, both on a constant currency basis. Performance was highlighted by **faster than market growth across focus areas**, **continued success with our AngioScore** integration and robust performance across U.S. and global regions. **In Vascular Intervention, we achieved 91% growth**, 19% organic, again both constant currency. **U.S. peripheral atherectomy was up 30% and above-the-knee growth was even stronger at 34%. These results were achieved over a strong prior year quarter and demonstrate ISR traction**.
>
> We're still in early stages of the ISR launch, but physician feedback, demand for training, new accounts and deeper penetration all point to us **being on track with our guidance of $15 million to $20 million this year**. **I'm also pleased to report that the AngioScore integration is on or ahead of schedule**. Operational milestones are largely complete. Gross margin for this business is 560 basis points ahead of prior year and the commercial team is settling in with another quarter of solid performance.

254.    Defendant Drake's statements about "growth" in all segments and his reiteration of ISR guidance of $15 to $20 million in sales were materially false and misleading because he knowingly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures; (iii) the Company's illicit sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable

to even the slightest increase in competitive or economic pressure; and (iv) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would or was reasonably expected to have a material unfavorable impact on revenues.

255.    During the February 19, 2015 earnings call, Defendant Childs further broke down the Q4 2014 results, and highlighted the seemingly outstanding performance of the peripheral atherectomy segment:

> We achieved fourth quarter revenue of $63 million, which represents growth of 50% or 51% constant currency. Organic revenue growth was 15%, 16% constant currency, the highest of any quarter this year.
>
> Vascular Intervention revenue of $39.1 million increased 90%.... This growth was led by U.S. peripheral atherectomy, which increased 30% and also represented the highest quarterly growth rate of the year. Notably, this is our first full quarter of the ISR launch and these results reflect early traction.
>
> AngioSculpt revenue of $14.7 million brings our second half revenue to $29.6 million, consistent with our previous guidance of $29 million to $30 million.

256.    The financial results reported by Defendant Childs were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

257.    Additionally, Defendant Childs affirmed 2015 revenue guidance as follows:

Now turning to our 2015 financial outlook, which has been updated to reflect the projected impact of Stellarex and adjustments for the weakening euro, since the financial outlook provided in December of 2014. **We continue to project revenue in the range of $258 million to $265 million, an increase of 26% to 29% over 2014.**

*\*\*\**

**Vascular Intervention revenue growth is anticipated to be in the range of 41% to 46%. This includes projected AngioSculpt revenue of $62 million to $66 million and projected ISR revenue of approximately $15 million to $20 million.**

258.    Defendant Childs' reiteration of the 2015 guidance was materially false and misleading and lacked a reasonable basis because he knowingly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures; (iii) the Company's illicit sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive or economic pressure; and (iv) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would or was reasonably expected to have a material unfavorable impact on revenues.

### 3.    Q4 2014 Analyst Reaction

259.    Following Defendants' February 19, 2015, press release and earnings call, analysts largely repeated Defendants' assessment of the new ISR indication as the primary driver of the remarkable Vascular Intervention performance for Q4 2014, and trumpeted peripheral atherectomy as a continued growth driver into 2015. On February 20, 2015, J.P. Morgan noted that Q4 2014 total revenues were $1.3 million above Street consensus and VI revenues were $0.2

million above Street consensus.[12] Repeating Defendants' 2015 guidance, J.P. Morgan stated "[f]or 2015, Spectranetics reiterated its guidance for 41-46% Vascular Interventions growth. This outlook assumes $15-20M in ISR revenues and a $62-66M contribution from AngioSculpt." J.P. Morgan praised the VI segment growth, stating that:

> Spectranetics' US Peripheral Atherectomy business was especially impressive, growing 30% YOY and topping our forecast by $1.3M. The upside was driven by the recent in-stent restenosis launch, which appears to be gaining significant traction. In the first full quarter since Spectranetics' July FDA label expansion, the company generated more than $4M in ISR revenues, or roughly double its 4Q13 level.

260.    Noting that AngioScore's performance was $0.4 million below Street consensus forecast, J.P. Morgan expressed disappointment but believed this to be due to the distraction of the ISR launch rather than any integration or product issues and echoed Defendants' statements that the AngioSculpt launch was successful and progressing well:

> While this lack of sequential growth is somewhat disappointing, we suspect that it may have been due in part to the sales force being preoccupied with the ISR launch. For its part, management noted that the integration of the AngioScore acquisition continues to progress well and it remains enthusiastic about AngioSculpt's long-term potential.

261.    Convinced that the stage was set for growth acceleration based on Defendants' statements, J.P. Morgan praised the Company's growth acceleration:

> **Stage is set for growth acceleration; reiterate Overweight.** Spectranetics' 4Q results increase our conviction that the pieces are in place for a meaningful growth acceleration at the company over the next few quarters. We expect upside to Street estimates over the course of 2015 to drive improving investor sentiment and further multiple expansion, making SPNC one of our favorite small-cap names. With significant upside to our $40 December 2015 price target from current levels, we reiterate our Overweight rating.

---

[12] Excessive bulk sales in Q4 2014 allowed Defendants to artificially meet consensus expectations. As alleged herein, a subsequent J.P. Morgan report from April 30, 2015, indicated Defendants admitted Q4 2014 results had been inflated by approximately $2 million in bulk sales "pulled" into Q4 2014 from Q1 2015.

G.     **Materially False and Misleading Statements and Omissions in the 2014 Form 10-K**

262.    On February 27, 2015, the Company filed its Annual Report with the SEC on Form 10-K for the 2014 fiscal year (the "2014 10-K"). The Form 10-K was signed by Defendants Drake and Childs, and reiterated the Company's earnings results previously stated on February 19, 2015.

263.    The financial results repeated in the 2014 10-K, including total revenue and growth, VI revenue and growth, atherectomy revenue growth, AngioSculpt revenue, and adjusted EBITDA were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

264.    In the 2014 10-K, Defendants assured investors that proper internal controls over financial reporting were in place and being observed: "Management has concluded that our internal control over financial reporting was effective as of December 31, 2014." This statement was materially false and misleading because Defendants knowingly and/or recklessly failed to disclose that Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures.

265.    The 2014 10-K was further materially false and misleading because it failed to disclose information on known trends, as required by Item 303 of Regulation S-K (17 CFR

§ 229.303), and it failed to disclose risks and uncertainties that could significantly affect financial amounts reported, as required by GAAP regulation ASC 275-1. Specifically, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends within the Company, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand); and (ii) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would, or was reasonably expected to, have a "material…unfavorable impact on…revenues."

### H. Defendants Announce Disappointing, Yet Materially False and Misleading Q1 2015 Results & Revised Guidance

#### 1. Q1 2015 Press Release and Form 8-K

266.    On April 23, 2015, Defendants filed a Current Report on Form 8-K with the SEC, attaching a press release of the same date (the "April 23, 2015 press release), reporting Q1 2015 earnings results, with total revenues up 45% YoY at $57.4 million, and VI revenue growth was up 82% YoY to $36.5 million. U.S. peripheral atherectomy revenue grew 16% and AngioSculpt revenues were $14.0 million. Additionally, Defendants reported that net loss for the quarter was $27.3 million, or $0.65 per share.

267.    The financial results reported in the April 23, 2015 press release, including total revenue and growth, VI revenue and growth, peripheral atherectomy revenue growth, and AngioSculpt revenue were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in

violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

268.   Despite noting strength in the VI portfolio in Q1 2015, Defendants partially revealed a crack in their growth story, blaming competitive pressures from DCBs. The April 23, 2015 press release quoted Defendant Drake as stating:

> Solid execution across commercial, clinical and new product development is evident,.... **Our Vascular Intervention portfolio is profoundly strengthening**, especially in our drug-coated balloon (DCB) platform, and record laser placements bode well for future growth. **Vascular performance is generally on track, yet scoring balloons in the United States are feeling the effect of recent competitive DCB launches**. Given recent launches, it is difficult to predict long-term impact, therefore we are guiding investors to the low end of our previously provided outlook.

269.   Defendant Drake's statement that the VI portfolio was "profoundly strengthening" was materially false and misleading because he failed to disclose that the illicit sales practices alleged herein artificially inflated VI revenues.

270.   In the April 23, 2015 press release, Defendants also revealed to investors that 2015 overall and VI revenues would be at the lower range of previously reported guidance, and specifically revised AngioSculpt guidance downward:

> **Spectranetics management continues to project revenue in the range of $258 million to $265 million, an increase of 26% to 29% over 2014, but is guiding to the low end of the range**. The revision reflects the potential impact of DCB products recently launched by competitors on the U.S. AngioSculpt business. As a result, **Vascular Intervention revenue is anticipated to be at the low end of the previously provided 41% to 46% range. More specifically, AngioSculpt revenue is projected in the range of $59 million to $66 million, compared with previous outlook of $62 million to $66 million. The remainder of our revenue outlook is unchanged, including ISR revenue of $15 million to $20 million**, and Lead Management revenue of 8% - 10% growth compared with last year.

Net loss for 2015 is projected to be within a range of $78.0 million to $82.0

million, or $1.84 to $1.93 per share, compared with $58.0 million to $62.0 million, or $1.36 to $1.46 previously provided. The increased net loss consists of approximately $14 million of incremental spending associated with the Stellarex program and $6 million of increased costs related to litigation with TriReme Medical, Inc.

271.    While the April 23, 2015 press release partially revealed the risks previously concealed from investors, Defendants nonetheless reiterated their materially false and misleading overall 2015 guidance, only guiding toward the low end of the range. Again, the revised guidance provided on April 23, 2015 was materially false and misleading and lacked a reasonable basis because Defendants knowingly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures; (iii) the Company's illicit sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive or economic pressure; and (iv) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would or was reasonably expected to have a material unfavorable impact on revenues.

## 2.    Q1 2015 Conference Call

272.    On April 23, 2015, Defendants hosted a conference call with analysts and investors to discuss Q1 2015 earnings results. During the call, Drake assured investors that the growth would continue to accelerate, citing ISR as a strong point but blaming AngioSculpt's flat U.S. growth to competitive pressures from DCBs:

**On the vascular side, double-digit organic growth continues and overall growth was rapid**. That said, two things worth mentioning, **U.S. peripheral atherectomy was at the lower end of historical performance, which has ranged from mid-teens to 30% growth. And our U.S. AngioScore franchise was under some pressure from recent competitive drug-coated balloon launches**. I'll go into more detail on this in a few minutes, but suffice it to say fundamentals are strong and the building blocks are in place to drive accelerating growth over the next several years. The punch line of today's call is that our business is on solid footing and that our pipeline of clinical, new product development, and commercial programs amplify in the months and years ahead.

<center>***</center>

**ISR performance is evident and on track. On the vascular intervention front, we achieved 84% growth overall, 13% organic, both on a constant currency basis. U.S. peripheral atherectomy grew 16%, about twice the market rate** yet as mentioned this is at the lower end of historical performance.

Over the last few years, growth rates have ranged from mid-teens to 30%, Q4 was at the high-end of the range, Q1 at the low end. Our trend line over time is positive and we expect that to continue. **Notably this quarter results in the hospital setting were robust at 33% growth, fueled by ISR**. Customer feedback, demand for training, and our new account pipeline reflects strength in this growth driver.

On the AngioScore front, the integration is largely complete. Operational metrics are ahead of expectations and commercially our team is melded into a cohesive unit.

That said, our AngioSculpt business was a tale of two cities. Our international business growth was robust and our U.S. business was flat. **The pressure we felt in the U.S. market is primarily due to the launch of drug-coated balloons**. Given the recent timing of launches and early trialing, it's difficult for us to clearly see the long-term impact.

273.    Defendant Childs reiterated the earnings results reported in the April 23, 2015

press release, blaming competition from DCBs for AngioScore's underperformance and citing to

"ordering patterns" from OBLs that made Q4 2014 strong and Q1 2015 soft:

**Our first quarter revenue was $57.4 million, which represents growth of 45% or 47% constant currency. Vascular Intervention revenue of $36.5 million, increased 82% or 84% constant currency. This growth was led by U.S. peripheral atherectomy, which increased 16%. This is at the low end of historical expectations, primarily due to ordering patterns in the office-based setting.**

<center>AMENDED CLASS ACTION COMPLAINT</center>

We had a strong quarter in Q4, and Q1 was soft. We're confident, the OBL business will drive growth going forward. And there has not been fundamental changes or market share shifts within this segment. **The U.S. AngioSculpt business was impacted primarily by the launch of drug-coated balloons. As a result, we're adjusting our overall revenue guidance and the VI growth rate guidance to the low end of the previously provided ranges.**

**We remain confident in the future growth of our vascular business due to our expanding portfolio and the ISR opportunity**….

274.    The financial results and "growth" reported by Defendants Drake and Childs for Q1 2015 were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

275.    Moreover, Drake's statements regarding AngioSculpt sales were materially false and misleading because he knowingly and/or recklessly failed to disclose: (i) that the Company's illicit sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive or economic pressure, including pressure from DCBs; and (ii) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would, or was reasonably expected to, have a material unfavorable impact on revenues.

276.   Meanwhile, Defendant Childs' statements that "ordering patterns" in OBLs caused "softness" in the first quarter atherectomy sales is materially false and misleading where he failed to disclose that these "patterns" were actually driven by the Company's own aggressive bulk sale discounting practice, which practice Defendants knew or recklessly disregarded would diminish Q1 2015 sales.

277.   Defendant Childs again blamed DCBs rather than admit that the Company's excessive bulk discounting practice was cannibalizing its future sales:

> Before I provide our full year 2015 outlook, I want to offer some insights that will assist you in modeling our Q2 and rest of year VI business. During Q2, we expect our VI revenue growth rate excluding AngioScore to be in the low to mid-teens as reported and mid to high teens constant currency.
>
> For the full year, we project high teens to low 20%s as reported growth and low to mid 20%s constant currency growth. **These growth rates represent approximately 4 times the market growth and an acceleration over 17% growth last year**, which reflects our confidence in the fundamental strength in this business.
>
> **Now turning to our 2015 financial outlook. We continue to project revenue in the range of $258 million to $265 million, an increase of 26% to 29% over 2014, and are guiding to the low end of this range. The revision reflects the potential impact of recently launched DCBs on the U.S. AngioScore business**.
>
> As a result, that's where Intervention revenue as anticipated would be at the low end of the previously provided 41% to 46% range. More specifically AngioSculpt revenue was projected in the range of $59 million to $66 million, compared with previous outlook of $62 million to $66 million.
>
> **The remainder of our revenue outlook is unchanged, including ISR revenue of $15 million to $20 million**….

278.   Again, the revised guidance provided by Defendant Childs on April 23, 2015 was materially false and misleading and lacked a reasonable basis because Defendants knowingly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well

as market expectations; (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures; (iii) the Company's illicit sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive or economic pressure; and (iv) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would or was reasonably expected to have a material unfavorable impact on revenues.

279.    In response to a question from analyst Brooks West with Piper Jaffray on ISR revenues and guidance, Defendants Drake and Childs further continued the charade. Rather than admit the fact that the Company had placed intense pressure on sales representatives to aggressively discount VI products for Q4 2014, such that customers would be still working their way through product for the following months, Drake insisted that they "scrubbed" the Company's accounts to understand the Q1 softness looking for any "positive or negative impact from drug-coated balloons," and still only came up with "ordering patterns" in OBLs:

> **The softness if you will is more in the OBL side of our business, which was stronger in Q4, softer in Q1. And we've scrubbed at the account level, what's going on and I think Guy referred to really nothing there other than ordering patterns from an OBL standpoint**…. Guy, would you add anything there?

> <A - Guy A. Childs>: **Other than to say that we continue to be very confident in the $15 million to $20 million that we talked about for full-year, the OBL ordering patterns did impact to some degree the ISR revenue in Q1 as well as the overall atherectomy business, but nothing that would cause us to come off our guidance at all**.

> <Q - Brooks E. West>: Okay. Okay. And then let me just make sure I'm clear on guidance. So for VI you're taking us down to the lower end of the 41% to 46%

range. And it sounds like you're saying that's coming primarily from the U.S. AngioSculpt business? I've already gotten a ton of questions just, again testing on the peripheral atherectomy business and the way you guided that cadence. **So, just to be clear, you're saying that you're seeing impact from DCBs on your U.S. AngioSculpt business and the peripheral atherectomy all-in ISR and de novo is really just ordering patterns in the office-based labs. Is that a good summary?**

<A - Guy A. Childs>: **That's correct**.

<A - Scott W. Drake>: **That's exactly right**, Brooks

280.    Echoing Piper Jaffray's concern, analyst Chris Pasquale with JPMorgan asked about potential impact from DCBs and the "air pocket in terms of ordering patterns":

<Q - Chris T. Pasquale>: Thanks. I just wanted to start with piggybacking on Brooks' question there. I want to understand the peripheral atherectomy performance a little bit better…. And, so **I'm trying to understand what gives you the confidence that what you're seeing there is just a bit of an air pocket in terms of ordering patterns? Can you point to anything specific that tells you that this is not a symptom of increased DCB adoption like the weakness in AngioSculpt?**

<A - Guy A. Childs>: Yeah, Chris, this is Guy. In terms of the VI business ex-ISR, it was actually up in a meaningful way, versus last year, down modestly, sequentially, but again **ordering pattern related some seasonality there as well, nothing to give us concern relative to the expectations for the full year. And then just looking at the peripheral atherectomy business, more specifically, very confident in our statements around ordering patterns, the start to April feeds that confidence**….

281.    Defendants Drake and Childs' statements that "ordering patterns" in OBLs caused "softness" in the first quarter atherectomy sales is materially false and misleading because Defendants failed to disclose that these "patterns" were actually driven by the Company's own aggressive bulk sale discounting practice, which practice Defendants knew or recklessly disregarded would diminish Q1 2015 sales. Indeed, Defendants failed to disclose that Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations, and that these illicit and undisclosed sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up (thereby inherently

decreasing future demand), rendering the Company's forecasts unreliable.

282.    During the call, in response to a question from Jason R. Mills from Canaccord Genuity about any potential negative impact of DCBs on VI sales, Drake again emphasized the supposed complementary nature of DCB's with Spectranetics' portfolio, declaring that "**drug-coated balloons will be a tailwind for atherectomy**."

283.    Defendants' statement disclaiming any potential negative effect of DCBs and instead insisting that DCBs would be "a tailwind for atherectomy," was materially false and misleading in light of the facts that: (i) Defendants failed to disclose a material risk (and known trend) inherent in the Company's sales practices, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand), rendering the Company's forecasts unreliable and highly vulnerable to even the slightest increase in competitive pressure; and (ii) that Defendants' ability to compete was dependent upon the unsustainable practice of pushing bulk sales at quarter-end to meet revenue guidance and was out of line with actual demand, and would, or was reasonably expected to, have a material unfavorable impact on revenues.

### 3.    Q1 2015 Analyst Reaction

284.    On April 24, 2015, J.P. Morgan despaired that Defendants "fell well short of expectations on Thursday[.]" According to J.P. Morgan, Q1 2015 total revenues were $2.8 million below Street consensus and VI revenues were $2.4 million below Street consensus. While noting that its prior commentary had questioned whether a potential negative impact of DCBs – if any, given Defendants' emphatic statements to the contrary – would be felt on the Company's peripheral atherectomy business, J.P. Morgan noted that AngioSculpt at least in part caused the first quarter miss, repeating Defendants' explanation that "ramping DCB adoption drove the AngioSculpt shortfall."

285.    J.P. Morgan also expressed doubt that Defendants' proffered explanation for the atherectomy softness – "ordering patterns" in OBLs – was truthful:

> **However, based on our conversations with management, we believe that Spectranetics' own salesforce likely contributed to this issue. The company confirmed that many of these customers entered 2015 with excess inventory due to aggressive selling on the part of some reps into yearend. This boosted 4Q sales, which saw US Peripheral Atherectomy grow an impressive 30%, but ultimately created an air pocket in 1Q order activity.** The good news is that this should be a temporary phenomenon and, encouragingly, some of these accounts have already placed orders in April. Meanwhile, management has implemented changes to its commission structure to try to discourage this kind of activity in the future. However, it is clearly a frustrating development at a time when this business should have the wind at its back given the scale of the ISR opportunity.

286.    As a result of the foregoing admissions and partial materialization of the risk, Spectranetics' stock price dropped $8.18 per share (over 23%), from a closing price of $34.70 per share on April 23, 2015, to close at $26.52 per share on April 24, 2015. The price drop likely would have been even more severe had the news of April 23 not been tempered by Defendants' emphatic contemporaneous statements on April 23 that DCBs were not the cause of the atherectomy weakness, that DCBs were expected to be a "tailwind" to atherectomy sales, that atherectomy sales were expected to stay on-target, including the $15-$20 million ISR revenue projection, as well as their simultaneous announcement of positive developments related to the Stellarex DCB platform, and Defendants' announcement of expected growth in the BTK market of $150 million over the next five years. Indeed, multiple analysts repeated Defendants' line that DCBs did not negatively impact the Company's peripheral atherectomy product line, and further commented, based on the fact that the Company maintained its ISR guidance of $15 to $20 million, that ISR still would drive the Company's VI growth for the remainder of 2015.

### 4.    Q1 2015 Form 10-Q

287.    On May 8, 2015, the Company filed its Quarterly Report with the SEC on Form

10-Q for the 2015 fiscal first quarter (the "Q1 2015 10-Q"). The Form 10-Q was signed by Defendants Drake and Childs, and reiterated the Company's earnings results previously stated on April 23, 2015.

288.    The financial results repeated in the Q1 2015 10-Q, including total revenue and growth, VI revenue and growth, peripheral atherectomy revenue growth, and AngioSculpt revenue were materially false and misleading because, as alleged in §§ VI & VII, *supra*, Defendants knowingly and/or recklessly failed to disclose that: (i) Spectranetics was reliant upon an illicit channel stuffing scheme, which artificially inflated the Company's sales figures, to meet its revenue and growth targets, as well as market expectations; and (ii) Spectranetics' sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. As a result of the foregoing, the Company's reported financial results created a materially false and misleading impression as to the underlying demand and growth of the Company's VI business.

289.    The Q1 2015 10-Q was further materially false and misleading because it failed to disclose information on known trends, as required by Item 303 of Regulation S-K (17 CFR § 229.303), and it failed to disclose risks and uncertainties that could significantly affect financial amounts reported, as required by GAAP regulation ASC 275-1. Specifically, pursuant to Item 303, Defendants were required to disclose: (i) the existence of trends within the Company, namely that the bulk sale practice had artificially inflated sales and caused customer inventory levels for key products to pile up (thereby inherently decreasing future demand); and (ii) that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand, and would, or was reasonably expected to, have a "material…unfavorable impact on…revenues."

I.      **May 2015 Bank of America Merrill Lynch Health Care Conference**

290.    On May 14, 2015, Defendant Drake presented at the Bank of America Merrill Lynch Health Care Conference. Drake discussed the underperformance in the first quarter, providing the same explanations for the weakness in AngioSculpt (blaming underperformance on DCBs) and for atherectomy (blaming underperformance on "ordering patterns" in OBLs).

291.    In response to a question about impact of DCBs on the scoring balloon Drake side, Drake stated, "I am not concerned. In fact, I'm invigorated by both our prep and treat portfolio and I think the clinical data will bear that out, as will our performance over time."

292.    Drake doubled down on the lack of even a *possibility* of negative impact by DCBs and again minimized the Company's illicit sales practices as the actions of a few rogue employees:

> \<A - Scott W. Drake\>: Yeah, **I would say in atherectomy, there's precisely zero impact from drug-coated balloons and I think that point is a very important one to make and make in a very stark way**. You were kind to say unique, I'll call the issues embarrassing. **We had a couple of regions racing for the finish line at the end of Q4 and, frankly, I think they pulled some volume in, that should have resided in Q1.**
>
> So if you take that 30% growth in Q4, I would bring that down a little bit, you take that mid-teens growth in Q1, I'd bring that up a little bit. And I think 20%-plus growth in the atherectomy market, that's growing about 8%, is pretty good and I think it's sustainable and I think our position in it is outstanding, frankly. So those are the issues, embarrassing, happened. **We've put some controls in place that we didn't have before. But the underlying strength and health of that business is absolutely rock solid.**

293.    These statements were materially false and misleading when made because Drake failed to disclose, as the CW accounts confirmed, that the Individual Defendants knew of, and actively encouraged, even directed, the rampant quarter-end bulk discounting practices. Defendant Drake further knew or recklessly disregarded the risks posed by new competitive technologies such as DCBs on the Company's business, including atherectomy sales, as a result

of the fragile house of cards the Company's illicit channel stuffing scheme created.

## IX.   END-OF-CLASS PERIOD DISCLOSURES – THE RISK MATERIALIZES

294.   On July 23, 2015, after the market closed, Spectranetics issued a press release (the "July 23, 2015 press release") in which Defendants reported disappointing second quarter 2015 results, missing guidance that had already been guided downward in April, and further revised downward the Company's 2015 guidance. Significantly, the Company reduced VI guidance for the remainder of 2015, even excluding AngioSculpt. The July 23, 2015 press release stated, in part:

> The Spectranetics Corporation (NASDAQ:SPNC) today reported financial results for the three and six months ended June 30, 2015. Highlights of the quarter, all compared with the three months ended June 30, 2014 include:
>
> - Revenue of $61.7 million increased 42% (45% constant currency1); 9% (12% constant currency) excluding AngioSculpt®
> - Vascular Intervention revenue of $26.4 million, excluding AngioSculpt, increased 17% (19% constant currency)
>   - U.S. peripheral atherectomy revenue grew 21%
>   - AngioSculpt revenue of $14.2 million
>
> * * *
>
> **"We are adjusting our 2015 outlook based on first-half results that fell short of plan and tempered expectations for the second half. Performance of our AngioSculpt franchise was below expectations due to relatively rapid adoption of competitive drug-coated balloons and our ongoing sales force optimization efforts**. Significant actions are underway to augment and improve sales performance, optimize the potential for our Stellarex™ drug-coated balloon platform, and adjust expenses to offset the revenue shortfall," said **Scott Drake, President and Chief Executive Officer. "While we are disappointed with these mixed results, we are focused on driving our key initiatives today and also look forward to the headwinds of drug-coated balloons becoming tailwinds in the not too distant future."**
>
> Net loss for the three months ended June 30, 2015 was $7.2 million, or $0.17 per share, compared with net loss of $5.3 million, or $0.13 per share, for the three months ended June 30, 2014. Non-GAAP net loss for the three months ended June 30, 2015 was $9.2 million, or $0.22 per share, compared with non-GAAP net loss of $2.4 million, or $0.06 per share, for the three months ended June 30, 2014.

Year-To-Date Financial Results

Revenue for the six months ended June 30, 2015 rose 43% (46% constant currency) to $119.1 million, from $83.2 million for the six months ended June 30, 2014. Excluding AngioSculpt, revenue increased 9% (12% constant currency). Vascular Intervention revenue, excluding AngioSculpt, increased 15% (17% constant currency) to $48.9 million, AngioSculpt revenue was $28.3 million, Lead Management revenue increased 10% (13% constant currency) to $33.7 million, and laser system, service and other revenue decreased 18% (15% constant currency) to $8.3 million.

Net loss during the six months ended June 30, 2015 was $34.5 million, or $0.82 per share, compared with net loss of $11.0 million, or $0.26 per share, for the six months ended June 30, 2014. Non-GAAP net loss during the six months ended June 30, 2015 was $21.7 million, or $0.51 per share, compared with non-GAAP net loss of $7.6 million, or $0.18 per share, for the six months ended June 30, 2014.

2015 Financial Outlook

**Spectranetics is revising its 2015 outlook**. All references to previous revenue guidance, including the guidance of $258 million for 2015, are to the guidance provided in a Current Report on Form 8-K filed on April 29, 2015. All references to previous guidance for net loss, gross margin, and research, development and other technology expenses are to the guidance provided in the Company's press release issued on April 23, 2015.

**Spectranetics now expects 2015 revenue to be within a range of $240 million to $250 million. Compared with 2014, this range represents an increase of 17% to 22%.** The following table provides a comparison of the revised 2015 outlook with the outlook previously provided.

| (in millions) | Previous Outlook | Revised Outlook Low | High | Growth vs. 2014 Low | High |
|---|---|---|---|---|---|
| Vascular Intervention, excluding AngioSculpt | $107.6 | $103 | $107 | 16% | 21% |
| AngioSculpt | $59.0 | $55 | $58 | 86% | 96% |
| Total Vascular Intervention | $166.6 | $158 | $165 | 34% | 40% |
| Lead Management | $72.6 | $67 | $69 | 1% | 4% |
| Laser Service and Other | $18.8 | $15 | $16 | -25% | -20% |
| Total Revenue | $258.0 | $240 | $250 | 17% | 22% |
| Total Revenue, excluding AngioSculpt | $199.0 | $185 | $192 | 6% | 10% |

Includes $5.0 -- $5.5 million of negative currency impact, which represents 2% - 3% of 2014 revenue.

Results for 2014 include six months of AngioSculpt revenue because the acquisition closed on June 30, 2014.

**The revised Vascular Intervention guidance reflects the impact of competitive drug-coated balloon launches on AngioSculpt revenue and ongoing sales team optimization**.

295.    On this news, shares of Spectranetics declined $8.53 per share, over 34%, to close

on July 24, 2015, at $16.30 per share, on unusually heavy volume.

296.    On the July 23, 2015 earnings call on Q2 2015 results, Defendant Drake admitted:

**On the Vascular Intervention side of our business, we underestimated the impact of drug-coated balloons, and overestimated our ability to compete in this changing clinical paradigm**. The external market is changing, but the need for continuous improvement on commercial execution is constant.

297.    Defendant Drake went on to state, "[t]he **weaker U.S. performance is largely a function of competitive drug-coated balloons** and our need to improve commercial execution."

298.    With respect to the supposed "complementary" use of DCBs with Spectranetics'

atherectomy products, Drake also said:

**On the atherectomy front, we have not seen notable pressure from DCBs nor have we seen complementary adoption**. These external dynamics have triggered internal changes. Most notably, our confidence in our drug-coated balloon platform and anticipated ROI has caused us to reexamine our portfolio of investments, our redeployment decisions aligned with the prioritization of DCBs at the top of our list.

299.    Defendant Childs stated on the earnings call, "The U.S. AngioSculpt business

continues to be impacted by the adoption of competitive drug-coated balloons and our sales team

optimization, which is ongoing and will take time."

300.    Analyst Chris Pasquale asked: "I think the most surprising thing for people is

probably going to be the magnitude of the guidance reduction. Given vascular performance this

quarter, that was actually pretty solid, all things considered. So, a couple of questions there." He

hammered down on why Defendants would reduce guidance for VI, excluding AngioSculpt,

given Defendants' statements that DCBs had no negative effect on atherectomy (the Company's

major VI devices):

Pasquale: First, **if you haven't seen a negative impact from DCBs on atherectomy at this point, then why take down your vascular guidance ex-AngioSculpt**? And then, for AngioSculpt, you did about $28 million in the first half of the year. You just launched some new products recently. So what are you seeing now that leads you to believe that even with those new product launches second half sales will essentially be flat?

Drake: …**We under-appreciated the impact of drug-coated balloons and over-appreciated our ability to grow in that clinical environment**.

\* \* \*

<A - Guy A. Childs>: And Chris, just from a numbers perspective, I'd add a couple of comments. Our first half vascular business grew 15%. Our guidance for the full year is 16% to 21%. So an acceleration is implied in that in the second half. And to be more specific, if you look at the first half actual performance, in the midpoint of our vascular guidance, we are planning on $7 million of improvement in the second half versus the first half. So all of the growth drivers that we've talked about remain intact and that is reflected in the revised guidance.

\* \* \*

<Q - Chris T. Pasquale>: Yeah. And that's helpful. Thanks. **Just to follow up a little bit more on the atherectomy piece. So do you think we've seen a shift at all in the market growth of that segment as a result of DCBs or did you guys anticipate kind of a coattails effect that has failed to materialize? Or I guess, thirdly, has the competitive landscape gotten tougher at all as you now have some competitors that are offering both the DCB and an atherectomy product?** And is that making things tougher from a share perspective?

<A - Scott W. Drake>: Yeah. Chris, I would say, consistent with what we reported in Q1, we just don't see a significant impact one way or the other on our atherectomy business. But **to your last point, there is a new dynamic going on certainly clinically with the adoption of drug-coated balloons**. And I think the clinical algorithm is still settling out and I think that's going to be the case here for some time going forward. But, **clearly, companies with drug-coated balloons and atherectomy are making for a heightened competitive environment and we've tried to factor that in here**.

301.    Analyst Jason R. Mills attempted to drill down on the impact of DCBs, and

Defendants, without disclaiming impact of DCBs on VI revenue overall, generally pointed to

sales issues as the reason for the reduced guidance:

Mills: "So is it an impact from drug-coated balloons that you're expecting to atherectomy in the second half of the year, while you haven't seen it you're

AMENDED CLASS ACTION COMPLAINT

guiding to it, or is it something else?"

<A - Guy A. Childs>: Jason, this is Guy. I'll take a cut at that. I think the – you're right. The second quarter came in solid for us on the VI side. And **as we completed a deep review of the business, had field checks both with customers and the team, and did a deep review on the projections for the year, in its simplest form, we just looked at the second half in light of first half and felt like the adjustment was warranted**.

302.    Still, Defendant Drake ultimately admitted that the Company's 2015 guidance was overstated, due, in part, to the impact of DCBs. In response to a question asking "when you reported the first quarter in early May, sounded like April in general was sort of back on track. Did something happen in the second half? Is there something about your analysis of the business where competitors are more aggressive on price?" Drake stated:

Well, Rick, there's a few things that have changed. **One is our understanding I think is clearer on the impact of drug-coated balloons and our respect for what's happening externally on that front**…

303.    Ultimately, at the August 12, 2015 Canaccord Genuity conference Defendant Drake admitted, "**We underestimated the impact of drug-coated balloons – competitive drug-coated balloons on our business. And, therefore, we have gotten our guidance wrong**."

## X.    MATERIALLY FALSE AND MISLEADING SOX CERTIFICATIONS

304.    The 2013 10-K, 2014 10-K, Q1 2014 10-Q, Q2 2014 10-Q, Q3 2014 10-Q, and Q1 2015 10-Q each contained required Sarbanes Oxley ("SOX") certifications, signed by Defendants Drake and Childs, who falsely certified that:

1.    I have reviewed this annual report on Form 10-K of The Spectranetics Corporation;

2.    Based on my knowledge, **this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report**;

3.    Based on my knowledge, the financial statements, and other financial

information included in this report, **fairly present in all material respects the financial condition**, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. **The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) **designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared**;

   b) **designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles**;

   c) **evaluated the effectiveness of the registrant's disclosure controls and procedures** and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d) **disclosed in this report any change in the registrant's internal control over financial reporting** that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. **The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting**, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to

record, process, summarize and report financial information; and

b)   **any fraud, whether or not material, that involves management or other employees** who have a significant role in the registrant's internal control over financial reporting.

305.   The SOX certifications signed by Defendants Drake and Childs were materially false and/or misleading for the following reasons:

(1)   Spectranetics' lack of adequate internal controls and procedures caused it to, as alleged above (in §§VI, VII, and VIII), to falsely report its financial results included in publicly issued financial results for FY 2013, Q1 2014, Q2 2014, Q3 2014, FY 2014, and Q1 2015, press releases and conference calls, which improperly inflated the Company's revenue and growth, and allowed the Company to meet market expectations;

(2)   Management of any public company is responsible for establishing and maintaining adequate internal controls over financial reporting as defined in 15 U.S.C. §78m-o under the Exchange Act.   AU 319.06, Internal Control in a Financial Statement Audit, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations;"

(3)   Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal

accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP]." 15 U.S.C. §78m(b)(2).  These provisions require an issuer to employ and supervise reliable personnel to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets;

(4)     Had Defendants, in fact, designed such internal controls over financial reporting (or caused such internal controls over financial reporting to be designed under their supervision) or evaluated the effectiveness of Spectranetics' internal controls over financial reporting, as they had represented, the Company would not have been able to engage in the wide-ranging and pervasive channel stuffing and accounting improprieties alleged herein;

(5)     Here, Defendant Drake admitted during a May 14, 2015, analyst conference that the Company did not have adequate internal controls and procedures during the Class Period.  Specifically, when discussing the quarter-end bulk sales and channel stuffing that occurred in Q4 2014, Defendant Drake conceded, "We've [subsequently] put some controls in place that we didn't have before."  Defendant Drake's statement is an admission that, as alleged in §§VI and VII, the Company engaged in pervasive channel stuffing during the Class Period and that Defendants incentivized and encouraged its employees to engage in the alleged bulk sales transactions; and

(6)     Spectranetics' financial statements contained untrue statements and omitted

material facts as alleged herein.  Defendant Childs and Drake's attestation to the

sufficiency of the disclosure controls and procedures misled investors to believe

that the Company's financial statements fairly represented the financial condition

of the Company when, in fact, they did not.

## XI.   ADDITIONAL SCIENTER AND CONTROL PERSON ALLEGATIONS

306.   As alleged herein, Defendants acted with scienter in that Defendants knew that

the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their

receipt of information reflecting the true facts regarding Spectranetics, his/her control over,

and/or receipt and/or modification of Spectranetics' allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to

confidential proprietary information concerning Spectranetics, participated in the fraudulent

scheme alleged herein.

### A.     Defendants Had To Present the Façade of a Financially Sound and Growing Company to Support its May 2014 Note Offering

307.   On May 29, 2014, Spectranetics announced the pricing of its offering of $200

million aggregate principal amount of 2.625% convertible senior notes due 2034 (the "Notes") in

an underwritten public offering, which closed on June 3, 2014. The Company filed a preliminary

prospectus on Form 424B2 with the SEC on May 27, 2014 and updated it on May 29, 2014.

308.   According to the Company's June 3, 2014 press release and Form 8-K filed with

the SEC, the Notes will accrue interest at a fixed rate of 2.625% per year, payable semi-annually in arrears on June 1 and December 1 of each year, commencing December 1, 2014. The Notes will mature on June 1, 2034, unless earlier converted, redeemed or repurchased. The Notes will be convertible into shares of Spectranetics' common stock at the option of the holders at any time prior to the close of business on the second scheduled trading day immediately preceding the maturity date. The conversion rate will initially be 31.9020 shares of common stock per $1,000 principal amount of Notes (equivalent to an initial conversion price of approximately $31.35 per share of common stock).

309.    According to the Company's June 3, 2014 press release, net proceeds from the sale of the Notes, after deducting fees and estimated expenses, were estimated to be approximately $222.6 million. According to the Company, the net proceeds from this offering were to be used to fund the acquisition of AngioScore Inc.

### B.    The Timing and Amount of Defendant's Class Period Stock Sales

310.    During the Class Period, Drake and Childs reaped the rewards of Defendants' fraud while Spectranetics' stock price was artificially inflated. During the Class Period, Drake sold and/or disposed of approximately 196,770 shares of his Spectranetics stock for net proceeds of nearly $5.2 million. Moreover, Drake had no trading activity during the approximate five months immediately preceding the Class Period.

311.    Meanwhile Childs sold and/or disposed of approximately 47,898 shares of his Spectranetics stock for net proceeds of over $1.14 million.

### C.    Bonuses and Other Incentive-Based Compensation Further Add to the Inference of Scienter

312.    During the Class Period, in addition to generous salaries, the Individual Defendants also received incentive compensation tied to the Company's performance,

particularly revenues. According to the Company's 2015 Proxy Statement filed with the SEC on April 24, 2015, the Company had a "Performance Bonus Plan" under which the Individual Defendants received short-term performance-based compensation in the form of cash bonuses, as well as long-term equity-based incentive compensation in the form of restricted stock units ("RSUs") and performance stock units ("PSUs"). In addition to the bonuses earned under the Performance Bonus Plan, in 2014, the Individual Defendants also earned a special 2014 year-end bonus related to the acquisitions of AngioScore and Stellarex

313.    As described herein, in total for 2014, under these various compensation plans, Defendant Drake's non-salary incentive-based compensation was valued at $3,200,151 and Defendant Childs' non-salary incentive-based compensation was valued at $890,541.

### 1.    Performance Bonus Plan (Short-Term Cash Compensation)

314.    In January 2014, the Compensation Committee set pre-determined performance objectives and weights to calculate the 2014 Performance Bonus Plan cash incentive. For 2014, the single largest target metric to determine Performance Bonus Plan compensation was Total Revenue. For 2014, the Individual Defendants achieved approximately 97% of their target for cash incentive pursuant to the Performance Bonus Plan. According to the Company's 2015 Proxy Statement, for fiscal year 2014, pursuant to the Performance Bonus Plan, Drake received a cash bonus of $458,325 and Childs received a cash bonus of $163,930.

### 2.    Long-Term Equity-Based Incentive Compensation (RSUs and PSUs)

315.    Under the long-term equity incentive program, the Individual Defendants historically received annual equity grants of time-vested RSUs and stock options. According to the Company's 2015 Proxy Statement, the Company did not grant stock options in 2014 because the Compensation Committed decided to modify its long-term equity incentive to provide for

grants of long-term, performance-based PSUs for named executive officers ("NEOs") including Drake and Childs.

316.    According to the 2015 Proxy Statement, for fiscal year 2014, Drake received a grant of 34,000 RSUs valued at $805,992 and Childs received a grant of 8,451 RSUs valued at $198,007. As the Company explained, the RSUs vest over four years and are awarded by the Compensation Committee annually if the Company and the Individual Defendant's "performance merit such awards."

317.    According to the 2015 Proxy Statement, the 2014 PSUs were "front-loaded" awards that granted the Individual Defendants three times the amount of PSUs that they would receive in a year. Under this incentive plan, if the revenue and Adjusted EBITDA Margin metrics are not achieved at the threshold levels, the PSUs are forfeited. The Company described the purpose of the PSUs to include an element of risk.

> The Compensation Committee introduced PSUs as an element of the equity award mix in order to reward the NEOs' performance as measured against our long-term financial results, **make a larger portion of the NEOs' total compensation "at risk"** and retain and motivate talented executive officers.
>
> ***
>
> The PSUs represent the right to receive a share of our common stock if certain performance goals are achieved in a specified time period. The performance period for the PSUs awarded to the NEOs in 2014 (the "2014 PSUs") is from January 1, 2014 through December 31, 2016. For the 2014 PSUs, the primary performance metric is the Company's three-year revenue compound annual growth rate ("CAGR") and the secondary performance metric is Adjusted EBITDA Margin. Adjusted EBITDA Margin means the Company's net income, less net interest income, plus income tax expense, depreciation, amortization and contingent consideration, plus or minus any special items preapproved by the Compensation Committee, divided by revenue. For the 2014 PSUs, Adjusted EBITDA Margin will be measured for the year ended December 31, 2016. **The Compensation Committee selected revenue growth as the primary performance metric for the 2014 PSUs because the Compensation Committee believes that revenue growth is a key driver of stockholder value and earnings growth over time.** The Company's Adjusted EBITDA Margin was selected as the secondary performance metric for the 2014 PSUs because we

believe it is the most relevant profitability metric for a company at our stage of growth.

318.    According to the 2015 Proxy Statement, for fiscal year 2014, Drake received 187,435 target PSUs valued at $4,391,062. The 2014 annualized value of Drake's PSU grant was reported as $1,463,867. For fiscal year 2014, Childs received 46,044 target PSUs valued at $1,078,811. The 2014 annualized value of Childs' PSU grant was reported as $359,604.

### 3.    Special Bonus Award

319.    According to the Company's 2015 Proxy Statement, the Individual Defendants also earned a special 2014 year-end bonus related to the acquisitions of AngioScore and Stellarex. Accordingly, Drake also received an additional 75% of his base salary, half of which was paid in cash ($338,000), and half of which was paid in 3,873 RSUs (valued at $133,967), which vest in four years on December 17, 2018. Childs received an additional 50% of his base salary, or $169,000, which was paid in cash.

## XII.    CLASS ACTION ALLEGATIONS

320.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Spectranetics' securities between February 27, 2014 and July 23, 2015, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

321.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Spectranetics' securities were actively traded on the Nasdaq Stock Market (the "NASDAQ"). While the exact number of Class members is unknown

to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Spectranetics shares were traded publicly during the Class Period on the NASDAQ. As of July 23, 2015, Spectranetics had 42,498,112 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Spectranetics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

322.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

323.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

324.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Spectranetics; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

325.   A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.  LOSS CAUSATION

326.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

327.    During the Class Period, Plaintiffs and the Class purchased Spectranetics' securities at artificially inflated prices and were damaged thereby. The false and misleading statements and omissions described above caused Spectranetics' publicly traded securities to trade at artificially inflated prices during the Class Period in that the securities traded at prices higher than they would have traded had complete, accurate and truthful information about Spectranetics been known to the market.

328.    The market for Spectranetics securities was open, well-developed and efficient at all relevant times.

329.    The undisclosed risks alleged herein above that were created by Defendants' illicit channel stuffing scheme eventually materialized when the Company failed to meet and was forced to lower its 2015 guidance, due in part to its failure to meet sales targets as a result of the previously undisclosed systemic bulk sales practices, the risks inherent in which were only compounded by increased pressure from DCBs. Indeed, Defendants ultimately admitted that they overstated the Company's 2015 guidance and that targets were missed, due at least in part, to increased competition by DCBs.

330.    When Defendants' prior misrepresentations, omissions, and fraudulent conduct, or the economic consequences thereof, were disclosed and became apparent to the market, the price of Spectranetics securities declined disproportionately to the market and relevant peer indices, thereby reducing or eliminating the prior artificial inflation. This disproportionate decline in Spectranetics' share price, including but not limited to, the disproportionate stock drops described below that occurred on April 24, 2015, and July 24, 2015, caused economic damages to be incurred by class members, including Plaintiffs, who had purchased Spectranetics securities at artificially inflated prices prevailing in the market during the Class Period.

331.    On April 23, 2015, Defendants announced disappointing Q1 2015 results, citing weakness in the Vascular Intervention business segment, and revised the Company's 2015 revenue guidance to the lower end of the previously-provided range. On this disclosure and partial materialization of risk, shares of Spectranetics stock dropped $8.18 per share (over 23%), from a closing price of $34.70 per share on April 23, 2015, to close at $26.52 per share on April 24, 2015, trading on very heavy volume. Still, the price drop likely would have been even more severe had the news of April 23 not been tempered by Defendants' simultaneous announcement of false positive news relating to the Company's VI business, as well as other seemingly positive acquisition-related news.

332.    On July 23, 2015, Defendants' concealed risks further materialized, upon the Company's disclosure of extremely disappointing Q2 2015, revealing that the Company's VI business, its key segment, did not meet targets, and Defendants' related announcement of further downward revision to the Company's 2015 guidance. As these revelations were absorbed by the market, the Company's stock was hammered by massive sales, sending the stock price plummeting to close at $16.30 on July 24, 2015, marking an ultimate decline of over 55% of

shareholder value from the Class Period high.

333.     By comparison, the Dow Jones U.S. Medical Devices Index Fund, which includes Medtronic and Boston Scientific among its holdings, fell by just 0.6% on April 24, 2015, and 0.7% on July 24, 2015, demonstrating that the declines in the price of Spectranetics securities resulted from the April 23 and July 23, 2015 disclosures, and not from general market conditions or other macroeconomic factors.

## XIV.   PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

334.     The market for Spectranetics' securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose material information known to Defendants, Spectranetics' securities traded at artificially inflated prices during the Class Period. On March 18, 2015, the Company's stock closed at a Class Period high of $36.44 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Spectranetics' securities and market information relating to Spectranetics, and have been damaged thereby.

335.     During the Class Period, the artificial inflation of Spectranetics' stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Spectranetics' business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Spectranetics and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of

the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

336.   At all relevant times, the market for Spectranetics' securities was an efficient market for the following reasons, among others:

(a)   Spectranetics stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Spectranetics filed periodic public reports with the SEC and/or the NASDAQ;

(c)   Spectranetics regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Spectranetics was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

337.   As a result of the foregoing, the market for Spectranetics' securities promptly digested current information regarding Spectranetics from all publicly available sources and reflected such information in Spectranetics' stock price. Under these circumstances, all purchasers of Spectranetics' securities during the Class Period suffered similar injury through their purchase of Spectranetics' securities at artificially inflated prices and a presumption of

reliance applies.

338.    In addition, Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 496 U.S. 128 (1972), because the claims asserted herein are predicated in part on material omissions of fact that Defendants had a duty to disclose.

## XV.    NO SAFE HARBOR

339.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Spectranetics who knew that the statement was false when made.

## XVI.   LEGAL CLAIMS ASSERTED

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

340.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

341.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Spectranetics' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

342.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Spectranetics' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

343.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Spectranetics' financial well-being and prospects, as specified herein.

344.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Spectranetics' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Spectranetics and its

business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

345.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

346.   The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Spectranetics' financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business,

operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

347.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Spectranetics' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Spectranetics' securities during the Class Period at artificially high prices and were damaged thereby.

348.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Spectranetics was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Spectranetics securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

349.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

350.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

351.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein

352.     The Individual Defendants acted as controlling persons of Spectranetics within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

353.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

354.     As set forth above, Spectranetics and the Individual Defendants each violated

Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XVIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 1, 2016                    GLANCY PRONGAY & MURRAY LLP


By:  *s/ Kara M. Wolke*
Lionel Z. Glancy
Robert V. Prongay
Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: kwolke@glancylaw.com

WEISSLAW LLP
David C. Katz
Joshua M. Rubin
1500 Broadway
16th Floor
New York, New York 10036
Telephone: 212.682.3025, ext. 3157
Facsimile: 212.682.3010
E-mail: jrubin@weisslawllp.com

*Co-Lead Counsel for Lead Plaintiff and
Plaintiffs*

THE SHUMAN LAW FIRM
Kip B. Shuman
885 Arapahoe Avenue
Boulder, CO 80302
Phone: 303-861-3003
Phone: 1-866-974-8626
Fax: 303-484-4886
Email: kip@shumanlawfirm.com

*Liaison Counsel for Lead Plaintiff and
Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed with this Court on March 1, 2016 through the CM/ECF system and will be sent electronically to all registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants.

*s/ Kara M. Wolke*
Kara M. Wolke

# Mailing Information for a Case 1:15-cv-01857-KLM Ellis v. Spectranetics Corporation, The et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Frederick J. Baumann**
  fbaumann@lrrc.com,phenke@rothgerber.com

- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com

- **Phillip C. Kim**
  pkim@rosenlegal.com

- **Alex C. Myers**
  amyers@lrrc.com,lelliott@lrrc.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com

- **Shane T. Rowley**
  srowley@zlk.com

- **Joshua M. Rubin**
  jrubin@weisslawllp.com

- **Kip Brian Shuman**
  kip@shumanlawfirm.com,rusty@shumanlawfirm.com

- **Kara M. Wolke**
  kwolke@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`