IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01857-KLM

MICHAEL ELLIS,
ALLEN J. WIESENFELD, and
PETER TUCKER, individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

THE SPECTRANETICS CORPORATION,
SCOTT DRAKE, and
GUY A. CHILDS,

      Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

      This matter is before the Court on Defendants' **Motion to Dismiss First Amended Class Action Complaint for Violations of Federal Securities Laws and Memorandum in Support Thereof** [#33][1] (the "Motion"). Plaintiffs filed a Memorandum of Law in Opposition to Defendants' Motion to Dismiss First Amended Class Action Complaint for Violations of Federal Securities Laws [#36] (the "Response") in response to the Motion. Defendants filed a Reply Memorandum in Further Support of Motion to Dismiss First Amended Class Action Complaint for Violation of Federal Securities Laws [#41] (the "Reply"). Plaintiffs also filed a Notice of Recent Authority in Support of Plaintiffs'

_____

[1] [#33] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

-1-

Opposition to Defendants' Motion to Dismiss First Amended Class Action Complaint for Violations of Federal Securities Laws [#43]. This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#22]. The Court has reviewed the pleadings,[2] the entire case file, and the applicable law, and is sufficiently advised in the premises. As explained in detail below, the Motion is **GRANTED.**

## I. Summary of the Case[3]

Defendant The Spectranetics Corporation ("Defendant," the "Company" or "Spectranetics") manufactures and sells medical devices "to treat arterial blockages in the legs and heart" and "to remove pacemaker and defibrillator cardiac leads." First Amended Complaint ("FAC") at ¶ 2. During the alleged Class Period (from February 27, 2014 to July 23, 2015), Defendant Scott Drake ("Drake") was the Chief Executive Officer of Spectranetics and Defendant Guy A. Childs ("Childs") was the Company's Chief Financial officer. FAC at ¶¶ 21, 22. The Plaintiffs are investors who purchased Spectranetics stock during the Class Period. FAC at ¶¶ 17-19. In short, Plaintiffs assert that during the Class Period, Defendants filed false and misleading financial documents and made false and misleading statements to investors regarding the Company's product sales and growth, which in turn "pushed the Company's stock price to levels never before reached since the

---

[2] In accordance with my previous Order [#42], I have also considered the exhibits offered by Defendants in support of the Motion. *See* [#34-1 to #34-32].

[3] At this stage of the litigation, the Court accepts the well-pled factual allegations of the First Amended Complaint, as distinguished from conclusory allegations, as true. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1088 (10th Cir. 2003). The court does not "take as true the complaint's legal conclusions." *Dronsejko v. Thornton*, 623 F.3d 658, 666 (10th Cir. 2011).

Company went public in 1992." FAC at ¶ 3. Plaintiffs further assert that Defendants engaged in channel-stuffing[4] to "create the facade of a strongly growing business" and that the Company recognized sales and revenue in violation of GAAP and its own policies. FAC at ¶ 4. According to Plaintiffs, Defendants ignored stiff new competition for some of the Company's products and "knew or recklessly disregarded that their quarter-end bulk sales of products on heavy discount were ultimately unsustainable," thus making the Company "particularly vulnerable to missing its aggressive earnings and growth forecasts in 2015." When the risks created by Defendants' alleged conduct materialized, the Company's stock price ultimately declined more than 55%. FAC at ¶¶ 9-12. As further explained below, Plaintiffs assert a claim for violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, and a claim for violation of § 20(a) of the Act. FAC at ¶¶ 340-354.

## II. Standard of Review

### A.    Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)

The purpose of a motion to dismiss pursuant to Rule 12(b)(1) is to test whether the Court has jurisdiction to properly hear the case before it. Because "federal courts are courts of limited jurisdiction," the Court must have a statutory basis to exercise its jurisdiction. *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); *see* Fed. R. Civ. P. 12(b)(1). Statutes conferring subject-matter jurisdiction on federal courts are to be strictly construed. *F & S Const. Co. v. Jensen*, 337 F.2d 160, 161 (10th Cir. 1964). "The burden of establishing subject-matter jurisdiction is on the party asserting jurisdiction." *Id.* (citing

---

[4] "Channel-stuffing refers to the practice of inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company." *Pirraglia v. Novell*, 339 F.3d 1182, 1184 n.2 (10th Cir. 2003) (citations omitted).

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).

A motion to dismiss pursuant to Rule 12(b)(1) may take two forms: facial attack or factual attack. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995). When reviewing a facial attack on a complaint, the Court accepts the allegations of the complaint as true. *Id.* By contrast, when reviewing a factual attack on a complaint, the Court "may not presume the truthfulness of the complaint's factual allegations." *Id.* at 1003. With a factual attack, the moving party challenges the facts upon which subject-matter jurisdiction depends. *Id.* The Court therefore must make its own findings of fact. *Id.* In order to make its findings regarding disputed jurisdictional facts, the Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing." *Id.* (citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990); *Wheeler v. Hurdman*, 825 F.2d 257, 259 n.5 (10th Cir.), *cert. denied*, 484 U.S. 986 (1987)). The Court's reliance on "evidence outside the pleadings" to make findings concerning purely jurisdictional facts does not convert a motion to dismiss pursuant to Rule12(b)(1) into a motion for summary judgment pursuant to Rule 56. *Id.*

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994); Fed R. Civ. P. 12(b)(6) (A complaint may be dismissed for "failure to state a claim upon which relief can be granted."). To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Shero v. City of Grove, Okla.*, 510 F.3d

1196, 1200 (10th Cir. 2007) ("The complaint must plead sufficient facts, taken as true, to provide 'plausible grounds' that discovery will reveal evidence to support the plaintiff's allegations." (quoting *Twombly*, 550 U.S. at 570)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937, 1949 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (internal quotation marks omitted). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

**B.      Private Securities Litigation Reform Act of 1995 ("PSLRA")**

Because the PSLRA governs this case, the court notes and applies guidance from the Tenth Circuit Court of Appeals regarding interpretation of the Act's "stringent" pleading requirements. *Novell*, 339 F.3d at 1186.

> "Under the Reform Act, a private complaint that alleges a violation of section 10(b) of the 1934 Act and Rule 10b-5 thereunder must first 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . [must] state with particularity all facts on which that belief is formed.' 15 U.S.C. § 78u-4(b)(1). Second, in order to show that the defendant acted with the requisite state of mind for securities fraud cases, i.e., scienter, the complaint must also, 'with respect to each act or omission alleged to violate the [1934 Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" § 78u-4(b)(2).

*Id.* (citation omitted).

When a complaint refers to an investigation of counsel as the basis for a plaintiff's allegations, as is the case here, the court "treats [the allegations of the complaint] as having been made on information and belief." *Kinder-Morgan,* 340 F.3d at 1098; FAC at p. 1. As indicated above, Plaintiffs must "state with particularity all facts upon which their belief is formed." *Id.* (citation omitted). The Tenth Circuit has interpreted the statutory language about stating "all" facts to mean that Plaintiffs must plead sufficient facts "to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements . . . were false or misleading." *Id.* at 1099.

> "In deciding whether the factual allegations support a reasonable belief that fraud occurred, courts should evaluate the facts alleged as a whole, evaluating the level of detail, number, and coherence and plausibility of the allegations; whether the allegations are specific enough to be verified or refuted by a defendant without requiring the complaint to disclose how the plaintiff learned of such facts or experts to prove such facts at trial; whether the sources of the facts are disclosed and the reliability of those sources; and any other factors that might affect how strongly the facts alleged support a reasonable belief that the defendant's statements were false or misleading. To meet the standard, plaintiffs are not required to disclose the documentary or personal sources from which they learned the facts alleged in an information and belief complaint."

*Id.* at 1102-03.

In *Novell*, the court first analyzed the complaint's alleged false statements "to determine whether plaintiffs specifi[ed] each statement alleged to have been misleading, the reason or reasons why the statement [was] misleading, and, if an allegation regarding the statement or omission [was] made on information and belief, . . . [whether the complaint] state[d] with particularity all facts on which that belief [was] formed." *Id.* at 1189 (internal quotations omitted). Second, the court "proceed[ed] to examine whether plaintiffs

met the scienter requirement," but only as to those statements which the court found met the above particularity requirements. *Id.* at 1190-91.

Regardless of the order in which the court addresses the PSLRA's pleading requirements, the court must decline a defendant's invitation to conclude that facts alleged by plaintiffs are simply false, regardless of whether a plaintiff's claims "seem far-fetched." *Novell*, 339 F.3d at 1193-94. Moreover, the court must accept the truth of the confidential witnesses' accounts as pled in the First Amended Complaint and decline to assess those witnesses' credibility. *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1239 (10th Cir. 2016), citing *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## C. Scienter

The pleading requirements for scienter under the PSLRA have attracted special attention from the courts. "In a securities fraud case, the appropriate level of scienter is a mental state embracing intent to deceive, manipulate or defraud, or recklessness." *Kinder-Morgan,* 340 F.3d at 1105. The Tenth Circuit has made clear that adequately pleading scienter requires a plaintiff to plead "facts with particularity giving rise to a strong inference that defendants acted with the requisite [state of mind]," and the trial court is instructed to "look to the totality of the pleadings" to determine whether a plaintiff's allegations permit such an inference. *Novell*, 339 F.3d at 1190. In addition, "an inference is a logical conclusion drawn from the facts." *Kinder-Morgan*, 340 F.3d at 1105. "A strong inference of scienter" means "a conclusion logically based upon particular facts that would convince a reasonable person that the defendant knew a statement was false or misleading." *Id.*

"[T]o establish scienter in a securities fraud case alleging non-disclosure of

potentially material facts, the plaintiff must demonstrate:(1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." Claims of accounting irregularities or violations of Generally Accepted Accounting Principles ("GAAP") support a claim of scienter only when 'coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors.' We also take into account evidence of 'motive and opportunity,' for, while these factors are typically insufficient in themselves to show scienter, they may be important to the 'totality' of the pleadings."

*Novell*, 339 F.3d at 1191, citing *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261-62 (10th Cir. 2001). Moreover,

"[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favorable to plaintiff."

*Tellabs*, 551 U.S. at 323-24.

As noted above, the state of mind necessary to sustain allegations of securities fraud is either intent or recklessness. "[P]laintiffs can adequately plead scienter by setting forth facts raising a strong inference of intentional *or* reckless misconduct." *Fleming*, 264 F.3d at 1259 (emphasis in original). "Recklessness, defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it, can also satisfy the scienter requirement for Section 10b-5. Simple negligence, however, does not satisfy the scienter requirement." *Id.* at 1258 (internal citations and quotations omitted). Recklessness is "something akin to conscious disregard." *In re Level 3 Communs., Inc. Sec. Litig.*, 667 F.3d 1331, 1343 n.12 (10th Cir. 2012). "Negligence, and even gross negligence, fall below the high threshold for liability

under Section 10(b) of the Exchange Act." *Sanchez v. Crocs, Inc.*, 667 F. App'x 710, 719 (10th Cir. 2016), citing *Dronsejko*, 632 F.2d at 668.

Regarding the adequacy of a complaint's allegations of scienter, the court has made clear that at the 12(b)(6) stage, the court's role "is simply to determine whether the plaintiff raises a strong inference of scienter. . . . [T]his process does not involve a weighing of the plaintiff's suggested inference against other inferences," as that task is left to the factfinder. *Novell,* 339 F.3d at 1188. Courts have refused "to draw inferences in the plaintiff's favor when doing so would allow [him] to make allegations on information and belief without satisfying the particularity requirements of the Reform Act." *Id.*

In addition, the Tenth Circuit has provided other guidance about the sufficiency of a complaint alleging securities fraud that is useful here. Regarding allegations of reckless misconduct, the Court has concluded that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Fleming*, 264 F.3d at 1260, citing *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). Further, "allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, [are] not sufficient to demonstrate that the defendant intentionally withheld these facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive, manipulate or defraud." *Id.* In order to sufficiently allege recklessness, Plaintiffs must present facts to show "defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Id.* at 1261. Moreover, vague statements of corporate optimism are not actionable under the securities laws. *Novell*, 339

F.3d at 1189.  But "violation of a corporation's internal policies can support a claim of scienter when coupled with other evidence of intent to defraud, such as motive and opportunity."  *Id.* at 1192.

Also worth nothing is that the Tenth Circuit has rejected the notion that knowledge may be imputed to a high-ranking corporate officer because of his or her position alone.

> "[A]llegations that a securities fraud defendant, because of his position within the company, must have known a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.[5] Generalized imputations of knowledge do not suffice, regardless of defendants' positions within the company."

*Fleming*, 264 F.3d at 1264, citing *In re: Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999).  Nevertheless, the seniority of management officials who are alleged to have engaged in fraudulent conduct "is a fact relevant in [the court's] weighing of the totality of the allegations."  *Kinder-Morgan*, 340 F.3d at 1106.  The cases have been careful to emphasize that "the important issue . . . is not whether [d]efendants knew the underlying facts, but whether [d]efendants knew that not disclosing [them] posed substantial likelihood of misleading a reasonable investor.  It is the *danger of misleading buyers* that must be actually known or so obvious that any reasonable man would be legally bound as knowing."  *Novell*, 339 F.3d at 1264, citing *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989) (emphasis in original).  Finally, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of §10(b) and Rule 10b-5 when those senior officials were acting within the scope

---

[5] As pointed out by the Court in *Fleming*, "the scienter pleading requirements of the PSLRA supercede the provisions of Rule 9(b) in securities fraud cases."  264 F.3d at 1255 n.13.

-10-

of their apparent authority." *Kinder-Morgan*, 340 F.3d at 1006.

In assessing whether allegations of a defendant's motives to mislead are sufficient to support a finding of the requisite scienter under the PSLRA, the Tenth Circuit has addressed only motives specifically and directly related to the alleged non-disclosure, finding that other alleged motives are not relevant to the inquiry. *See Novell*, 339 F.3d at 1268 (noting five asserted motives for defendants' alleged fraudulent conduct, but concluding that only one arguably supported plaintiffs' allegations because it was "specifically and directly related to the underlying facts" of the alleged non-disclosure). Moreover, it is also clear that "generalized motives shared by all companies and which are not specifically and uniquely related" to the defendant in particular, are "unavailing." *Id.* at 1269. Examples of such "shared business motives" are that defendants desired to protect their own positions with the company, or that they wanted to protect the value of their own stock, or that they wanted to further the interests of the company. "Allegations that merely charge that executives aim to prolong the benefits they hold are, standing alone, insufficient to demonstrate the necessary strong inference of scienter. . . . Similarly insufficient are allegations that corporate officers were motivated to defraud the public because an inflated stock price would increase their compensation." *Id.* at 1270, citing *Philips v. LCI Int'l, Inc.*, 190 F.3d 609, 622 (4th Cir. 1999); *see also Level 3*, 667 F.3d at 1346. In addition, when the complaint "includes nothing in the allegations of the defendants' motives to indicate that they are anything more than pure speculation," the court should not accord them much weight. *Kinder-Morgan*, 340 F.3d at 1104-05.

### III. Analysis

Plaintiffs allege in the First Amended Complaint that defendants made materially

false statements and issued false financial reports between February 27, 2014 and July 23, 2015 in violation of: (1) section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b)[6], and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5[7]; and (2) section 20 of the 1934 Act, 15 U.S.C. § 78t(a)[8].  The Court has examined the allegations of the 124-page First Amended Complaint in their entirety, and is not required to make explicit findings of fact and conclusions of law on a Rule 12(b)(6) ruling.  *Kinder-Morgan*, 340 F.3d at 1093.

To state a claim under Rule 10b-5 for securities fraud, a complaint must contain allegations addressing five elements: (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997).

To state a prima facie case of control person liability under Section 20(a) of the Act,

---

[6]  Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).

[7]  Rule 10b-5 forbids any person to "make any untrue statement of a material fact to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

[8]  Section 20 provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . .  Shall also be liable jointly and severally with and to the same extent as such controlled person...."  15 U.S.C. § 78t(a).

plaintiffs must allege: (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). To make a showing that a person is a "control person," plaintiffs must "point to facts which indicate that the defendants had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Kinder-Morgan*, 340 F.3d at 1108. Allegations that a person is the chief executive officer of a company likely satisfy the control person test, and allegations that a person is the chief financial officer of a company may also do so when a plaintiff brings claims of securities fraud relating to official reports of the company's financial performance. *Id.* "Section 20 of the Exchange Act contains no requirement that plaintiffs must prove a control person's state of mind."[9] *Id.* at 1109.

As instructed by Tenth Circuit precedent, I have reviewed all of the allegations of the First Amended Complaint and have assessed it holistically. As explained in detail above, in order to pass muster under the PSLRA, the First Amended Complaint must state with particularity facts giving rise to a strong inference or scienter. "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Level 3*, 667 F.3d at 1343. Taken as a whole, the First Amended Complaint does not create an inference of scienter that is

---

[9] "Section 20 does state that a controlling person is not liable if he acted in good faith and did not induce the acts on which the liability of the controlled person is founded. However, courts have held that these are affirmative defenses, to be pleaded and proved by defendants." *Id.* at 1109 n.5, citing *Kaplan v. Rose*, 49 F.3d 1363, 1382-83 (9th Cir. 1994); *Gould v. Am-Haw S.S. Co.*, 535 F.2d 761, 779 (3d Cir. 1976).

at least as strong as any opposing inference. For the reasons stated below, I conclude that Plaintiffs have failed to adequately allege the scienter necessary to state claims for securities fraud.[10]

At the heart of the scienter inquiry in a case like this are the allegations about what information the Individual Defendants knew and failed to report, and whether they knew or should have known that their non-disclosures were substantially likely to mislead a reasonable investor. *Novell*, 339 F.3d at 1264. In order to adequately plead scienter, Plaintiffs must allege that Drake and Childs acted *either* knowingly or recklessly. To show knowledge, Plaintiffs must sufficiently allege that Drake and Childs knew about the sales representatives' alleged bad behavior (quarter-end bulk sales, quarter-end bulk sales at deep discounts, offering of extended payment terms, permitted returns of expired products), and/or themselves engaged in bad behavior (by deliberately ignoring employee concerns about sales practices and strong market competition) and that they knew that failure to disclose the bad behavior would likely mislead investors, thus showing intent. In the alternative, Plaintiffs must allege that both the sales' representatives and Defendants' own bad behavior was so obviously material that they must have been aware that non-disclosure would likely mislead investors, thus showing recklessness. *See generally Zagg*,

---

[10] As noted above, the First Amended Complaint is one hundred and twenty-four pages long and consists of three hundred and fifty-four paragraphs. The Court appreciates the inclusion of a lengthy Table of Contents, and understands that the stringent pleading requirements of the PSLRA may not promote brevity and conciseness in drafting complaints. Nevertheless, the FAC is packed with redundant factual and legal allegations which, if omitted, would likely reduce its length by well more than half. Plaintiffs' counsel do themselves no favors by including such redundant material, which significantly prolongs judicial review. Because filing of motions to dismiss is common in securities fraud cases and because the PSLRA mandates that cases must be stayed while motions to dismiss are pending, filing of prolix complaints works against the parties' interests and should be avoided.

797 F.3d at 1202. Although recklessness may be established where a defendant ignores obvious signs of fraud, "an unseen red flag cannot be heeded." *Crocs*, 667 F. App'x at 720-722 (citing *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012); *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 574 (S.D.N.Y. 2011)). "Possession of documents and other information which . . . should have revealed red flags at most . . . raises an inference of gross negligence, but not fraud." *Id.* (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1210 (11th Cir. 2001) (internal quotations omitted)). Indeed, in order for recklessness to be adequately pled in a case asserting securities fraud claims against auditors, the Tenth Circuit has indicated that plaintiffs must cite "highly suspicious in-your-face facts that would cry out" that the company's financial status was fraudulently misrepresented. *Crocs*, 667 F. App'x at 723 (citing *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011)).

The crux of Plaintiffs' theory is that "Defendants knew or recklessly disregarded that their quarter-end bulk sales on heavy discount were ultimately unsustainable and knew of but ignored risks to sales posed by the introduction of a competing product, drug-coated balloons, to the market." FAC [#28] at ¶ 8. A careful reading of the cleverly-drafted First Amended Complaint makes clear that the overwhelming majority of allegations of fraud depend on assertions that Defendants failed to disclose to investors large amounts of quarter-end bulk sales to customers, deep quarter-end volume discounts to customers, extended payment terms, permitted returns of products (including expired products), employee concerns and the risk posed by a competing product. *Id.* at ¶¶ 6-8 194, 196, 197, 199, 203, 207, 208, 210, 213, 217, 218, 220, 222, 223, 227, 229, 231, 232, 234, 236, 238, 243, 245, 248, 250, 252, 254, 256, 258, 263, 264, 267, 269, 271, 274, 275, 276, 278,

281, 283, 288, 289.  It goes without saying that the First Amended Complaint cannot create a strong inference of the state of mind necessary to show securities fraud without sufficiently alleging that Drake and Childs knew or should have known of all of these problems.  But behind the First Amended Complaint's dense curtain of allegations relating to Spectranetics' products, business practices, finances, financial reporting and projections, Plaintiffs make very few particularized allegations about what the executives themselves knew during the relevant time frame.  At best, the totality of the allegations regarding Defendants' conduct which bear on their state of mind leaves more questions about their intent than answers.

With a pleading as lengthy and repetitive as the First Amended Complaint, the risks of attempting to list the allegations related to scienter are manifest and recognized by the Court.  By sheer volume alone, one might conclude that the document must sufficiently allege Defendants' intent to commit fraud or their recklessness in doing so.  Nevertheless, after an extremely careful review of the 124-page, 354-paragraph First Amended Complaint, the Court is more impressed by what is missing than by what is alleged.  Given the inadequacies pointed out below as to each allegation and taking them as a whole, the Court cannot conclude that Plaintiffs have sufficiently alleged scienter here.

The following allegations, either alone or in combination with others, bear on the scienter issue:

- The alleged fraud occurred over the course of (at most) approximately twenty months, from October 2013 to May 2015. ¶¶ 7, 290-293.  The Class Period encompasses approximately seventeen months, from February 27, 2014 to July 23, 2015. ¶ 1.

- During the Class Period, the size of the Company's sales force grew 240%. In June 2013, the Company had approximately 50 sales representatives.  In

June 2014, the sales force grew to 120 sales representatives.  ¶ 51.

- None of the confidential witnesses, all of whom were involved in sales of the Company's products, reported directly to Drake or Childs.  In terms of the structure of management and reporting tiers, CW1, CW6 and CW7 were at least  three tiers below Drake and Childs, and CW3, CW4 and CW5 were four tiers below. CW2's reporting structure is not specifically alleged, but he or she was "a clinical sales specialist" who is not alleged to have had any direct contact with Drake or Childs.  ¶¶ 25, 32-34, 35, 41, 42, 43.

- Company sales analysts completed daily sales reports which became more detailed as each year's quarter-ends progressed.  ¶ 27.  CW1 allegedly sent these reports to "Territory Managers, Regional Managers and above."  ¶ 28. Nowhere does the FAC specifically allege that Drake or Childs saw these reports.

- CW1 "was informed and believed that [sales] forecasts were ultimately provided to Defendants Drake and Childs and formed the basis of the Company's public sales and revenue forecasts."   ¶ 29.  But the lack of particularity as to who allegedly "informed" CW1 of this fact and when he or she did so is troubling.  Moreover, *sales forecasts* are specifically alleged to be different from *daily sales reports*.  Despite the allegation that the sales forecasts "reflected the figures [the Senior Vice President of Sales and Marketing for the Vascular Intervention business segment] was looking to achieve," Plaintiffs allege no facts from which it can be concluded that these sales forecasts (i.e., projections) were fraudulent.

- During the Class Period, Drake stated that the Company's "performance in ISR is critically important."   ¶ 53.   "ISR" means in-stent restinosis, which occurs when blockage of an artery re-forms or an artery narrows again after an angioplasty or placement of a stent. ¶ 47. The Company's vascular intervention products, which were used to treat ISR, accounted for 64% of the Company's consolidated revenue for the year ended December 31, 2014. ¶ 46.  These allegations merely reflect that the Company's CEO understood which segment of the Company's business derived the majority of its revenue.

- According to CW1, the Company's "managers and corporate executives were well aware" of channel stuffing by sales personnel, and "in fact *incentivized* sales representatives to offer quarter-end volume discounts."  ¶ 75 (emphasis in original).  "Management" was "repeatedly warned about the excessive use of bulk sales" in late 2013 and 2014.  ¶ 77. CW1 discussed concerns about quarter-end volume discounts with the Company Controller and SVP of Sales, and provided reports regarding the same to the Manager of Financial Planning and Analysis, Regional Managers, Area VPs, "and others" in April

2014.  ¶¶ 78, 79. CW1 was fired in November 2014.  ¶¶ 25,  78.  These allegations plainly fail to allege that Drake and Childs knew about channel stuffing or volume discounts, and require the reader to assume that this information somehow made its way to them.

- "CW1 was informed and believed that defendant Drake was well aware of the bulk sales and volume discounts offered at the end of each quarter because CW1 spoke with *different* sales representatives who told CW1 that Drake stressed to sales representatives that they had to meet quarterly sales targets any way possible."  ¶ 82 (emphasis in original).  The lack of specificity as to when Drake made these remarks and to whom is troubling. The fact that a CEO has allegedly, on unspecified occasions, told his sales force that they need to meet quarterly sales targets is not an indicator of fraud.  As mentioned above, the FAC contains no allegation that any sales representative ever directly told Drake or Childs about channel stuffing, volume discounts, extended payment terms, returns of expired products or employee or customer concerns about sales practices.

- CW1 told the Company Controller about "instances of product returns as they occurred, and the problem with practice of large bulk sale discounts generally, [and] . . . was informed and believed that [the Controller] had discussed this directly with Defendants Drake and Childs."  ¶ 86.  "It was evident to CW2 . . . that Defendants Drake and Childs were not only aware of these practices, *but, at times, directed sales representatives to engage in them.*"  ¶ 87 (emphasis in original).  But this allegation is merely conclusory. The FAC fails to reveal who "informed" CW1 that the Controller had discussed product returns and bulk sale discounts with Drake and Childs, or when CW1 was so informed.  Nor does the FAC reveal the date or time frame when the discussion or discussions with Drake and Childs allegedly occurred. Moreover, there is no explanation whatsoever of any occasions when Drake and Childs allegedly directed sales representatives to allow product returns and or offer bulk sale discounts. The FAC's lack of a single particularized allegation regarding this supposed conduct is a glaring omission.

- In April of 2015, CW2 wrote a letter complaining about "ethical concerns" within the Company to the "VP of Human Resources."  Among other things, CW2 complained about a Territory Manager's offer to bribe a physician by paying cash to buy products.  ¶ 34.  CW2 was subsequently contacted by a Compliance Officer who concluded that CW2 had no proof of the bribe and stated that he would "chalk it up to a bad joke."  ¶ 34.  This stand-alone allegation lacks any connection to Drake or Childs and simply does not shed light on their states of mind.

- According to CW2, who heard it from a Territory Manager, on the last day of

the second quarter of 2014, Drake and Childs called the Territory Manager and told him "*the Company was not going to make its quarterly targets unless [the Territory Manager] leveraged his customer relationships and found a customer willing to accept a bulk shipment*." The Territory Manager then "had numerous frantic phone calls and text messages back and forth between himself, Drake, Childs and [the SVP of Sales] during the final hours of the quarter as [the Territory Manager] attempted to reach and negotiate the bulk sale with [a customer]." ¶¶ 89-90 (emphasis in original). At best, this allegation establishes Drake's and Child's alleged knowledge of a single incident of a bulk sale of laser catheters to a customer in the middle of 2014. But the lack of specificity as to whether Drake and Childs knew anything about the details of the deal aside from the fact that it was a "bulk sale" is revealing. For example, there is no allegation that they specifically knew the terms of the sale, including the price paid. Nor does this allegation establish that Drake and Childs knew about any other instances of such sales, or that they knew about any price discounts, any returns of products (either pre- or post-expiration), any extended payment terms, or any customer or employee complaints about the transaction.

- CW2 "believed" that Drake and Childs met in person with customers who were considered to be "VIP customers due to their volume purchases." ¶ 92. Stunning in its lack of specificity, this allegation does not include how or why CW2 came to "believe" this, when the alleged meetings occurred, or whether the "volume purchases" were at the ends of various quarters during the Class Period. Nor does this allegation address whether the so-called "bulk deals" with the three identified customers involved volume discounts, extended payment terms, permitted returns of expired products, or customer or employee complaints.

- According to CW5, "the Company internally referred to the prevalence of bulk sales as being 'on the juice' and it was acknowledged that the Company needed to get 'off the juice.'" In addition, "[a]ccording to CW5, Drake addressed the sales representatives at sales meetings and encouraged bulk sales." CW5 recalled that "management" acknowledged during a meeting that the Company had to 'get off the juice' or stop offering bulk discounts, but sales representatives were not told to stop the practice." ¶¶ 106, 109. Despite clever drafting, these paragraphs fail to allege that Drake had any knowledge of anything besides "bulk sales," and as such sales are neither prohibited nor necessarily undesirable, the allegations are insufficient to show fraud. Plaintiffs make no attempt to appropriately particularize these allegations by further identifying which internal Company employees used this vernacular, by specifying the "sales meetings" at which Drake's alleged encouragement was given or by even stating whether Drake or Childs were part of the "management" present at the single meeting where getting "off the juice" was allegedly discussed.

- In April of 2015, Childs admitted that the slowdown in revenue growth during the first quarter of 2015 was "primarily due to ordering patterns in the office-based setting." ¶ 119. Interestingly, Plaintiffs fail to directly assert that Childs' knowledge of "ordering patterns" was knowledge of channel stuffing, although they clearly attempt to imply it. The Court is unconvinced that implying that the Company CFO admitted knowing that channel stuffing occurred in the past raises a strong inference of fraud, especially under the circumstances alleged here. Plaintiffs freely admit and assert that immediately after Childs' "admission," the Company publicly disclosed to an analyst that "management has implemented changes to its commission structure to try to discourage this kind of activity in the future." ¶ 121. This statement infers an honest attempt to address a problem at least as strongly as it infers fraud. As Plaintiffs further allege, one week later the same analyst concluded as follows: "While a bolus of orders like this late in the quarter would normally have raised some red flags, management was slow to recognize the issue. This was in part due to the fact that they were in the early stages of the ISR rollout and thus seeing good underlying demand across their customer base. . . . To prevent a problem like this from occurring again, Spectranetics has made changes to its rep compensation plan." ¶¶ 122-123. Again, the gravamen of these statements is that Company executives were distracted by rolling out a new product and vowed to fix the problem when it was discovered. Fraud cannot be strongly inferred here.

- In May of 2015, when Drake was directly challenged by an analyst about the "inflated" growth rate the Company had reported in the last quarter of 2014 and "the unique issue" (implying channel stuffing) disclosed in the first quarter of 2015, he said: "You were kind to say unique, I'll call the issues embarrassing. We had a couple of regions racing for the finish line at the end of Q4 and, frankly, I think they pulled some volume in, that should have resided in Q1." ¶ 125. First, the FAC includes no allegations whatsoever regarding Drake's or Child's involvement in bulk sales at the end of the fourth quarter of 2014. Second, this is the sole allegation in the 354-paragraph FAC that includes direct evidence of Drake's state of mind during the Class Period. But the embarrassment that results from discovery of wrongdoing may be either culpable, as in being embarrassed because one is caught red-handed (as Plaintiffs would apparently have the Court infer), or non-culpable, as in being embarrassed because one did not know of inappropriate activity of which one could have been aware. This allegation, therefore, is a good illustration of why the Court cannot conclude that the FAC raises a strong inference of scienter.

- After the discovery of bulk sales at the end of the first quarter of 2015, "Defendants failed to disclose that Spectranetics was still engaging in these bulk sales" to certain customers. ¶ 128. Again, the missing link here is Drake and Childs' alleged knowledge that channel stuffing continued. Not

only do Plaintiffs fail to directly allege such knowledge, but they make clear allegations to the contrary. For example, in July of 2015, when "the Company announced further disappointing Q2 2015 results," Plaintiffs allege that Drake was quoted in a Company press release as explaining the adjustment to the Company's 2015 financial outlook on underestimating the competition from drug-coated balloons and "our ongoing sales force optimization efforts." ¶ 131. In an earnings call on the same date, Drake stated: "We underestimated the impact of drug-coated balloons, and overestimated our ability to compete in this changing clinical paradigm." ¶ 134. When pressed for more information, he said: "Our understanding I think is clearer on the impact of drug-coated balloons and our respect for what's happening externally on that front." ¶ 142. He further emphasized the need to continue adjusting sales force goals to include "further dedicating sales reps to the peripheral and coronary markets, adding to our clinical team to improve case coverage, and our new sales and clinical teammates allow for more offensive selling capacity. This work is ongoing and will take time to have the desired effect." ¶¶ 135-136. Plain and simple, acknowledgments that the Company did not accurately assess the risk from a competitive product and that overhauling the sales force was going to take longer than anticipated do not strongly infer the presence of fraud.

- Plaintiffs likewise attempt to infer fraud from Drake's and Child's failure to recognize that introduction of a competitive product, drug-coated balloons, during the Class Period would adversely impact the Company's financial performance. Plaintiffs assert that "throughout 2014 and into 2015," these competitive products "were increasingly being used" instead of Spectranetics' products to treat the same medical conditions. ¶¶ 62-66. They further assert that although some analysts opined that FDA approval of the competitive products would "negatively impact" the Company's business, "Defendants remained bullish about the [vascular intervention] business segment and its supposed growth during the Class Period." ¶ 66. Plaintiffs assert that Defendants "downplayed and materially misrepresented the risk of potential negative effects posed by the introduction of competitive [drug-coated balloons] to the already competitive marketplace." During an October 2014 conference call, Drake told an analyst that "we believe very, very strongly that there is a complementary [sic] nature between atherectomy and drug-coated technology generally, and we think there is a bias to our atherectomy given the ISR application." ¶ 237. In April of 2015, the Company acknowledged that its business "was impacted primarily by the launch of drug-coated balloons." ¶ 273. In May of 2015, Drake stated that "the underlying strength and health" of the Company's atherectomy business "is absolutely rock solid." ¶ 292. Plaintiffs portray this as failing to acknowledge "even a *possibility* of negative impact by" drug-coated balloons. *Id.* (emphasis in original). However, they previously alleged that Childs had made just such an acknowledgment. *See* ¶ 273. Moreover, in July of 2015,

Drake flatly admitted that the Company "underestimated the impact of drug-coated balloons, and overestimated our ability to compete in the changing clinical paradigm. . . . [W]e have not seen notable pressure from [drug-coated balloons] nor have we seen complementary [sic] adoption." ¶¶ 296-298. These statements plainly express that the Company got it wrong, and that things didn't turn out the way they anticipated. As the saying goes, hindsight is 20-20. Plaintiffs even offer a glimpse at why the Company's "guidance was overstated," as they allege that Childs responded to an analyst's question in July of 2015 as follows: "[A]s we completed a deep review of the business, had field checks both with customers and the team, and did a deep review on projections for the year, in its simplest form, we just looked at the second half [of 2015] in light of the first half and felt like the adjustment was warranted." ¶ 301. Adjustment of a financial outlook after a "deep review" and "field checks" which disclose previously unknown problems or the extent of previously known issues does not equate to an intent to deceive or recklessness. These allegations amount to nothing more than an overly optimistic outlook about the effect of competition in the market. They do not suggest the scienter required to adequately allege securities fraud.

- Finally, Plaintiffs ultimately allege that Drake and Childs "acted with scienter . . . by virtue of their receipt of information reflecting the true facts regarding Spectranetics, his/her control over, and/or receipt and/or modification of Spectranetics' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Spectranetics." ¶ 306. But the conclusory nature of this allegation is not bolstered by sufficiently particularized factual allegations. As outlined above, Plaintiffs have failed to adduce facts to demonstrate that Drake and Childs received "information reflecting the true facts." Nor have they provided sufficient allegations about the executives' alleged "control" or "associations. . .which made them privy to confidential proprietary information concerning" the Company. In the absence of such allegations, there is simply no strong inference of scienter.

As explained above, the Court finds that not only are many of these allegations inadequately particularized and merely conclusory, but taken as a whole, they do not create a strong inference that Defendants acted intentionally or recklessly. At most, the allegations show that Defendants encouraged bulk sales, misjudged the strength of competition in the market and were overly optimistic about revenue growth. But Plaintiffs do not even purport to allege that Drake and Childs knew about or ignored other alleged

bad sales conduct (deep bulk sales discounts, extended payment terms, returns of expired products) or employee concerns. The Court is hard-pressed to draw any inference from these allegations that Defendants knew of or recklessly disregarded the full scope and extent of the alleged illicit behavior at Spectranetics, much less that they condoned it and defrauded investors despite it. Needless to say, in the absence of such an inference, not to mention the strong inference required by the PLSRA, Plaintiffs' claims cannot proceed.

Nor are Plaintiffs' claims rescued by sufficient allegations regarding Defendants' motive and opportunity. Plaintiffs allege nothing more than standard financial motives common to all for-profit businesses. For example, they assert that the Company announced a note offering in mid-2014 and "Defendants had to present the facade of a financially sound and growing company to support" the note offering. ¶¶ 307-309. They further assert that during the Class Period, both Defendants Drake and Childs sold and/or disposed of stock for net proceeds of millions of dollars and received incentive compensation tied to the Company's performance. ¶¶ 310-319. While "personal financial gain may weigh heavily in favor of a scienter inference," *Level 3*, 667 F.3d at 1345, the absence of any cogent allegation of a financial benefit from the alleged fraud cuts the other way. *In re Gold Resource Corp. Sec. Litig.*, 776 F.3d 1103, 1117 n.8 (10th Cir. 2015). In sum, Plaintiffs produce no convincing allegations of a motive for Defendants to engage in fraud. Under these circumstances, it is more probable that the Spectranetics executives "were overly optimistic and failed to give weight to financial red flags, for the plaintiffs supply little reason to suspect malevolence rather than benign optimism." *Spirit Aerosystems*, 827 F.3d at 1238.

"The absence of a motive allegation . . . is not dispositive, but it is relevant, and in

this case it counts against scienter." *Level 3*, 667 F.3d at 1347; *see also Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1069 (5th Cir. 1994) ("Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater.").

At the end of the day, the court must decide if a reasonable person construing the allegations as a whole would deem the inference of scienter cogent *and* at least as compelling as any plausible opposing inference one could draw from the facts alleged. *Tellabs*, 551 U.S. at 324 (emphasis added). In other words, the court must "compare the parties' dual explanations" for the alleged failures to disclose and decide which is more cogent and compelling. *See, e.g.*, *Spirit Aerosystems*, 827 F.3d at 1248. Defendants argue that they simply failed "to predict the effect of a competitors' newly approved product, DCBs, on a relatively new product line for the Company, AngioSculpt." *Motion* [#33] at 41. They state that "the facts alleged actually show that Defendants had good reason to believe that the introduction of DCBs would increase—and not decrease as Plaintiffs now claim—sales of the Company's Legacy VI Products." *Id.* at 33. They also point out that none of the confidential witnesses "is alleged to have had any contact or communicated with either Individual Defendant regarding anything alleged" in the First Amended Complaint. *Id.* at 35. They state that Defendants' stock sales were automatic pursuant to trading plans, and note that Plaintiffs fail to allege suspicious trading based on other trading patterns or the price at which the sales were made. *Id.* at 49. They say that even assuming they wanted to make the Company appear financially sound, that motive is not equivalent to a motive to commit fraud. *Id.* at 40. Taken as a whole, Defendants appear to assert that the inference to be

-24-

drawn from the failures to disclose alleged by Plaintiffs is that Defendants may have made errors in business judgment, but they did not commit fraud. In the Court's view, this inference is equally strong as any inference regarding fraud.

A final word about recklessness under the PSLRA. Plaintiffs assert that even if the facts alleged do not show that Defendants knew, at the time when the omissions occurred, that failure to reveal the channel stuffing and stiff competition would likely mislead investors, there is enough to conclude that they "acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015). They contend that the danger of misleading investors by not disclosing these facts was so obvious that Defendants must have been aware.

But recklessness "is a particularly high standard" under the PSLRA. *Dronsejko*, 632 F.3d at 668. The Tenth Circuit has noted that it is "something closer to a state of mind approximating actual intent." *Zagg*, 797 F.3d at 1206. And Plaintiffs' allegations about recklessness are overwhelmingly conclusory. For example, they assert that because "Defendants knew that the market was rapidly adopting DCBs and other technological advances were being made rapidly," that Defendants "recklessly disregarded that the amount of product that ultimately may need to be returned was unknown and could be larger than expected." ¶ 158. Plaintiffs assert in connection with the fourth quarter of 2013 and overall fiscal year 2013 that Defendants recklessly failed to disclose that the company was reliant upon an illicit channel stuffing scheme to meet its revenue targets, growth targets, and market expectations, and that the company's sales and accounting practices resulted in improper revenue recognition in violation of both GAAP and its own stated policies and procedures. ¶¶ 194, 196, 199; *see generally* ¶¶ 192-200. Plaintiffs make essentially the

same assertion regarding recklessness in connection with the first quarter of 2014 (¶¶ 203, 207, 210; *see generally* ¶¶ 201-211), the second quarter of 2014 (¶¶ 213, 217, 220, 222; *see generally* ¶¶ 212-225), the third quarter of 2014 (¶¶ 227, 231, 234, 236; *see generally* ¶¶ 226-239), the fourth quarter of 2014 and guidance regarding fiscal year 2015 (¶¶ 248, 256, 263, 264; *see generally* ¶¶ 240-265), and the first quarter of 2015 (¶¶ 267, 274, 275, 276, 288; *see generally* ¶¶ 266-293). These conclusory allegations of recklessness do nothing to advance facts demonstrating that conduct. Plaintiffs' statements made specifically about Defendants Drake and Childs' conduct are equally weak. For example, they conclusorily state that Defendant Drake recklessly failed to disclose that the company's sales practices created a material risk in that artificially inflated sales caused customer inventory levels for key products to pile up and that Defendants' practice of pushing bulk sales at quarter-end to meet revenue guidance was unsustainable and out of line with actual demand and would reasonably be expected to have a material unfavorable impact on revenues. ¶ 275. They further allege, for example, that Childs' statement that "ordering pattern'" in OBLs caused "softness" in atherectomy sales was reckless in light of his knowledge that those patterns were actually driven by the Company's own aggressive bulk sale discounting practice, but they fail to connect the dots by sufficiently alleging particularized facts to show that Childs knew about the extent of that practice. ¶ 276; *see also* ¶ 281. These and other statements and allegations of fact made in connection with those statements simply do not show the level of recklessness required to show scienter. Simply stated, even if the First Amended Complaint gives rise to *some* plausible inference of scienter, it is not the strong inference required by the PSLRA. *Tellabs*, 551 U.S. at 314. Hence, the Section 10(b) and Rule 10b-5 claims must be dismissed.

Because Plaintiffs have failed to allege "a primary violation of the securities laws," their Section 20(a) claim is also not viable. *Durango Metals*, 144 F.3d at 1305. In addition Plaintiffs failed to make an argument that their First Amended Complaint could be further amended to correct any deficiencies. Consequently, the Court is not inclined to permit further leave to amend. *See, e.g.*, *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d at 1118-19 (stating that "[t]he district court did not abuse its discretion in dismissing the complaint with prejudice where plaintiff's memorandum contained only one sentence at the very end of his brief alternatively requesting leave to amend in the event the district court should decide to dismiss his complaint").

### IV. Conclusion

For the reasons set forth above, the Motion [#33] is **GRANTED.** The claims are dismissed and the Clerk of Court is directed to close this case.

Dated: March 31, 2018

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge